UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 82-3583 |
| v. | ) ) | |
| THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, et al., | ) ) ) | |
| Defendants. | ) | |


POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

J. PAUL McGRATH
Assistant Attorney General

STANLEY S. HARRIS
United States Attorney

RICHARD K. WILLARD
Deputy Assistant Attorney General

LEWIS K. WISE
ANDREW M. WOLFE
BETSY J. GREY

Attorneys, Department of Justice
Civil Division — Room 3531
10th & Pennsylvania Avenue, N.W.
Washington, D.C.  20530
Tele:  (202) 633-4020

Attorneys for Plaintiffs United
  States of America and Anne M.
  Gorsuch

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................. 1

STATEMENT OF THE CASE .................................... 2

    A.  Executive Responsibilities For
       Enforcing The Superfund Act................... 4

    B.  EPA's Efforts To Cooperate With The
       Levitas Subcommittee Investigation ........... 9

    C.  The November 22 Subpoena ..................... 11

    D.  The Contempt Resolution and This
       Lawsuit ...................................... 14

SUMMARY OF ARGUMENT ..................................... 16

ARGUMENT ................................................ 19

    I.  This Case Presents a Justiciable Claim
      for Declaratory Relief ....................... 19

        A.  This Court Has Subject Matter
           Jurisdiction ............................. 19

        B.  Plaintiffs Have Standing ................. 24

        C.  Declaratory Relief Is Both
           Necessary and Proper ..................... 30

        D.  The Political Question Doctrine
           Does Not Require Abstention .............. 37

    II.  The Speech or Debate Clause Does Not
       Bar This Action .............................. 40

        A.  The Purpose of the Speech Or
           Debate Clause ............................ 41

        B.  Since The Relief Sought Here Would
           Not Interfere With The Legislative
           Process, The Clause Is Not Applicable .... 44

        C.  The Clause May Not Be Asserted To
           Immunize Non-Legislative Activities ...... 47

III.   Mrs. Gorsuch Properly Withheld The
       Documents In Dispute Under A Claim
       Of Executive Privilege ...................... 53

       A.   The Claim Of Executive Privilege
            Is Rooted In Separation Of Powers
            Principles And Should Be Reviewed
            By This Court ............................ 53

       B.   Executive Privilege May Be Invoked
            For Sensitive Documents In Open Law
            Enforcement Files ........................ 55

       C.   The Documents At Issue In This Case
            Are Properly Subject To A Claim Of
            Executive Privilege ...................... 65

       D.   Congress Has Not Shown A Specific And
            Compelling Need For Disclosure Of The
            Documents That Overcomes The Presumption
            Of Executive Privilege ................... 67

CONCLUSION .............................................. 71

TABLE OF AUTHORITIES

Cases                                                    Page

* Ansara v. Eastland, 442 F.2d 751
    (D.C. Cir. 1971) ........................................ 35

  Association For Women In Science
    v. Califano, 566 F.2d 339
    (D.C. Cir. 1977) ........................................ 57

  Association of Data Processing
    Service Organization v.
    Camp, 397 U.S. 150 (1970) .............................. 28

  Aspin v. Department of Defense,
    491 F.2d 24 (D.C. Cir. 1973 ........................... 59,60

* Barenblatt v. United States,
    360 U.S. 109 (1959) ................................... 43,44,54

* Black v. Sheraton Corp. of
    America, 564 F.2d 531
    (D.C. Cir. 1977) ..................................... 57,58,59

  Bristol-Myers Co. v. FTC,
    598 F.2d 18 (D.C. Cir. 1978) .......................... 26

  Buckley v. Valeo, 424 U.S.
    1 (1976) (per curiam) ................................. 53

  Carl Zeiss Stiftung v. V.E.B.
    Carl Zeiss, Jena,  40 F.R.D.
    318 (D.D.C. 1966), aff'd mem.
    sub nom. V.E.B. Carl Zeiss,
    Jena v. Clark, 384 F.2d 979,
    cert. denied, 389 U.S. 952
    (1967) ................................................ 58

  Center For National Policy Review
    on Race and Urban Issues v.
    Weinberger, 502 F.2d 370
    (D.C. Cir. 1974) .................................... 59,60,66

  Chadha v. Immigration And
    Naturalization Service,
    634 F.2d 408 (9th Cir. 1980) .......................... 53

  Clark v. Valeo, 559 F.2d 642
    (D.C. Cir. 1977) ...................................... 19

  Coastal States Gas Corp. v.
    DOE, 617 F.2d 854
    (D.C. Cir. 1980) ...................................... 26

*Cases principally relied upon

- i -

Cases                                                                 Page

Confiscation Cases, 7 Wall. 454
   (1869) ............................................... 34

Consumers Union v. FTC, No. 82-1737
   (D.C. Cir., Oct. 22, 1982) .......................... 19

In Re Debs, 158 U.S. 564 (1865) ......................... 28

DOE v. McMillan, 412 U.S.
   306 (1973) .......................................... 43,51

Eastland v. United States
   Servicemen's Fund, 421                                 42,45,51,
   U.S. 491 (1975) ....................................   52

Frankel v. SEC, 460 F.2d
   813 (2d Cir.) cert. denied,
   409 U.S. 889 (1972) ................................. 59,60

Golden v. Zwickler,
   394 U.S. 103 (1969) ................................. 30

Government Nat'l Mortgage
   Ass'n v. Terry, 608 F.2d
   614 (5th Cir. 1979) ................................. 23

* Gravel v. United States,
   408 U.S. 606 (1972) ................................. passim

Halkin v. Helms, 598 F.2d 1
   (D.C. Cir. 1978) .................................... 56

Hickman v. Taylor, 329 U.S.
   495 (1947) .......................................... 10

Inmates of Attica Correctional
   Facility v. Rockefeller,
   477 F.2d 375 (2d Cir. 1973) ......................... 35

Jabara v. Kelly, 62 F.R.D. 424
   (E.D. Mich. 1974) ................................... 59

Kaiser Aluminum & Chemical
   Corp. v. U.S., 157 F. Supp.
   939 (Ct. Cl. 1958) .................................. 58

* Kilbourn v.  Thompson, 103
   U.S. 168 (1881) ..................................... 41,44,48

Kinoy v. Mitchell, 67 F.R.D.
   1 (S.D.N.Y. 1975) ................................... 60

<u>Cases</u> <u>Page</u>

Lake Carriers' Ass'n v.
  MacMullan, 406 U.S. 498 (1972) ...................... 30,33

Maryland Casualty Co. v.
  Pacific Coal & Oil Co.,
  312 U.S. 270 (1941) ................................. 30

Myers v. United States,
  272 U.S. 52 (1926) ................................. 54

NLRB v. Robbins Tire &
  Rubber Co., 437 U.S.
  214 (1978) ......................................... 58,60

NLRB v. Sears, Roebuck &
  Co., 421 U.S. 132 (1975) ........................... 26

New York Times v. United
  States, 403 U.S. 713 (1971) ........................ 28

Newman v. United States, 382
  F.2d 479 (D.C. Cir. 1967) .......................... 35

Nixon v. Administrator of
  General Services, 433 U.S.
  425 (1977) ......................................... 56,57,58

Nixon v. Sirica, 487 F.2d
  700 (D.C. Cir. 1973) (en banc) ..................... 39,58,69

Philadelphia Resistance v.
  Mitchell, 63 F.R.D. 125
  (E.D. Pa. 1972) .................................... 59

Ponzi v. Fessenden, 258 U.S.
  254 (1922) ......................................... 34

* Powell v. McCormack, 395 U.S.
  486 (1969) ......................................... 22,47,50

Pugach v. Klein, 193 F. Supp.
  630 (S.D.N.Y. 1961) ................................ 34

Sanders v. McClellan, 463
  F.2d 894 (D.C. Cir. 1972) .......................... 35,36

Senate Select Committee v.
  Nixon, 366 F. Supp. 51
  (D.D.C. 1973) ...................................... 20

<u>Cases</u>                                                                <u>Page</u>

<u>Senate Select Committee</u> v.
  <u>Nixon</u>, 370 F. Supp. 521
  (D.D.C. 1974), <u>aff'd</u> 498
  F.2d 725 (D.C. <u>Cir.</u> 1974) ............................... <u>passim</u>

* <u>Senate Select Committee</u> v.
  <u>Nixon</u>, 498 F.2d 725
  (D.C. Cir. 1974) (<u>en banc</u>) ........................... <u>passim</u>

<u>Smith</u> v. <u>United States</u>, 375
  F.2d 243 (5th Cir. 1967),
  <u>cert. denied</u>, 389 U.S. 841
  (1967) .................................................. 35

<u>Southern Mutual Help</u>
  <u>Association</u> v. <u>Califano</u>,
  574 F.2d 518 (D.C. Cir. 1977) ........................ 25

<u>Steffel</u> v. <u>Thompson</u>, 415 U.S
  452 (1974) ............................................. 33

<u>Super Tire Engineering Co.</u>
  v. <u>McCorkle</u>, 416 U.S.
  115 (1974) ............................................. 30

<u>United States</u> v. <u>A.T. & T.</u>,
  551 F.2d 384 (D.C. Cir. 1976) ........................ <u>passim</u>

<u>United States</u> v. <u>A.T. & T.</u>,
  567 F.2d 121 (D.C. Cir. 1977) ........................ <u>passim</u>

<u>United States</u> v. <u>Brewster</u>,
  408 U.S. 501 (1972) .................................. 41,44,50

<u>United States</u> v. <u>Charles Price</u>,
  688 F.2d 204 (3d Cir. 1982) ......................... 4

<u>United States</u> v. <u>Cox</u>, 342
  F.2d 167 (5th Cir.),
  <u>cert. denied, sub nom.</u>
  <u>Cox</u> v. <u>Hauberg</u>, 381 U.S.
  935 (1965) ............................................ 34,35

<u>United States</u> v. <u>Johnson</u>,
  383 U.S. 169 (1966) ................................. 41,50,51

<u>United States</u> v. <u>Mattson</u>,
  600 F.2d 1295 (9th Cir. 1979) ....................... 23

**Cases**                                                                    **Page**

\* United States v. Nixon,
     418 U.S. 683 (1974) ........................................ passim

United States v. Reilly Tar &
     Chemical Corp., 546 F. Supp.
     1100 (D. Minn. 1982) ...................................... 4

United States v. Reynolds,
     345 U.S. 1 (1953) ......................................... 56

United States v. Seymour Recycling
     Corporation, Civil Action No.
     IP-80-457-C, (S.D. Ind. Dec. 15,
     1982) (Attachment A) ...................................... 7

United States v. Solomon,
     563 F.2d 1121 (4th Cir. 1977) ......................... 23,24,28

Valley Forge Christian College
     v. Americans United for
     Separation of Church and
     State, Inc., 454 U.S. 464
     (1982) ..................................................... 28

Watkins v. United States,
     354 U.S. 178 (1957) ................................... 43,44,54

Youngstown Sheet & Tube Co.
     v. Sawyer, 343 U.S. 579 (1952) ........................... 53

**Constitution and Statutes**

U.S. Const. Art. I, §6, cl. 1 ............................. passim

U.S. Const. Art. II, §3 ................................... passim

U.S. Const. Art. III, ..................................... passim

2 U.S.C. §192 ............................................. passim

2 U.S.C. §194 ............................................. passim

5 U.S.C. §552(b)(5) ....................................... 26

5 U.S.C. §552(b)(7) ....................................... 60

28 U.S.C. §519 ............................................ 19

- v -

Cases                                                         Page

28 U.S.C. §1331, as amended
  December 1, 1980,
  Pub. L. 96-486, §2(a), .................................. passim

28 U.S.C. §1345 ......................................... passim

28 U.S.C. §2201 ......................................... 30

Comprehensive Environmental Response,
  Compensation and Liability Act of
  1980, 42 U.S.C. §9601, et seq. ......................... passim

Fed.R.Civ.Pro. 26(b)(3) ................................. 67

Fed.R.Civ.Pro. 56 ....................................... 17

Legislative Materials

H.R. Rep. No. 968, 97th Cong.,
  2d Sess. 7 (1982) ..................................... passim

128 Cong. Rec. H10046 (daily ed.,
  Dec. 16, 1982) ........................................ 3

129 Cong. Rec. H30 (daily ed.,
  Jan. 3, 1983) ......................................... 3,16

129 Cong. Rec. H31 (daily ed.,
  Jan. 3, 1983) ......................................... 16

Rule XI, cl. 2, §§706c, 712, Rules
  of the House of Representatives
  reprinted in Constitution, Jefferson's
  Manual, and Rules of the House of
  Representatives, H.R. Doc. No. 398,
  96th Cong., 2d Sess. (1981) ........................... 65

47 Fed. Reg 20664 (May 13, 1982) ....................... 6

Miscellaneous

Executive Order 12316, Response to
  Environmental Damage, 46 Fed Reg.
  42237 ................................................. 4

Cox, Executive Privilege, 122
U. Pa. L. Rev. 1383 ..................................... 62

Note, 85 Harv. L. Rev. 1566 (1972) ..................... 23

3B Moore's Federal Practice ¶24.18 ..................... 20

2 Weinstein's Evidence ¶509[07] (1975) ................. 59

<u>Cases</u>                                                          <u>Page</u>

53 C.J.S. Libel and Slander §14 ........................... 25

40 Op. A.G. 45, 46 (194) ................................. 63

Principles of Federal Prosecution, U.S.
  Department of Justice, Part B(1)
  (July 1980) ........................................... 36

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | |
| THE HOUSE OF REPRESENTATIVES OF ) | 82-3583 |
| THE UNITED STATES, et al., ) | |
| ) | |
| Defendants. ) | |

POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

INTRODUCTION

This suit for declaratory relief raises one legal issue:  May
Congress compel an Executive Branch official to produce sensitive
materials from open law enforcement files even though the dis-
closure of those documents would, in the opinion of the President
and the Attorney General, impair the President's ability to take
care that the laws will be faithfully executed.  Although the
Executive Branch has historically withheld information of this
sort from Congress under a claim of privilege, this is the first
time in history that the Legislative Branch has cited an official
of the Executive Branch for contempt of Congress for doing so.

By this suit, we seek from the Judicial Branch a resolution
of the unprecedented constitutional impasse which now exists
between the other two coordinate branches of the federal
government.  Only judicial intervention can prevent a stalemate
between the other two branches that could result in a partial

paralysis of governmental operations. Historically, judicial resolution of controversies between Congress and the Executive has been rare, because confrontations such as the present one have been rare. Yet judicial intervention is now urgently needed, because it is the only way left to resolve in an acceptable fashion the critically important issues that give rise to this unique suit.

We ask this Court to declare that the Executive acted lawfully in withholding under a claim of privilege, certain documents sought by Congress.

### STATEMENT OF THE CASE

On December 16, 1982 -- for the first time in history -- a House of Congress held the head of an Executive agency or department in contempt. That evening, the House of Representatives voted a contempt citation against Anne M. Gorsuch, Administrator of EPA, for her refusal to furnish a limited number of sensitive law enforcement documents demanded by a subcommittee subpoena. Mrs. Gorsuch's refusal to produce these documents was based on a determination -- shared by the President and the Attorney General -- that their production would impair performance of the President's constitutional duty to "take care that the laws be faithfully executed." The House's contempt vote occurred even though its subcommittee had no basis for concluding it had a particular need for the documents in question, since it had not yet reviewed the vast number of other documents EPA was producing for it. By certifying the contempt citation to the United States

- 2 -

Attorney for this District pursuant to 2 U.S.C. §§192, 194[*/]
the House of Representatives has demanded that the Executive
Branch subject Mrs. Gorsuch to criminal prosecution for with-
holding the documents.  The Chairman of the Subcommittee has gone
so far as to threaten the United States Attorney and even the
Attorney General with impeachment unless such a criminal action is
commenced.  128 Cong. Rec. H10046 (daily ed. Dec. 16, 1982); 129
Cong. Rec. H30 (daily ed. Jan. 3, 1983).

The events leading to this extraordinary situation are not in
dispute.  They stem from an investigation by the Subcommittee on
Oversight and Investigations of the Committee on Public Works and
Transportation [the "Levitas Subcommittee"] of EPA's efforts to
enforce federal laws governing hazardous waste contamination of
water resources.  H.R. Rep. No. 968, 97th Cong., 2d Sess. 7
(1982).  The investigation included the manner in which EPA was
implementing the Comprehensive Environmental Response Compensation

---

[*/]  Section 194 of Title 2 provides in relevant part:

> Whenever a witness summoned as
> mentioned in section 192 fails to appear
> to testify or fails to produce any books,
> papers, records, or documents, as
> required,. . . [by] any committee or
> subcommittee of either House of Congress,
> and the fact of such failure or failures
> is reported to either House while Con-
> gress is in session,. . . it shall be
> the duty of the . . . Speaker of the
> House, to certify, and he shall so
> certify, the statement of facts aforesaid
> under the seal of the . . . House . . .
> to the appropriate United States
> attorney, whose duty it shall be to bring
> the matter before the grand jury for its
> action.

- 3 -

and Liability Act of 1980, 42 U.S.C. § 9601 et seq., commonly
known as "the Superfund Act."

### A. Executive Responsibilities For Enforcing The Superfund Act.

The Superfund Act was designed to provide the federal
government with the tools to abate the risks posed by hundreds of
inactive and abandoned hazardous waste sites across the country.
The Act provides two basic mechanisms by which the federal
government may effect the cleanup of such sites. One mechanism
allows the government to expend money from the $1.6 billion
"Superfund," which is derived from congressional appropriations
and taxes on crude oil, petroleum products and certain chemical
products. See 42 U.S.C. §9631. Once spent, the money may be
recovered from parties made liable for the cleanup costs pursuant
to Section 107 of the Act. See 42 U.S.C. §9607. The second
mechanism authorizes the President to require the Attorney General
to institute judicial proceedings to "secure such relief as may be
necessary to abate" an imminent and substantial danger to the
public health or welfare or the environment. See 42 U.S.C. §9606.
See generally United States v. Charles Price, 688 F.2d 204 (3rd
Cir. 1982); United States v. Reilly Tar & Chemical Corporation,
546 F. Supp. 1100 (D. Minn. 1982). Declaration of Robert M. Perry
("Perry Dec."), submitted herewith, para. 4.

On August 14, 1981, President Reagan issued Executive Order
12316, "Responses to Environmental Damage." By that order, the
President delegated part of his authority to carry out the
provisions of the Superfund Act to the Administrator of EPA.
Pursuant to that delegation, EPA now has the authority to identify

- 4 -

hazardous waste sites and to determine, among other things, the parties potentially responsible for the generation of the hazardous wastes located there.  The Administrator of EPA may request the Attorney General to institute judicial actions, but only the President may require him to do so.  See 42 U.S.C. §9606.  Perry Dec., para. 5.

At bottom, both mechanisms are part of an overall law enforcement effort designed to protect the public health and welfare and the environment from the effects of the release or threatened release of hazardous substances which may present an imminent and substantial danger.  42 U.S.C. §9604(a).  In addition to the institution of judicial proceedings, the Act provides broad enforcement powers, authorizing the President or his delegate to issue administrative orders necessary to protect the public health and welfare or the environment and to require designated persons to furnish information about the storage, treatment, handling or disposal of hazardous substances.  See 42 U.S.C. §§9606, 9604(e)(1).  The Act also contains criminal penalties.  42 U.S.C. §9603.  Perry Dec., para. 6.

As with any new program, the implementation and enforcement of the Superfund Act has required the government to put into place the policies and personnel needed to carry out the statutory mandates.  In the two years since the Superfund Act became law, EPA has pursued the implementation of this new statutory mandate with vigor.  It has developed and published the National Contingency Plan required by Section 105 of the Act, 42 U.S.C. § 9605, which serves as the basis for Superfund-financed cleanups.

- 5 -

See 47 Fed. Reg. 31180 (July 16, 1982). It has developed an Interim Priorities List identifying the 160 sites which pose the greatest risk to the public health and welfare and the environment. With assistance and input from the states, EPA has recently published a proposed National Priorities List identifying the 418 sites which, in EPA's judgment, require priority in use of the Superfund to effect cleanup. See 47 Fed. Reg. 58476 (December 30, 1982).*/ It has developed and published enforcement guidelines, as required by Section 106 of the Act, in consultation with the Attorney General. See 47 Fed. Reg. 20664 (May 13, 1982). Perry Dec., para. 7.

EPA has also pursued the enforcement of the Superfund Act. Since the passage of the Act, EPA has sent more than 1,760 notice letters, undertaken Superfund-financed action at 112 sites involving the obligation of more than $236 million, instituted Superfund claims in 25 judicial actions and obtained two criminal convictions. In its hazardous waste site efforts, the government has reached settlements in 23 civil actions providing for the expenditure of more than $121 million to conduct cleanup opera-tions. In addition, the Agency and the Department are actively negotiating with responsible parties concerning the cleanup of 56 sites around the country. A recent judicial decision under the

---

*/ The National Priorities List is required by Section 105(8)(B) of the Act, 42 U.S.C. §9605(8)(B). Completion of the list must be preceded by notice and opportunity for public comment, 42 U.S.C. §9605, para. 1, and may also be subject to legislative veto. 42 U.S.C. §9655. It is not yet known when the preparation of the National Priorities List will be completed.

Superfund Act termed the government's approach in these cases "reasonable from the standpoint of the long-range public inter-est." <u>United States</u> v. <u>Seymour Recycling Corporation</u>, Civil Action No. IP-80-457-C, ____ F. Supp. ____, (S.D. Ind. Dec. 15, 1982) Slip Op. (Attachment A hereto), 17. Perry Dec., para. 8.

EPA's goal in the implementation of the Superfund Act is, of course, to effect cleanups as expeditiously as possible for the protection of the public health and welfare and the environment. Since the Superfund cannot pay for the cleanup of all sites and since enforcement litigation is complex and time-consuming, EPA has adopted an approach which seeks in the first instance to obtain cleanup from parties it has identified as being responsible for or having contributed to the presence of hazardous substances at the sites. If voluntary cleanup cannot be achieved, the Agency then determines whether it will spend Superfund monies and sue for cost recovery under Section 107 or use its enforcement authority under Section 106 to obtain cleanup. Perry Dec., para. 9.

Before any meaningful contact with responsible parties can occur or administrative or judicial enforcement proceedings can be initiated, substantial time must be spent on investigation and case preparation. Of necessity, this is a time-consuming, resource-intensive process. It includes studying the nature and extent of the hazard present at sites, identifying potentially responsible parties and evaluating the evidence which exists or must be generated to support government action. This initial investigation is conducted by EPA attorneys and technical staff. Since many sites have literally hundreds of "generators" --

parties who produced or sent hazardous substances to the site --
the initial investigation of such a site typically will consume
hundreds of hours and involve the examination of tens of thousands
of documents.  Perry Dec., para. 10.

Each continuing investigation is treated by EPA as an
enforcement matter, since the government will, in almost every
instance, proceed against responsible parties either for cost
recovery or for injunctive relief.  Moreover, even where voluntary
settlements are obtained, EPA develops a strategy for conducting
negotiations which is part of its overall enforcement effort.  The
staff which conduct the investigations are part of the Office of
Enforcement Counsel and the Office of Solid Waste and Emergency
Response, which are charged with the development and implementa-
tion of EPA's enforcement program in the hazardous waste area.  At
an early stage in the case development process, prior to the time
EPA formally refers a case for the institution of judicial
enforcement proceedings, a Department of Justice attorney is
assigned to assist in the case evaluation and development process.
Perry Dec., para. 11; Declaration of Carol E. Dinkins ("Dinkins
Dec."), attached hereto, para. 5.

Once a case strategy has been developed, EPA notifies
responsible parties that it intends to take action at the site
unless they undertake an adequate program to clean up the site.
Typically, following the issuance of notice letters, EPA enters
into negotiations with responsible parties to reach an agreement
which would require those parties to clean up the site.  Such
negotiations may involve hundreds of potentially responsible

parties and millions of dollars in cleanup costs.  Moreover, EPA may settle the case with some but not all parties and then have to continue negotiations as to the remaining parties.  Perry Dec., para. 12.

Because the enforcement process can be lengthy and extremely complex, an enormous amount of paperwork is generated.  This includes data on the amounts, nature, and origin of waste present at a site; records of interactions with state and local government officials; records of the storage or disposal facility itself, as well as of the generators, treaters, transporters, and handlers of the substances which found their way to the sites.  It also includes correspondence with responsible parties, contractors, state officials, and representatives of other federal agencies, legal opinions and interpretations, internal memoranda on such matters as negotiation strategy, rights and remedies of the parties, case strengths and weaknesses, and notes and logs from meetings and telephone conversations.  Perry Dec., para. 13.

    B.  EPA's Efforts To Cooperate With The
        Levitas Subcommittee Investigation

On March 10, 1982, the Levitas Subcommittee opened a series of hearings on certain environmental matters, including implementation of the Superfund Act.  H.R. Rep. No. 968, 97th Cong., 2d Sess. 7 (1982).*/  Several EPA officials testified at numerous hearings before the Subcommittee and numerous EPA documents were made available to the Subcommittee.  Id. at 9.

_____

*/   That report, hereafter "the Committee Report," is the Committee's official account of the alleged contempt of Congress by Mrs. Gorsuch.

The only documents not made available to the Subcommittee were documents from certain law enforcement files. Id. at 11.

Apparently unhappy with this limitation, Subcommittee Chairman Levitas sent a letter to Mrs. Gorsuch on September 15, 1982 requesting "all [Superfund] information being reported to or otherwise being obtained by the U.S. Environmental Protection Agency or any others acquiring such information on behalf of the agency." Perry Dec. 15 and Exhibit A.

In response to the Subcommittee's concerns, EPA made available to the Subcommittee almost all the documents from EPA's files on the 160 interim priority sites. EPA declined, however, to produce a small number of documents generated by government attorneys and other enforcement personnel in the development of potential litigation. Those documents, which were part of open law enforcement files, include sensitive memoranda and other sensitive papers which identify parties potentially liable under the Act and which discuss the strengths and weaknesses of the government's case against them, legal issues, anticipated defenses, timetables and other enforcement plans, negotiation and litigation strategy, the names of potential witnesses, their anticipated testimony and other evidentiary matters. Perry Dec., para. 16. In short, EPA withheld documents which in litigation would be characterized as sensitive attorney work-product material.*/

---

*/   See Hickman v. Taylor, 329 U.S. 495 (1947). While we believe that the sensitive work-product nature of these documents is more than amply established by the declarations submitted herewith, we are willing to submit the documents to the Court for an in camera inspection should the Court determine that such an examination is necessary.

After this, there were a number of meetings, exchanges of letters and telephone conversations between the Subcommittee, on the one hand, and EPA and the Department of Justice on the other. EPA sought to accommodate the Subcommittee's concerns about the withheld documents in a manner which would meet the need to prevent their premature disclosure. The Subcommittee attempted to assure EPA that, if EPA produced those documents to the Subcommittee, an effort would be made to preserve their confidentiality. However, such documents, if produced, could be disclosed to other members of Congress and that Congress could decide to make the documents public even if EPA objected. Perry Dec., para. 19, Exhibit B, Exhibit C at 1-2 and Exhibit E at 7.

C.   The November 22 Subpoena

On November 22, 1982, the Committee served on Mrs. Gorsuch a subpoena calling for her to appear before the Subcommittee on December 2, 1982 and to produce at that time the following described documents:

> all books, records, correspondence,
> memorandums, papers, notes and
> documents drawn or received by the
> Administrator and/or her
> representatives since December 11,
> 1980, including duplicates and
> excepting shipping papers and other
> commercial or business documents,
> contractor and/or other technical
> documents, for those sites listed as
> national priorities pursuant to
> Section 105(8)(B) of [the Superfund
> Act.]

Perry Dec., para. 20 and Exhibit D.   Even though EPA had not promulgated the above-mentioned statutory list of national priority sites, EPA nonetheless undertook, as a matter of

- 11 -

accommodation to the Subcommittee, to begin to gather all docu-
ments pertinent to the Agency's Interim Priorities List of 160
sites.  Some of those 160 cases were at that time in litigation
while others were in earlier stages of development and
negotiation.  While gathering those documents, EPA segregated
sensitive law enforcement documents for separate review.  Perry
Dec., para.  21.

Because the incipient controversy was assuming more critical
significance, it was brought to the attention of the Attorney
General and by him to the President at this time.  Perry Dec.,
para. 22.  After reviewing the matter, President Reagan wrote
Mrs. Gorsuch instructing her to cooperate with the Subcommittee to
the fullest extent possible.  He also instructed her, however,

> that sensitive documents found in
> open law enforcement files should
> not be made available to Congress
> or the public except in extraordi-
> nary circumstances.  Because
> dissemination of such documents
> outside the Executive Branch would
> impair my solemn responsibility to
> enforce the law, I instruct you and
> your agency not to furnish copies of
> this category of documents to the
> Subcommittee in response to their
> Subpoena.

Perry Dec., para. 23 and Exhibit E.

On the day the President wrote his memorandum to
Mrs. Gorsuch, the Attorney General sent a letter to Chairman
Levitas indicating that

> "it has been the policy of the
> Executive Branch throughout this
> Nation's history generally to
> decline to provide committees of

- 12 -

> Congress with access to or copies
> of law enforcement files except in
> the most extraordinary circumstances."

Perry Dec., para. 23 and Exhibit F.   The Attorney General

explained that

> "[o]ur policy is premised in part on
> the fact that the Constitution vests in
> the President and his subordinates the
> responsibility to 'take care that the
> laws be faithfully executed.'  . . .
> At bottom the President has a
> responsibility vested in him by the
> Constitution to protect the
> confidentiality of certain documents
> which he cannot delegate to the
> Legislative Branch."

Ibid.

Upon receiving this instruction, EPA intensively reviewed

sensitive law enforcement documents from its open Superfund law

enforcement files to insure that no documents would be withheld

from the Subcommittee except as instructed by the President.

Those documents which EPA determined were subject to the Presi-

dent's instruction were also reviewed by the Department of Justice

under the supervision of the Assistant Attorney General of the

Land and Natural Resources Division.   Perry Dec., para. 24.   As of

December 15, 1982, EPA and the Department of Justice identified

sixty-four documents, the disclosure of which would impair the

government's ability to enforce the Superfund Act.   These

documents were therefore withheld from the Subcommittee.   Perry

Dec. paras. 16-18 and 24; Dinkins Dec., paras. 5-9.   The

Subcommittee was provided with lists which identified each of

those sixty-four documents and briefly explained why each document

was being withheld.   Perry Dec., para.  26 and Exhibit G.

- 13 -

On December 2, 1982 Mrs. Gorsuch appeared before the Sub-
committee as instructed by the subpoena. She advised the
Subcommittee that the documents requested by the subpoena (docu-
ments concerning "those sites listed as national priorities
pursuant to Section 105(8)(B)" of the Superfund Act) did not
exist, because EPA had not yet listed any sites as national
priorities pursuant to that section. Perry Dec., Exhibit C at 3.
Nevertheless, she explained that EPA had "in a spirit of coopera-
tion and comity" already begun to gather its files on the 160
interim priority sites and would make more than 750,000 pages of
documents available to the Subcommittee. Ibid. She brought with
her to the hearing, and tendered to the Subcommittee, the first
five file boxes of such documents, but the Subcommittee declined
to accept delivery of those documents. Id. at 6. Indeed, neither
at that time nor at any subsequent time has the Subcommittee asked
to examine any of the documents Mrs. Gorsuch brought to the
hearing or offered to produce thereafter. Perry Dec., para. 25.

At the hearing, Mrs. Gorsuch also advised the Subcommittee
that "sensitive documents found in open law enforcement files will
not be made available to the Subcommittee," citing the President's
instructions to her. Perry. Dec., para. 26 and Exhibit C at 5.

D.   The Contempt Resolution and This Lawsuit

At the conclusion of its December 2 hearing, the Subcommittee
passed a resolution finding Mrs. Gorsuch to be in contempt for
failure to comply with its subpoena. The Subcommittee reported
the matter to the full Committee. Perry Dec., para. 27 and
Committee Report at 57.

- 14 -

A final attempt was made to resolve the impasse between the Subcommittee and the Executive Branch at a meeting on December 8, 1982, but that attempt was unsuccessful.  The Subcommittee's final proposal contemplated that its members and staff would have unrestricted access to sensitive documents from open law enforcement files.  The Executive Branch, although willing to subject all such documents to an elaborate screening process within the Executive Branch to insure that no document would be improperly withheld, was unwilling to permit the requested Subcommittee examination because it contemplates

> that the President will lose control
> over the contents of material which
> those who assist him in enforcing the
> law have determined to be in a narrow
> category of documents the release
> of which would adversely affect
> the Executive Branch's ability
> to enforce the law.

Perry Dec. para. 28 and Exhibit H; Committee Report at 22-23.

On December 10, 1982, the Committee reported Mrs. Gorsuch's alleged failure to comply with the subpoena to the full House of Representatives together with a recommendation that she be cited for contempt of Congress.  On December 16, the House of Representatives passed a resolution citing Mrs. Gorsuch for contempt of Congress.  On December 17, the Speaker and Clerk of the House certified the contempt citation to the United States Attorney for this District for criminal prosecution pursuant to 2 U.S.C. §§192 and 194.  Late that evening, the certification was delivered to the United States Attorney by the House Sergeant at Arms.  Perry Dec., paras. 29-31; Declaration of Stanley S. Harris ("Harris Dec."), para. 2 and Exhibit A; Committee Report, 57 and 70.

On December 27, 1982, the United States Attorney advised Speaker O'Neill of his conclusion that "it would not be appropriate for me to consider bringing this matter before a grand jury until the civil action has been resolved." Harris Dec., para. 3 and Exhibit B. Chairman Levitas subsequently called for the impeachment of the Attorney General and the United States Attorney. 129 Cong. Rec. H30-31 (daily ed., January 3, 1983) (Attachment B hereto). On January 5, 1982, Speaker O'Neill wrote a letter to the United States Attorney, asserting that the pendency of this civil action did not alter the United States Attorney's duty to prosecute Mrs. Gorsuch. Harris Dec. para. 3 and Exhibit C.

The Executive filed this action on December 16, 1982, minutes after the House vote of contempt, seeking both declaratory and injunctive relief. On December 29, the Executive filed an amended complaint, seeking declaratory relief only with respect to defendants' efforts to compel production of the withheld documents. On December 30, defendants filed a motion to dismiss the complaint.

## SUMMARY OF ARGUMENT

This case is unique. There has rarely been a sharper confrontation between the Legislature and the Executive, and never one quite like this. Accordingly, while we are seeking what may appear to be extraordinary relief, that is because this is an extraordinary situation.

The House subpoena sought a broad array of documents concerning numerous open enforcement actions. EPA sought to accommodate the Subcommittee's needs by producing files on its 160

interim-priority cases.  These files -- consisting of more than 750,000 pages of documents -- spell out in detail the technical background, parties, and procedural status of each matter.  The only papers the Executive balked at turning over were a small minority of documents that are the most sensitive kind of prosecutorial work-product.  Any leakage of such documents to the public or potential targets of EPA and the Justice Department could seriously undermine the integrity and effectiveness of law enforcement efforts.

The Subcommittee was urged to review the files being produced to see whether the additional few documents being withheld were essential for any legitimate oversight function.  In addition, the Subcommittee was promised that the withheld documents would be made available once they were no longer enforcement sensitive.  However, without establishing any need for immediate access to the withheld documents, the House -- in the midst of the Lame Duck session -- rushed to cite Mrs. Gorsuch for contempt of Congress and to demand that she be criminally prosecuted.

Only the Judiciary can resolve the resulting constitutional controversy, which reached a total impasse when the House of Representatives took the unprecedented step of citing an Executive official for contempt of Congress solely for following the instructions of the President that certain documents not be disclosed in order to preserve the ability of the Executive Branch faithfully to execute the law.  By this motion for summary judgment,*/ the United States and Mrs. Gorsuch seek a

--------

*/  Summary judgment is appropriate pursuant to Rule 56, Fed.R.Civ.P. because there is no "genuine issue as to any material fact" and the plaintiffs are entitled to judgment as a "matter of law."

declaration that the Executive Branch's refusal to release certain highly sensitive materials contained in open law enforcement files is fully in accordance with the law, so that the "unseemly" situation of a high-level Executive Branch official being cited for contempt of Congress and threatened with prosecution can be resolved.*/

Such relief is available in this unique situation, as will be demonstrated below. First, the controversy is ripe for judicial review, because no further steps remain in the subpoena enforcement process and the other two branches of government are at complete loggerheads. The Executive has asserted a constitutional privilege to withhold the documents, and Congress is doing all it can to require the Executive to forego the privilege and to turn over the documents. Thus judicial review is necessary to determine the right of the Executive to assert the privilege and to vindicate that right if the Executive has properly asserted it. Second, this action may be pursued against the House and its members despite the Speech or Debate Clause of the Constitution, Art. I, §6, cl. l, because the Court is not being asked to interfere with ongoing congressional action but merely to review the validity of efforts to enforce a complete legislative act. Finally, on the merits of the controversy, the refusal of the Executive Branch to produce the documents was properly based upon well-recognized separation of powers principles.

---

*/ See United States v. Nixon, 418 U.S. 683, 691-92 (1974).

- 18 -

ARGUMENT

I.   This Case Presents a Justiciable Claim
     For Declaratory Relief

A.   This Court Has Subject Matter Jurisdiction

Subject matter jurisdiction for this suit is properly based on 28 U.S.C. §1331, because all of plaintiffs' claims arise from the Constitution and laws of the United States, and on 28 U.S.C. §1345, because this action was commenced by the United States. Defendants' arguments to the contrary are based on irrelevant cases and a confusion between subject matter jurisdiction and cause of action.[*]/

That this Court has subject matter jurisdiction over this case is confirmed by the Court of Appeals' decision in United States v. A.T.& T., 551 F.2d 384 (D.C. Cir. 1976). There the court held that an action brought by the United States to vindicate a claim of Executive privilege asserted against a congressional subpoena presented a claim arising under the Constitution

---

[*]/ Defendants make the strange assertion that the Executive did not properly sue in the name of the United States. That assertion is wrong because the Attorney General here seeks to vindicate constitutional and legal rights of the President and two Executive Branch agencies. See 28 U.S.C. §§515-19; Senate Select Committee v. Nixon, 336 F. Supp. 51, 56-57 (D.D.C. 1973). The Executive historically has participated in ligitation against the Legislative Branch in the name of the United States. See, e.g., Consumers Union v. FTC, No. 82-1737 (D.C. Cir., Oct. 22, 1982); Clark v. Valeo, 559 F.2d 642 (D.C. Cir. 1977); United States v. A.T.& T., 551 F.2d 384 (D.C. Cir. 1976).

- 19 -

of the United States and, hence, under §1331.   Id. at

389.[*]/   Using language applicable here the court stated at

389 that:

> Other decisions dealing with interbranch
> conflict have not discussed the problem of
> jurisdiction, but have nevertheless reached the
> merits.  It seems to be assumed that these cases,
> dealing with the powers and relations of the
> branches of the United States, are maintainable
> in federal court, if justiciable at all.  We need
> not resolve this question for we find subject
> matter jurisdiction under 28 U.S.C. §1331.

Defendants rely upon the first decision in Senate Select

Committee v. Nixon, 366 F. Supp. 51 (D.D.C. 1973), in which a

Senate Committee's attempt to enforce a congressional subpoena was

dismissed for lack of subject matter jurisdiction.  Defendants'

Brief at 33-34.  As defendants recognize, the court in that case

rejected jurisdiction under §1331 for failure to satisfy the

$10,000 amount-in-controversy requirement then applicable.  366

F. Supp. at 59-61.[**]/   However, §1331 was subsequently

---

[*]/   Defendants attempt to distinguish A.T.& T. on two grounds.
Defendants' Brief at 43.  First, they suggest that A.T.& T.'s
jurisdictional holding should be limited to cases in which Execu-
tive privilege is claimed on national security grounds.  However,
this is an argument on the merits, i.e., that there is no Execu-
tive privilege for law enforcement materials.  Defendants' second
argument is that A.T.& T should be distinguished because the
congressional party in that case intervened as a defendant and was
not originally sued.  This purported distinction is irrelevant
since the requirement of subject matter jurisdiction is as applic-
able to intervenors as to original parties.  See 3B Moore's
Federal Practice ¶24.18.

[**]/   After enactment of a special jurisdictional statute, the
court considered the Committeee's claim and rejected it on the
merits.  370 F. Supp. 521 (D.D.C. 1974), aff'd, 498 F.2d 725 (D.C.
Cir. 1974).

amended to eliminate the amount-in-controversy requirement for federal question jurisdiction. See 28 U.S.C. §1331, as amended Dec. 1, 1980, Pub. L. 96-486, §2(a), 94 Stat. 2369. This amendment to the jurisdictional statute thus eliminates any barrier to federal question jurisdiction over the present case.

Defendants also argue that there is no legislative history showing a specific congressional intent to confer jurisdiction on the federal courts to decide inter-branch suits. In particular, defendants advert to several proposals rejected by the Congress which would have conferred upon the courts a specific grant of jurisdiction for the civil enforcement of legislative subpoenas. Defendants' Brief at 34-35, 39-41. Yet the failure of Congress to enact such a statute is hardly surprising in view of the broad grant of jurisdiction created by §1331, as amended in Pub. L. 96-486, §2(a), 94 Stat. 2369, Dec. 1, 1980. Congress could not have been expected to enumerate every cause of action covered by such a general jurisdictional statute and did not attempt to do

so.  Indeed, this same argument was rejected by the Supreme Court in Powell v. McCormack, 395 U.S. 486 (1969).  In that case, the defendants alleged that the Court lacked subject matter jurisdiction under 28 U.S.C. §1331 because the legislative history underlying that provision did not expressly state that it applied to suits questioning the exclusion of Congressmen from the House of Representatives.  The Court first noted that "it has generally been recognized that the intent of the drafter was to provide a broad jurisdictional grant to the federal courts."  Id. at 515. It then found that because the resolution of that case "depend[ed] directly on construction of the Constitution [and the] Court has consistently held such suits are authorized by [§1331]," id. at 516, the Court had subject matter jurisdiction over the lawsuit. Similarly, resolution of this dispute "depends directly on construction of the Constitution" and accordingly, subject matter jurisdiction lies under §1331.*/

In addition to federal question jurisdiction, §1345 also provides a basis for subject matter jurisdiction of the present

---

*/   Defendants also argue that no cause of action should be implied from §1331.  Defendants' Brief at 36-41.  This perplexing argument confuses the issue of subject matter jurisdiction with the existence of a cause of action.  Plaintiffs have never asserted that their cause of action is implied under §1331.  See Powell v. McCormack, 395 U.S. 486, 512-516 (1969).

case.*/   That section provides as follows:

> Except as otherwise provided by Act
> of Congress, the district courts
> shall have original jurisdiction of
> all civil actions, suits or
> proceedings commenced by the United
> States, <u>or by any agency or officer
> thereof expressly authorized to sue
> by act of Congress</u>.   (Emphasis added.)

Defendants argue that this jurisdictional basis is unavailable
because the final clause -- "expressly authorized to sue by act of
Congress" -- is not satisfied.  However, defendants misconstrue
this section because that clause modifies the phrase "any agency
or officer thereof" and not the phrase "the United States."  <u>See
generally</u> Reviser's Notes, 28 U.S.C. §1345; <u>Government National
Mortgage Association</u> v. <u>Terry</u>, 608 F.2d 614 (5th Cir. 1979).  <u>See
also</u> <u>United States</u> v. <u>Mattson</u>, 600 F.2d 1295, 1299 (9th Cir.
1979); <u>United States</u> v. <u>Solomon</u>, 563 F.2d 1121, 1126 (4th Cir.
1977); Note, 85 Harv. L. Rev. 1566 (1972).

Defendants rely principally on <u>United States</u> v. <u>Mattson</u>,
<u>supra</u>, and <u>United States</u> v. <u>Solomon</u>, <u>supra</u>, for the proposition
that §1345 provides no additional capacity to the United States to
sue "unless another statute expressly authorizes it."  Defendants'
Brief at 43.  Yet both those cases recognized that where no
statute expressly authorizes suit, "the government can sue if it
has some interest that can be construed to warrant an implicit
grant of authority."  <u>United States</u> v. <u>Mattson</u>, 600 F.2d at 1298.

---

*/   In <u>United States</u> v. <u>A.T.&T.</u>, the court found it unnecessary to
decide whether §1345 furnished a basis for jurisdiction, since it
found jurisdiction under §1331.   551 F.2d at 388-89.

See United States v. Solomon, 563 F.2d at 1126.   The courts in

both cases rejected a claim of a nonstatutory grant of authority

to sue on behalf of mentally retarded patients in state hospitals

because the government could not allege an injury in fact suffi-

cient to grant standing to bring suit or to imply a nonstatutory

cause of action on behalf of the United States.   It is not argued

here that §1345 grants the United States a cause of action.

Rather, as demonstrated below, the United States and Mrs. Gorsuch

can demonstrate sufficient harm to judicially cognizable interests

to demonstrate standing to maintain this lawsuit.

## B.   Plaintiffs Have Standing

Plaintiffs have standing to sue because they have sustained

injury-in-fact that is directly traceable to the conduct of

defendants and which only the courts can adequately remedy.

Although defendants prefer that this controversy be resolved by

subjecting Mrs. Gorsuch to a criminal prosecution, requiring such

a draconian solution "would be unseemly, and would present an

unnecessary occasion for constitutional confrontation between two

branches of the government."   United States v. Nixon, 418 U.S.

638, 691-92 (1974).

Mrs. Gorsuch has been cited for contempt by the House, which

has submitted the matter to the Executive for prosecution.

Indeed, even if she is never prosecuted by the Executive, the

House's contempt citation, in and of itself, more than amply

- 24 -

establishes the immediacy of this controversy.  The House vote
represents a formal determination by a co-equal branch of our
government that the head of an Executive agency has failed to
comply with the law.  That citation thus stands as an accusation
by the House of Representatives that an Executive officer has
committed a criminal act in discharging her official duties as
Adminstrator of the EPA.[*]  The effectiveness of any high-
level executive official is, at least in part, dependent upon the
establishment of relations with the Legislative Branch free of the
sort of coercion reflected by a contempt of Congress citation.
These injuries are all concrete, direct and immediate and can only
be redressed through judicial resolution.

In addition to the injury to Mrs. Gorsuch in her capacity as
Administrator of EPA, the plaintiff United States has also
suffered a legally cognizable injury.  Here, the injury to the
Executive Branch and its agencies is an unprecedented interference
with its responsibility for faithful execution of the laws and
derogation of its independence from a co-equal branch of govern-
ment.  The protection of these sensitive law enforcement files is
necessary because "[h]uman experience teaches that those who
expect public dissemination of their remarks may well temper

---

[*]  Indeed, under well-established common law principles, the
imputation of criminal behavior to an individual is generally
considered defamatory per se and actionable without proof of
special damages.  53 C.J.S. Libel and Slander §14.  The Court of
Appeals for this Circuit has held that damage to one's "good name
and reputation" constitutes injury in fact for Article III
purposes.  Southern Mut. Help Ass'n v. Califano, 574 F.2d 518, 524
(D.C. Cir. 1977).  Here, Mrs. Gorsuch's reputation for fidelity
to the rule of law has been seriously impugned by the contempt
citation of the House.

candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." United States v. Nixon, 418 U.S. 683, 705 (1974). As the Supreme Court found in an analogous context, the purpose of the privilege "is to prevent injury to the quality of agency decisions." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151 (1975).

NLRB v. Sears Roebuck & Co. involved Exemption 5 of the Freedom of Information Act, 5 U.S.C. §552, as applied to protect the deliberative process and work-product of the government from disclosure. The Court found that the exemption is necessary to preserve the efficacy of the decisionmaking process and to encourage the free exchange of ideas within the agency without the threat of public scrutiny. Id. at 150. See Coastal State Gas Corp. v. DOE, 617 F.2d 854, 866-69 (D.C. Cir. 1980); Bristol-Myers Co. v. FTC, 598 F.2d 18, 23-24 (D.C. Cir. 1978). In Coastal States Gas Corp. v. DOE, the Court recognized another reason for the exemption:

> to protect the adversary trial
> process itself. It is believed that
> the integrity of our system would
> suffer if adversaries were entitled
> to probe each other's thoughts and
> plans concerning the case. Cer-
> tainly less work-product would be
> committed to paper which might harm
> the quality of trial preparation.
> [617 F.2d at 864.]

Without judicial intervention here, the threat to the integrity of the enforcement efforts and decisionmaking process of EPA and the Department of Justice under the Superfund law becomes very real.

The threat of premature disclosure if the Executive loses control over sensitive law enforcement documents can well be expected to inhibit actions of all participants in the law enforcement process.  It is likely, for example, that outside sources of information will not cooperate as freely due to the fear of possible premature disclosure; that parties responsible for the hazardous waste sites will avoid settlement negotiations and await possible disclosure of the government's settlement strategies, and that staff attorneys may shrink from conducting a candid and thorough evaluation of an enforcement action where those evaluations may be disclosed before the case has been completed.  Accordingly, the threat that the Executive will lose control over enforcement file materials creates a present uncertainty as to the overall independence and integrity of the law enforcement process.  See Perry Dec., paras. 32 and 33.  Such uncertainty and the consequent harm to the enforcement process constitutes an injury-in-fact to the Executive's ability to execute the law and, hence, to the welfare of the general public.

Defendants argue that the United States does not have standing, absent a statute, unless the case involves either a contractual or proprietary interest of the government, or harm to the national security or public welfare.  Defendants' Brief at 46-49.  Even if this were the correct standard, the harm to the public welfare threatened by enforcement of defendants' subpoena is sufficient to confer standing upon the United States as

plaintiff, in accordance with such cases as In re Debs, 158 U.S. 564 (1895), and New York Times v. United States, 403 U.S. 713 (1971). There could be no greater harm to the public welfare than disruption of law enforcement activity by the Executive Branch.[*]  The United States -- unlike other plaintiffs -- has authority to sue on behalf of the public welfare under Debs and its progeny. For this reason, the United States can bring suit to vindicate rights shared by the people in common or "generalized grievances," for which private individuals or organizations would not have standing.  Cf. Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464 (1982).[**]

---

[*]  Of course, this argument in favor of standing presumes that plaintiffs have a good case on the merits. Such a situation is not uncommon, however, where the existence of a legally cognizable injury is effectively the same as the ultimate legal issue in the case. See Association of Data Processing Service Organizations v. Camp, 397 U.S. 150 (1970).

[**]  For this reason, United States v. Solomon, 563 F.2d 1121 (4th Cir. 1977), cited by defendants, is inapposite. In Solomon, the court found that no nonstatutory grant of authority existed to sue on behalf of mentally retarded patients in state hospitals because, among other reasons, it could not be shown that "the immediate victims constitute 'the public at large.'" 563 F.2d at 1129.

- 28 -

The foregoing demonstration of injury-in-fact is easily traceable to the acts of defendants.  It is the defendants who caused the subpoena to be served upon Mrs. Gorsuch, cited her for contempt of Congress, and certified the matter to the United States Attorney for criminal prosecution.  Indeed, Defendants' brief to this Court repeatedly urges the criminal prosecution of Mrs. Gorsuch pursuant to 2 U.S.C. §194.  Defendants' Brief at 9, 25, 26-27, 30-32, 46, 56.  Chairman Levitas has threatened the United States Attorney and Attorney General with impeachment if they do not initiate criminal proceedings against Mrs. Gorsuch. See p. 3, supra.  Under these circumstances, it is disingenuous for defendants to argue that the

> "complaint doesn't offer a clue about how the present legislative defendants are responsible for [plaintiff's] injury, for it is not the legislative defendants who are responsible for proceeding under 2 U.S.C. §192."

Defendants' Brief at 50.

Defendants' final standing argument concerns the utility of declaratory relief to redress the injuries suffered by plaintiffs. This argument is best considered together with the appropriateness of declaratory relief under the circumstances, which follows.

- 29 -

C.  Declaratory Relief Is Both Necessary and Proper

Under the Declaratory Judgment Act, a federal district court in any actual controversy within its jurisdiction may declare the rights and other legal relations of any interested parties seeking such a declaration whether or not any further relief is or could be sought.  28 U.S.C. §2201.[*/]  There are three criteria for the issuance of a declaratory judgment.  First, there must be a "substantial controversy."  Second, the controversy must be between parties having "adverse legal interests."  Third, the controversy must be of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941); see also Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 122 (1974); Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 506 (1972).  In most cases, it would be premature to enter a declaratory judgment on the legality of a witness' refusal to comply with a subpoena except as a defense to a contempt proceeding.  On the unique facts of this case, however, declaratory relief is appropriate.

First, there is a substantial controversy between the parties present here.  The House subcommittee and committee in their written documents and in their vote to recommend a contempt citation have made clear their total disagreement with the

---

[*/]  The Declaratory Judgment Act does not grant any additional jurisdiction to the federal courts, but rather allows them to declare the rights and obligations of parties where an actual case cause or controversy already exists.  Golden v. Zwickler, 394 U.S. 103 (1969).

rationale of the Executive Branch in refusing to turn over sensi-
tive law enforcement materials.  The full House of Representatives
has ratified their position.  The defendants take the position,
and have so stated repeatedly, that a congressional committee is
absolutely entitled to all documents contained in the open law
enforcement files of the EPA, an executive branch agency.  On the
other hand, the Executive Branch has taken the position that the
Constitution requires it to maintain control over documents where
their release would impair the President's ability faithfully to
execute the law.  There is, then, without doubt a controversy both
concrete and live between the parties.

Second, the parties have adverse legal interests.  The House
of Representatives has already voted that Mrs. Gorsuch be cited
for contempt solely for following the instructions of the Presi-
dent.  Moreover, this matter has now been referred to the United
States Attorney for prosecution, and the Chairman of the House
Subcommittee has threatened the United States Attorney and the
Attorney General with impeachment proceedings unless Mrs. Gorsuch
is prosecuted.  In light of the extraordinary seriousness of this
unprecedented situation, the parties have sharply adverse legal
interests.

Third, this unique controversy has sufficient immediacy and
reality to warrant a declaratory judgment here.  The House has
voted contempt and has referred that citation to the United States
Attorney.  The legislative process is complete, thus rendering
this controversy both immediate and ripe.

The current case involves a contempt citation against the head of an Executive agency whose acts are the acts of the President in many matters.  Indeed, the President instructed the Administrator to take the action at issue here.  Under such circumstances, it is unnecessary to require the agency head to be cited for contempt -- much less subjected to criminal prosecution -- before resolving the legal issues.  This principle was emphasized in United States v. Nixon, which authorized judicial review without requiring contempt as a condition precedent.  In that case, the threshold question was whether the Supreme Court had jurisdiction over the appeal in view of the fact that the normal procedure for reviewing a refusal to comply with subpoenas, a defense to a contempt prosecution, was not before it.  The Court found, in view of the unique situation presented in that case, that traditional methods of review were not applicable:

> Here too, the traditional contempt avenue to immediate appeal is peculiarly inappropriate due to the unique setting in which the question arises.  To require a President of the United States to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism for review of the ruling would be unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the Government.  Similarly, a federal judge should not be placed in the posture of issuing a citation to a President simply in order to invoke review.  The issue whether a President can be cited for contempt could itself engender protracted litigation, and would further delay both review on the merits of his claim of privilege and the ultimate termination of the underlying criminal action for which his evidence is sought.  [418 U.S. at 691-692.]

The same legal concept is applicable here.  As in the <u>Nixon</u>
case, the "traditional contempt avenue to immediate appeal is
peculiarly inappropriate due to the unique setting in which the
question arises."  It is particularly "unseemly" that a high
Executive offical has been cited for contempt of Congress for
following the instruction of the President.  The purely legal
issues giving rise to this controversy should be resolved now in a
civil lawsuit, as in <u>Nixon</u>, in order to resolve and thereby render
"unnecessary" further protraction of this "constitutional
confrontation."

The propriety of declaratory relief in this case is further
supported by the rationale of <u>Steffel</u> v. <u>Thompson</u>, 415 U.S. 452
(1974).  There the plaintiff had been warned twice to stop hand-
billing and demonstrating on the sidewalk of a shopping center.
He then brought an action for injunctive and declaratory relief in
the district court claiming that the application of the law to him
would violate his First and Fourth Amendment rights.  In ruling
that there was a sufficient case or controversy for purposes of
the Declaratory Judgment Act, the Court stated:

> In these circumstances, it is not
> necessary that petitioner first expose
> himself to actual arrest or prosecution
> to be entitled to challenge a statute
> that he claims deters the exercise of his
> constitutional rights.  See, <u>e.g.</u>,
> <u>Epperson</u> v. <u>Arkansas</u>, 393 U.S. 97 (1968).
> [415 U.S. at 459].

Again, in <u>Lake Carriers' Ass'n</u> v. <u>MacMullan</u>, 406 U.S. 498 (1972),
the Court stated that when "compliance is coerced by the threat of
enforcement, . . . the controversy is both immediate and real."
406 U.S. at 508.

Defendants appear to concede that declaratory relief would be available under the theory of <u>Steffel</u> v. <u>Thompson</u> if no prosecution was pending and there was a genuine threat of enforcement of a criminal statute. However, defendants argue that:

> the certification by the Speaker renders the prosecution 'pending' for purposes of <u>Steffel</u>, for 2 U.S.C. §194 imposes the non-discretionary duty upon the United States Attorney to at least present the matter to the grand jury.

Defendants' Brief, at 26-27.*/ This argument makes the dubious assumption that §194 must be interpreted in a literal manner to deprive the United States Attorney of any prosecutorial discretion in situations where a House of Congress has certified a finding of contempt. Such an interpretation would itself raise serious constitutional questions.

It is by now well-settled that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." <u>United States</u> v. <u>Nixon</u>, 418 U.S. 683, 693 (1973), <u>citing</u> <u>Confiscation Cases</u>, 7 Wall. 454 (1869); <u>United States</u> v. <u>Cox</u>, 342 F.2d 167, 171 (5th Cir.), <u>cert.</u> <u>denied</u>, <u>sub nom</u> <u>Cox</u> v. <u>Hauberg</u>, 381 U.S. 935 (1965).**/ Indeed, the Court

---

*/ Defendants also rely upon dicta in <u>United States</u> v. <u>A.T.&T.</u>, 551 F.2d at 393, n.16 (D.C. Cir. 1976) to the effect that "[c]riminal proceedings are begun" by a contempt resolution. Taken in context, this statement has nothing to do with the determination required by <u>Steffel</u>.

**/ This fundamental power derives from Article II, Section 3, of the United States Constitution which vests the Executive Branch with the authority to see that "the laws be faithfully executed." By virtue of this provision, the law enforcement prerogative resides "squarely in the executive arm of the government." <u>Pugach</u> v. <u>Klein</u>, 193 F. Supp. 630, 634 (S.D. N.Y. 1961). As the President's surrogate in discharging this executive function, <u>Ponzi</u> v. <u>Fessender</u>, 258 U.S. 254 (1921), the Attorney General is the chief law enforcement officer and possesses the "exclusive prerogative" (continued)

of Appeals for this Circuit has specifically recognized that the
Executive Branch retains its traditional prosecutorial discretion
under §194. As the court stated in Ansara v. Eastland, 442 F.2d
751, 754 & n.6 (D.C. Cir. 1971)

> We are aware that . . . the Executive
> Branch . . . may decide not to present
> the [contempt citation] to the grand
> jury (as occurred in the case of the
> officials of the New York Port
> Authority). . . .

Contrary to defendants' assertions, therefore, §194 does not
require the United States Attorney to initiate a prosecution. For
this reason, defendants cannot argue that the theory of Steffel v.
Thompson is inapplicable to the present case.

Plaintiffs recognize that declaratory relief is not ordinar-
ily available to permit a witness to challenge the validity of a
congressional subpoena. As defendants point out, the "orderly and
often approved means" of raising constitutional defenses to a
subpoena normally requires presenting one's defense through the
following process: review by the subcommittee, full committee,
and full House of Congress, followed by referral to the United
States Attorney and indictment or information. "Should prosecu-
tion occur, the witness' claims could then be raised before the
trial court." Sanders v. McClellan, 463 F.2d 894, 899 (D.C. Cir.
1972), cited in Defendants' Brief at 23. However, none of the

---

**/ (continued from previous page)
to begin a criminal prosecution. United States v. Cox, supra, 342
F.2d at 190-91 (Wisdom, J. concurring). Because this power is
constitutional in source, the Courts have consistently invoked the
separation of powers doctrine to decline review of particular
prosecutorial decisions. Newman v. United States, 382 F.2d 479,
481 (D.C. Cir. 1967); Smith v. United States, 375 F.2d 243, 247
(5th Cir. 1967); Inmates of Attica v. Rockefeller, 477 F.2d 375,
379 (2nd Cir. 1973).

cases cited by defendants involved the peculiar facts present here, namely a completed legislative process which resulted in a contempt action against a top Executive Branch official.*/

There is another reason why declaratory relief is not only proper but necessary in the present case. The "regular procedure" for testing a witness' claims referred to in Sanders, 463 F.2d at 900, is not available. The witness in this case, Mrs. Gorsuch, was cited for contempt for withholding documents at the direction of the President and upon the advice of the Attorney General. Under these circumstances, it is questionable whether the Department of Justice could properly prosecute Mrs. Gorsuch for contempt.**/ Because the "regular procedure" for resolving this dispute is not available, declaratory relief is necesssary for its resolution.

---

*/ Sanders and the cases cited in that opinion were all cases where "injunctive or declaratory relief has been sought with respect to an ongoing congressional investigation. . . ." Id. at 901 (emphasis added). Here congressional action is complete.

**/ The inability to prosecute Mrs. Gorsuch for contempt has several dimensions. As we have shown, pp. 34-35, supra, 2 U.S.C. §194 cannot impose a mandatory obligation to prosecute Mrs. Gorsuch. Since the Attorney General counseled the President to instruct Mrs. Gorsuch to withhold the documents in question, it would also raise serious ethical questions for the Department of Justice to undertake a discretionary prosecution. See Principles of Federal Prosecution, U.S. Dept. of Justice, Part B(1) (July 1980). And, because Article II makes criminal prosecution an exclusive responsibility of the Executive Branch in most situations, it is doubtful that Mrs. Gorsuch could be prosecuted by anyone who is not subject to the direction of the President. Finally, the criminal prosecution of an Executive official for complying in good faith with the President's instructions to withhold documents could well be unconstitutional in any event, since it imposes a heavy burden on the assertion of executive privilege. In this regard, it is significant that civil litigation remains available as an alternative means of resolving such inter-branch disputes. See Senate Select Committee v. Nixon, 498 F.2d 725 (D.C. Cir. 1974).

- 36 -

The extraordinary and compelling circumstances of this case strongly militate in favor of departing from the usual rule that the validity of a congressional subpoena can be tested only in defense of a criminal prosecution.  Accordingly, an immediate and concrete controversy exists; a declaratory judgment is not only a proper method of review but indeed the best method to determine the legality of the Administrator's action.

### D. The Political Question Doctrine Does Not Require Abstention

This case involves a dispute between the Executive and Legislative Branches over fundamental constitutional principles.  The only way it can be resolved is through the intervention of the Judiciary.  Under these circumstances, the political question doctrine does not require the Court to abstain from adjudicating the issues raised by this action.[*/]

As noted above, a similar confrontation between the two branches was presented in United States v. A.T.&T., 567 F.2d 121 (D.C. Cir. 1977).  There, the court considered political question principles at length in determining whether it was appropriate to intervene in the dispute between the two branches over a congressional subpoena.  After noting that the courts had often resolved

---

[*/]  Defendants disclaim any argument based upon the political question doctrine.  Defendants' Brief at 45.  Nevertheless, this argument is addressed here in the event the Court raises the question sua sponte.

- 37 -

disputes concerning the allocation of power between the branches, 567 F.2d at 126, n.13, the court stated at 126:

> Where the dispute consists of a clash
> of authority between two branches,
> however, judicial abstention does not
> lead to orderly resolution of the
> dispute.  No one branch is identified
> as having final authority in the area
> of concern.

If, the court went on to say, a stalemate results, judicial inter- vention is required to avoid the "detrimental effect on the smooth functioning of government." 567 F.2d at 126.

Abstention was rejected by the court in A.T.&T. because the court found those factors to be present.  The identical factors are present here.  As in A.T.&T., the Legislative Branch claims a power to investigate the manner in which an agency has admini- stered a particular program.  As part of that power, it contends that it has an unlimited right to any documents involved in that program.  The Executive, on the other hand, as in A.T.&T., con- cedes that the Legislative Branch has the power to investigate, but contends that the right to investigate is not without bounds and cannot reach documents which, if disclosed, would impair its duty to faithfully execute the laws.  Moreover, a stalemate has resulted over this dispute, since no further legislative action is possible.  A.T.&T. stands for the clear proposition that when such a constitutional confrontation between the two branches has reached an impasse, the courts have a duty to intervene in order to provide for an orderly resolution of the dispute.

The Court of Appeals for this Circuit has reached essentially the same conclusion in two other cases involving a claim of executive privilege, Nixon v. Sirica, 487 F.2d 700 (D.C. Cir. 1973) and Senate Select Committee v. Nixon, 498 F.2d 725 (D.C. Cir. 1974). In Sirica, a claim of privilege was interposed in response to a grand jury subpoena while in Senate Select Committee, the claim was interposed in response to a congressional subpoena.   In both cases the argument was made that judicial intervention was inappropriate because non-justiciable political questions were involved.   That contention was rejected in each case, and in each case the court reviewed the merits of the privilege claim.   Nixon v. Sirica, 487 F.2d at 716-718; Senate Select Committee v. Nixon, 498 F.2d at 728.   The political question doctrine, therefore, does not preclude this Court from entertaining this action.

## II.   The Speech Or Debate Clause
Does Not Bar This Action.

The Speech or Debate Clause does not bar this suit.  The
congressional action in question is complete, and the Court is in
no way requested to interfere with any ongoing congressional
activity.  Moreover, in a decision fully applicable here, the
Court of Appeals for this Circuit has held that a suit such as
this is not barred by the Speech or Debate Clause.  In United
States v. A.T.&T., 567 F.2d 121 (D.C. Cir. 1977), the court
permitted the Executive Branch to obtain judicial review of a
congressional subpoena which sought sensitive national security
information that was subject to a claim of executive privilege.
The court noted that the intent of the Clause is primarily to
protect members of Congress from "personal suit[s] against them."
567 F.2d at 130.  Where that is not the case, "the Clause does not
and was not intended to immunize Congressional investigatory
actions from judical review."  567 F.2d at 129.

## A.   The Purpose of the Speech Or Debate Clause

The Speech or Debate Clause of the Constitution, Article I, Section 6, clause 1, provides:

> For any Speech or Debate in either House, they [the Senators and Representatives] shall not be questioned in any other place.

The fundamental purpose of the Clause is to "protect the integrity of the legislative process by insuring the independence of individual legislators." United States v. Brewster, 408 U.S 501, 507 (1972). In this regard, the clause has been expanded beyond a literal construction to include anything "generally done in a session of the House by one of its members relating to the business before it." Kilbourn v. Thompson, 103 U.S. 168, 204 (1881). However, the Clause cannot be interpreted to cover conduct that is "in no way related to the due functioning of the legislative process." United States v. Johnson, 383 U.S. 169, 1972 (1966). Thus, the Court has held that legislative acts covered by the Clause in addition to speech or debate are only those which constitute an "integral part of the deliberative and communicative process" of the Congress. Gravel v. United States, 408 U.S. 606, 625 (1972).

- 41 -

The Clause has been applied to bar two different types of suits against members of Congress. The first includes civil or criminal suits which seek to hold individual legislators liable for their legislative activities. Indeed, the prevention of such suits is the primary intent of the Clause. See United States v. A.T.&T., 567 F.2d at 130. This bar against criminal prosecution or civil damage actions against individual legislators preserves their independence when engaged in legislative activities.

The Clause has also been applied to prevent a second type of suit -- one which would directly interfere with the legislative process. Thus, for example, the Clause prevents a court from enjoining the implementation of a congressional committee's subpoena. Such a suit is barred because the relief would "impede congressional action" and "interfere with an ongoing activity by Congress." Eastland v. United States Servicemen's Fund, 421 U.S. 491, 509-510, n.16 (1975).

It should be emphasized, however, that the Clause bars only those suits which would have the effect of interfering with the legislative process in some way. Thus, for example, in Gravel v. United States, 408 U.S. 606 (1972), the Court held that the private publication by a Senator of materials received by a Senate Committee was not entitled to Speech or Debate protection because such an activity is not essential to the legislative process:

- 42 -

> As the Court of Appeals put it, the
> courts have extended the privilege to
> matters beyond pure speech or debate in
> either House, but "only when necessary to
> prevent indirect impairment of such
> deliberations." United States v. Doe,
> 455 F.2d at 760.
>
> Here, private publication by Senator
> Gravel through the cooperation of Beacon
> Press was in no way essential to the
> deliberations of the Senate; nor does
> questioning as to private publication
> threaten the integrity or independence of
> the Senate by impermissibly exposing its
> deliberations to executive influence.
> [408 U.S. at 625].

See also Doe v. McMillan, 412 U.S. 306 (1973).

Finally, the Speech or Debate Clause does not bar the deter-

mination by a court of the legality of the action of a person

opposing a subpoena if the legislative process has essentially

terminated.  Thus, in Watkins v. United States, 354 U.S. 178, 208

(1957) and Barenblatt v. United States, 360 U.S. 109 (1959), the

Court was required to fulfill its judicial function of determining

the legality of declining to comply with a subpoena when the

defendants were found in contempt under 2 U.S.C. §192 and prose-

cuted under 2 U.S.C. §194.  Similarly in Senate Select Committee

On Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C.

Cir. 1974), the Speech or Debate Clause was no bar to judicial

resolution of an executive claim of privilege when the Committee

brought suit to enforce the subpoena, even though that decision

effectively prevented the committee from procuring information it

requested.  Moreover, if Congress orders the Sergeant-at-Arms to

imprison a witness for failing to comply with a subpoena, a court

clearly has the power under 28 U.S.C. 2241 et seq., to issue a writ of habeas corpus against the Sergeant-at-Arms and those imprisoning the witness, and to determine the validity of the recalcitrant witness' actions. See, Kilbourn v. Thompson, supra.

The overriding purpose of the Speech or Debate Clause is, therefore, not to immunize congressional actions from judicial review. It is not to be extended "beyond . . . its intended scope and its history, to include all things in any way related to the legislative process." United States v. Brewster, 408 U.S. 501, 516 (1972). To construe the Speech or Debate Clause as barring this suit would be inconsistent with this admonition because the relief sought here would in no way interfere with any ongoing legislative activity.

B. Since the Relief Sought Here Would
Not Interfere With The Legislative
Process, The Clause Is Not Applicable

This action will not interfere with the legislative process because that process has terminated. The full House has considered this matter and resolved to cite Mrs. Gorsuch for contempt. The contempt citation has been certified and delivered to the United States Attorney. It is, therefore, critically important to emphasize that a declaratory judgment in this action would no more interfere with any legislative processes than would judicial review of the same issues in the context of a criminal contempt proceeding. In each, the court would review the lawfulness of Mrs. Gorsuch's actions which gave rise to the contempt citation. Since it is well-established that Speech or Debate principles do not bar such review in the context of a criminal contempt proceeding, see Watkins v. United States, 354 U.S. 178 (1957); Barenblatt

- 44 -

v. United States, 360 U.S. 109 (1959), there is no reason why, in
the compelling and unique circumstances present here, such
principles should bar review in this case.

In arguing that the Speech or Debate Clause bars this action,
defendants focus largely on the impropriety of the issuance of any
injunctive or "coercive" relief against members of the House.
While it is true that the original complaint in this action
contained a prayer for injunctive relief, the amended complaint
seeks declaratory relief only.*/ Much of the defendants'
arguments are therefore no longer applicable.  For example,
defendants argue that Eastland v. United States Servicemen's Fund,
421 U.S. 491 (1975), bars this suit because the Supreme Court
there rejected the proposition that a court could "enter a 'coer-
cive order' which in context would mean that the Subcommittee
would be prevented from pursuing its inquiry by use of a subpoena
to the bank." 421 U.S. at 512.  Defendants' brief at 16-17.  But
in Eastland, injunctive and declaratory relief were sought immedi-
ately after the issuance of the Subcommittee subpoena.  In that
context, injunctive or declaratory relief would have effectively
interfered with the ongoing investigation.  Here, on the other
hand, a declaratory judgment will produce none of the coercive
effects that would have resulted had either an injunction or a
declaratory judgment been entered in Eastland.

---

*/    At the time the original complaint was filed, the contempt
resolution had not been certified or delivered to the United
States Attorney.

- 45 -

Indeed, as noted above, the situation here is similar to that in United States v. A.T.&T., 567 F.2d 121 (D.C. Cir. 1977). There, the United States filed suit and invoked executive privilege to prevent A.T. & T. from complying with a congressional subpoena which sought highly sensitive national security information in A.T. & T.'s possession. The House Subcommittee seeking that information intervened. It contended that Speech or Debate principles barred the suit because a judicial resolution of the dispute would interfere with its investigatory activities.

The Court of Appeals for this circuit flatly rejected this contention. After reviewing Watkins, Barenblatt and Senate Select Committee v. Nixon, the court stated:

> . . . individual members of Congress are
> not impermissibly 'questioned in any other
> place' regarding their investigatory activities
> merely because the validity and permissibility
> of their activities are adjudicated. . . . As
> is clear from Watkins, Barenblatt and Senate
> Select Committee, however, the [Speech or
> Debate] Clause does not and was not intended to
> immunize congressional investigatory actions
> from judicial review. Congress' investigatory
> power is not, itself, absolute. . . . [567 F.2d
> at 129].

The court, therefore, concluded that judicial intervention was not precluded by Speech or Debate principles because those principles are primarily intended to protect individual legislators from personal suits against them for legislative activities. Where that is not the case, "the Clause cannot be invoked to immunize the congressional subpoena from judicial scrutiny." 567 F.2d at 130.

- 46 -

C.    The Clause May Not Be Asserted To
      Immunize Non-Legislative Activities.

It is well-established that judicial review of a congres-
sional action is available if employees of the Congress take steps
to implement that action beyond the purely legislative sphere.  As
noted by the defendants in their brief at p. 15, the defendant
Clerk of the House certified the contempt resolution to the United
States Attorney for prosecution under 2 U.S.C. § 194.  Moreover,
the defendant Sergeant-at-Arms of the House*/ delivered the
contempt citation to the United States Attorney.  Each of these
defendants, therefore, was responsible for carrying out the House
resolution that the contempt citation against Mrs. Gorsuch be
certified and delivered to the United States Attorney for prosecu-
tion.  In these circumstances, the Supreme Court has held that
suits can be maintained against the congressional employees in
order to review the legality of the underlying legislative order
pursuant to which they were acting.

This principle was recognized by the Court in Powell v.
McCormack, 395 U.S. 486 (1969).  There the House of Representa-
tives passed a resolution excluding Rep. Powell from the House.
Pursuant to that resolution, the Clerk of the House threatened to
refuse to perform the duties due a Representative, the Sergeant-
at-Arms refused to pay his salary and the Doorkeeper refused to
admit him to the House Chamber.  Powell filed suit against certain
Congressmen as well as these employees challenging the legality of
the House's exclusion order.  The defendants moved to dismiss,

---

*/   The Sergeant-at-Arms was mistakenly omitted from the Amended
Complaint.  We have, therefore, moved to amend the Complaint to
join him as a party defendant to this action.

arguing that the Speech or Debate Clause protected both the legis-
lators and their employees from suit.  The Supreme Court refused
to dismiss the employees and reaffirmed the doctrine that:

> . . . although an action against a Congressman
> may be barred by the Speech and Debate Clause,
> legislative employees who participated in the
> unconstitutional activity are responsible for
> their acts . . .  That House employees are acting
> pursuant to express orders of the House does not
> bar judicial review of the constitutionality of the
> underlying legislative decision.  [395 U.S. at 504].

The Court therefore permitted the suit to proceed against the
House employees in order to review the legality of the exclusion
order adopted by the members of the House.

In reaching this conclusion, the Court specifically reaf-
firmed its decision in Kilbourn v. Thompson, 103 U.S. 168 (1881).
There, the House had passed a resolution ordering the Sergeant-at-
Arms to arrest and imprison a witness who had refused to respond
to a House Committee subpoena.  The witness filed a false impris-
onment suit against certain members of the House as well as
against the Sergeant-at-Arms who had actually executed the arrest
warrant, contending that the House resolution was unconstitu-
tional.  The Court held that while the members were immune from a
damage action based upon their legislative act, the Sergeant-at-
Arms did not share in that immunity, even though he had merely
implemented the House resolution.  Indeed, the Court emphasized
the importance of permitting the case to proceed against the House
employee to ensure that the House's action not escape judicial
review:

> Especially is it competent and proper for this
> court to consider whether its [the legislature's]
> proceedings are in conformity with the Constitution
> and laws, because, living under a written consti-
> tution, no branch or department of the government
> is supreme; and it is the province and duty of the
> judicial department to determine in cases regularly
> brought before them, whether the powers of any
> branch of the government, and even those of the
> legislature in the enactment of laws, have been
> exercised in conformity to the Constitution; and
> if they have not, to treat their acts as null and
> void." 103 U.S., at 199.

The instant case is indistinguishable from Powell or

Kilbourn in this regard. Plaintiffs here, as in Powell and

Kilbourn, seek judicial review of a House resolution. Similarly,

as in Powell and Kilbourn, the legislative process has terminated

so that judicial intervention could not interfere with any ongoing

legislative activity. Moreover, as in Powell and Kilbourn, the

implementation of the resolution here required the participation

of House employees. Without the certification and delivery of the

contempt citation to the United States Attorney, the House resolu-

tion that Mrs. Gorsuch be prosecuted for contempt would have had

no effect. This case, therefore, can proceed against the House

employees who carried out the House resolution, just as the Powell

and Kilbourn actions were permitted against the House employees

who implemented the House resolutions challenged in those cases.

Moreover, contrary to the House's assertions, this conclusion

is perfectly consistent with the Supreme Court's Speech or Debate

analysis in cases such as Gravel v. United States, 408 U.S. 606

(1972). In Gravel, the Court emphasized that Speech or Debate

immunity attaches to either Members or employees if the action

they took was a protected legislative act. Thus, the Court held

that

> . . . the Speech or Debate Clause applies
> not only to a Member but also his aides
> insofar as the conduct of the latter would
> be a protected legislative act if performed
> by the Member himself.  [408 U.S. at 621]

Therefore, to determine whether the House employees here are

immune from suit, it is necessary to decide whether they performed

"protected legislative acts."[*]  As noted by the Court in

Gravel, and in United States v. Brewster, 408 U.S. 501 (1972),

members of Congress engage in a wide range of unprotected

activities, including constituent "errands", communicating with

federal agencies regarding their administration of programs, news

releases and speeches outside the Congress.  Indeed, the Court

held in United States v. Johnson, 383 U.S. 169 (1966), that the

Speech or Debate Clause did not immunize a Member's attempt to

influence the Department of Justice.[**]  In light of the wide

range of congressional activities, the Court in Gravel cautioned

that:

---

[*]    The Gravel analysis suggests that a distinction between
legislators and legislative employees may not be appropriate,
particularly in an action for declaratory relief.  But see Powell
v. McCormack, 395 U.S. at 517-18.  Under the Gravel approach,
however, plaintiffs would be entitled to seek declaratory relief
against all defendants who participated in conduct outside the
scope of "protected legislative acts," including Members of
Congress.

[**]  Had the member sought to influence the Department of Justice
solely through legislative activities such as floor speeches,
committee hearings, or voting on a resolution or bill, Speech or
Debate immunity would have attached.  Similarly, here, had the
defendants sought to influence the Executive Branch through
such legislative activities, they would be immune from suit.
However, when Congress took the unprecedented step of certifying
the contempt resolution to the United States Attorney and
purporting to require him to prosecute Mrs. Gorsuch, it went
beyond the legislative arena as did the member in Johnson who
similarly sought to influence the Executive Branch through
extra-legislative means.

> Legislative acts are not all-encompassing.
> The heart of the Clause is speech or debate in
> either House.  Insofar as the Clause is construed
> to reach other matters, they must be an integral
> part of the deliberative and communicative
> processes by which Members participate in
> committee and House proceedings with respect to
> the consideration and passage or rejection of
> proposed legislation or with respect to other
> matters which the Constitution places within the
> jurisdiction of either House.  [408 U.S. at 625]

The test has been applied to immunize the issuance of a duly
authorized congressional subpoena, Eastland v. United States
Servicemen's Fund, 421 U.S. 491 (1975), and the preparation of a
Committee report, Doe v. McMillan, 412 U.S. 306 (1973), because
those activities were held to be integral parts of Congress'
deliberative and communicative processes.  However, the private
publication or public distribution of materials received or
prepared by a congressional committee have been held to be
unprotected activities.  Gravel v. United States, supra; Doe v.
McMillan, supra.  Such activities are simply not essential to the
internal processes of the Congress.

Under the Gravel analysis, the certification and delivery of
the contempt citation to the United States Attorney in an attempt
to compel criminal prosecution is not a protected legislative
activity.*/  Those acts have nothing to do with "speech or
debate" nor are they an integral part of the House's internal
deliberative and communicative processes.  Instead, the

---

*/   The Speaker's letter of January 5, 1983 (Harris Dec., Exhibit
C), which explicitly seeks to compel the United States Attorney to
bring a criminal prosecution against Mrs. Gorsuch, is also not a
protected legislative act.  See United States v. Johnson, 383 U.S.
169 (1966).

certification[*] and delivery of the contempt citation consti-
tute an effort to enforce the legislative decision, just as the
physical exclusion of Rep. Powell by the House doorkeeper in
Powell and the arrest of the witness in Kilbourn constituted
efforts to enforce the legislative decisions reached in those
cases.[**] As the Court stated in Eastland, 421 U.S. at 508,
the arrest by the Sergeant-at-Arms of a witness who had been held
in contempt was unprotected because it was not "essential to
legislating." For the same reason, the certification and delivery
in the present case are not protected legislative activities.
Therefore, although the Speech or Debate Clause may immunize the
Member defendants for their legislative activities in this case,
that immunity extends only through the vote on the contempt
resolution by the House. Beyond that point, the legislative
process ends and the enforcement process begins; any acts by the
defendants beyond that vote can therefore form the basis for
judicial resolution of the underlying controversy as in Powell and
Kilbourn.

---

[*] The House argues that the certifiction of bills and resolu-
tions are protected legislative actions and that the Department of
Justice took this position in a recent case. See Defendants'
Brief at 15, 20. Ordinarly, this proposition is accurate because
the certification is part of the process by which a bill or
resolution becomes law. Here, however, 2 U.S.C. § 194 provides
that certification is a necessary step in obtaining criminal
prosecution by the United States Attorney, an activity which is
not part of the process by which a bill or resolution becomes
law.

[**] Indeed, the statutes pursuant to which the contempt citation
was certified and delivered, 2 U.S.C. § 192 and 194, were enacted
to provide Congress with an additional means to enforce its con-
tempt resolutions as an alternative to the method employed in
Kilbourn. See Cong. Globe, 34th Cong., 3d Sess. 427 (remarks of
Rep. Davis) (the statute "makes a mere substitution of a judicial
proceeding for the ordinary proceeding by attachment by a parlia-
mentary body"), quoted in Defendants' Brief, at 28-29.

### III.   Mrs. Gorsuch Properly Withheld The Documents In Dispute Under A Claim Of Executive Privilege

The Executive has asserted a privilege to withhold only a smattering of hard-core, enforcement sensitive documents. That action was ordered by the President because he and the Attorney General believed disclosure of the documents could compromise effective law enforcement, a responsibility given the Executive by the Constitution. The defendants have done nothing to satisfy their burden of showing that the privilege was wrongly asserted or that they had a compelling need for the documents.

### A.   The Claim of Executive Privilege Is Rooted In Separation Of Powers Principles And Should Be Reviewed By This Court

Executive privilege was invoked here in order to preserve the fundamental principle of separation of powers, "which is at the heart of our Constitution." Buckley v. Valeo, 424 U.S. 1, 119 (1976) (per curiam). The judiciary has indeed often checked actions by the other branches which represent

> an assumption by one branch of powers that are central or essential to the operation of a coordinate branch, provided also that the assumption disrupts the coordinate branch in the performance of its duties and is unnecessary to implement a legitimate policy of the Government.

Chadha v. Immigration and Naturalization Service, 634 F.2d 408, 425 (9th Cir. 1980). See Buckley v. Valeo, 424 U.S. 1, 118-24 (1976) (per curiam); United States v. Nixon, 418 U.S. 683 (1974); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952);

- 53 -

_Myers_ v. _United States_, 272 U.S. 52 (1926).  Judicial intervention in these disputes was essential in order to maintain the delicate balance of powers among the branches created by the constitution.

Congress does have the power to investigate.  That power is broad, but it is not without limitations.  _Watkins_ v. _United States_, 354 U.S. 178, 187 (1957).  As the Supreme Court stated in _Barenblatt_ v. _United States_, 360 U.S. 109 at 112:

> Lacking the judicial power given to
> the Judiciary, it cannot inquire into
> matters that are exclusively the concern
> of the Judiciary.  _Neither can it supplant_ ·
> _the Executive in what exclusively belongs_
> _to the Executive._  (emphasis added).

When the Congress uses its power to investigate in a manner that threatens to impair the Executive's ability to fulfill constitutional responsibilities, as here, the courts have stepped in to resolve the dispute.  As the Court of Appeals for this Circuit stated in _Senate Select Committee_ v. _Nixon_, 498 F.2d 725, 729 (D.C. Cir. 1974), in which a claim of executive privilege was similarly invoked in response to a congressional subpoena, "it is the responsibility of the courts to decide whether and to what extent executive privilege applies."  _See also United States_ v. _Nixon_, _supra_.  The Court of Appeals, after a thorough review of the issues raised, concluded that the materials in question were, indeed, subject to a claim of executive privilege.  The court further held that the committee had failed to demonstrate that the materials were "demonstrably critical to the responsible fulfillment of the Committee's functions" so as to overcome the claim of privilege.  498 F.2d at 731.

This case is like <u>Senate Select Committee</u>.  As will be demonstrated below, the documents are subject to a valid claim of privilege.  Since the committee has failed to demonstrate any compelling investigative need for them, the investigative interests of the Legislative Branch must yield to the necessity for the Executive to preserve its ability faithfully to execute the law.

    B.    Executive Privilege May Be Invoked For
          Sensitive Documents In Open Law
          Enforcement Files

Here the Subcommittee's demands threatened damage to a fundamental responsibility of the Executive -- the obligation to enforce the laws.  Therefore, in response to the demands of the congressional subpoena here at issue, Mrs. Gorsuch followed the instructions of the President in interposing a claim of executive privilege to protect from disclosure materials that consist of

          "sensitive memoranda or notes by EPA attorneys
          and investigators reflecting enforcement
          strategy, legal analysis, lists of potential
          witnesses, settlement considerations and
          similar materials the disclosure of which
          might adversely affect a pending enforcement
          action, overall enforcement policy, or the
          rights of individuals."

Perry Dec., Exhibit E at 4.  This claim was based on a determination that dissemination of such documents to the public or to Congress would impair the Executive's constitutional duty to ensure that the laws be faithfully executed.  <u>See</u> U.S. Const., Art. II, § 3; <u>United States</u> v. <u>Nixon</u>, 418 U.S. 683 (1974). Accordingly, the claim of executive privilege has been properly asserted.

- 55 -

The doctrine of executive privilege defines the constitutional authority of the Executive Branch to protect documents or information in its possession from public disclosure and from the compulsory processes of the legislative and judicial branches. See United States v. Nixon, 418 U.S. 683 (1974).  The privilege protects two different constitutional interests.  Executive privilege protects material where disclosure would either significantly impair the performance of the constitutional responsibilities of the Executive or where it would interfere with its functioning as an independent branch of government.  Id.

Executive privilege may properly be invoked to protect several distinct aspects of the Executive's constitutional responsibilities.  It may be invoked, for example, where there is a danger that disclosure of the material will impair the conduct of foreign relations or the national security.  See e.g., United States v. Reynolds, 345 U.S. 1 (1953); Halkin v. Helms, 598 F.2d 1 (D.C. Cir. 1978).  See also United States v. Nixon, 418 U.S. at 706.  It may also be invoked to shield confidential deliberative communications which have been generated within the Executive Branch from compulsory disclosure, unless there is a strong showing that access to the documents is critical to the responsible fulfillment of a constitutional function.  See Nixon v. Administrator of General Services, 433 U.S. 425, 441-55 (1977); United States v. Nixon, 418 U.S. 683, 711-12 (1974); Senate Select Committee v. Nixon, 498 F.2d 725, 730-31 (D.C. Cir. 1974)

(en banc). Similarly, it may be invoked to protect from disclosure investigative files compiled for law enforcement purposes. See Ass'n For Women In Science v. Califano, 566 F.2d 339, 343 (D.C. Cir. 1977); Black v. Sheraton Corp. of America, 564 F.2d 531 (D.C. Cir. 1977).

The assertion of a claim of executive privilege is based on the practical need for the confidentiality of communications within the Executive Branch to carry out its constitutional responsibilities, as well as the doctrine of separation of powers that provides that each branch of government is "suprem[e] . . . within its own assigned area of constitutional duties." United States v. Nixon, 418 U.S. at 705. In United States v. Nixon, the Court recognized the need for confidentiality within the Executive Branch to assist the President in the discharge of his constitutional powers and duties, by ensuring discussion that is free-flowing and frank, unencumbered by fear of disclosure or intrusion by the public or the other branches of government. It stated that "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." United States v. Nixon, 418 U.S. at 705. Such "temper[ed] candor" in executive deliberations would impede the President's performance of his constitutional duty to exercise the Executive powers granted in Art. II, § 3 of the Constitution. See Nixon v. Administrator of General Services,

433 U.S. 425 (1977); <u>United States</u> v. <u>Nixon</u>, 418 U.S. at
705.*/

Because its invocation is infrequently challenged in court,
there has not been much litigation in the area of executive privi-
lege. However, courts have long recognized the need for the
privilege in the area of civil discovery with respect to "intra-
governmental documents reflecting advisory opinions, recommenda-
tions and deliberations comprising part of a process by which
governmental decisions and policies are formulated." <u>Carl Zeiss</u>
<u>Stiftung</u> v. <u>V.E.B. Carl Zeiss, Jena</u>, 40 F.R.D. 318, 324 (D.D.C.
1966), <u>aff'd</u> <u>mem.</u> <u>sub</u> <u>nom.</u> <u>V.E.B. Carl Zeiss, Jena</u> v. <u>Clark</u>, 384
F.2d 979, <u>cert denied</u>, 389 U.S. 952 (1967). <u>See</u> <u>Kaiser Aluminum &</u>
<u>Chemical Corp.</u> v. <u>United States</u>, 157 F. Supp. 939 (Ct. Cl. 1958).

In addition, the courts have recognized that a related privi-
lege, commonly known as the law enforcement evidentiary privilege,
protects from disclosure investigative files compiled for law
enforcement purposes. <u>Black</u> v. <u>Sheraton Corp. of America</u>, 564
F.2d 531 (D.C. Cir. 1977). <u>See</u> <u>United States</u> v. <u>A.T.&T.</u>, 86
F.R.D. 603, 639-42 (D.D.C. 1979). Courts have long recognized a
strong public interest in minimizing the disclosure of documents
which would tend to reveal law enforcement strategies, investiga-
tive techniques or sources. <u>See</u> <u>e.g.</u>, <u>NLRB</u> v. <u>Robbins Tire &</u>
<u>Rubber Co.</u>, 437 U.S. 214, 224-25 (1978); <u>Black</u> v. <u>Sheraton Corp.</u>,

---

*/ The Supreme Court and lower federal courts have made clear
that the presumption of confidentiality accorded executive
communications is intended to protect not only the substance of
sensitive communications but the integrity of the decision-making
process within the Executive Branch as well. <u>See</u> <u>Nixon</u> v.
<u>Administrator of General Services</u>, <u>supra</u>; <u>Senate Select Committee</u>
v. <u>Nixon</u>, <u>supra</u>; <u>Nixon</u> v. <u>Sirica</u>, 487 F.2d 700 (D.C. Cir. 1973)
(<u>en</u> <u>banc</u>).

564 F.2d at 535, 536; Center for National Policy Review on Race and Urban Issues v. Weinberger, 502 F.2d 370, 374 (D.C. Cir. 1974); Aspin v. Department of Defense, 491 F.2d 24 (D.C. Cir. 1973); Frankel v. SEC, 460 F.2d 813, 817-18 (2d Cir.), cert. denied, 409 U.S. 882 (1972); Jabara v. Kelly, 62 F.R.D. 424 (E.D. Mich. 1974); Philadelphia Resistance v. Mitchell, 63 F.R.D. 125 (E.D. Pa. 1972). See generally 2 Weinstein's Evidence ¶509[07] (1975). This privilege is rooted in the same concerns as the privilege accorded to intra-governmental documents -- the need to minimize disclosure of documents the revelation of which would both impair the functioning of the Executive Branch in its law enforcement efforts and impair its ability to operate as an independent branch of government. See Black v. Sheraton Corp. of America, 564 F.2d at 542.

Effective law enforcement relies heavily on the assurance of confidentiality within the enforcement process. The need for confidentiality is even stronger, of course, while enforcement is being carried out and enforcement policies and strategies are still being developed. Without that assurance of confidentiality, efforts of the Executive Branch to enforce the law effectively would be undercut by disclosure of sensitive investigative techniques, methods or strategies, forewarning of suspects under investigation, deterrence of witnesses from coming forward, endangering the safety of confidential informants or prejudicing the rights of those under investigation. Moreover, disclosure of investigative files in a particular case could interfere with ongoing administrative enforcement proceedings and could obviously

prejudice or harm the government's case.  See e.g., NLRB v.
Robbins Tire & Rubber Co., 437 U.S. 214, 224-25 (1978); Center for
National Policy v. Weinberger, 502 F.2d 370, 374 (D.C. Cir. 1974);
Aspin v. Department of Defense, 491 F.2d 24, 29-30 (D.C. Cir.
1973); Frankel v. SEC, 460 F.2d 813, 817-18 (2d Cir.), cert.
denied, 409 U.S. 882 (1972); Kinoy v. Mitchell, 67 F.R.D. 1, 11-12
(S.D. N.Y. 1975).  Indeed, the government may shrink from conduct-
ing a thorough investigation if there is a risk that the informa-
tion gathered may be prematurely disclosed.  Perhaps most
importantly, the fear exists that the integrity, impartiality and
fairness of the law enforcement process as a whole would be
damaged if sensitive material were distributed beyond those
persons necessarily involved in the investigation and prosecution
process.  See Perry Dec., paras. 17, 18, 24, 32 and 33; Dinkins
Dec., paras. 6-9.*/

The disclosure of open law enforcement files could also
seriously impair the Executive Branch's functioning as an

---

*/ Congress itself has recognized the vital importance for such a
privilege in the Freedom of Information Act, which greatly
expanded information that government agencies must make available
to the public.  That Act specifically contains an exemption for
certain types of investigatory records compiled for law enforce-
ment purposes.  5 U.S.C. §552(b)(7).  As the Second Circuit con-
cluded in analyzing the purposes behind the §552(b)(7) exemption:

> [the Senate and House Reports] indicate
> that Congress had a two-fold purpose in
> enacting the exemption for investigatory
> files:  to prevent the premature disclosure
> of the results of an investigation so that
> the Government can present its strongest
> case in court, and to keep confidential
> the procedures by which the agency conducted
> its investigation and by which it has obtained
> information.  Both these forms of confiden-
> tiality are necessary for effective law
> enforcement.  Frankel v. SEC, 460 F.2d 813
> 817 (2d Cir.), cert. denied, 409 U.S.
> 889 (1972).

independent branch of government.  Were the documents at issue

here disclosed to congressional subcommittees, members of Congress

would become partners in the enforcement process, possessing the

information necessary to participate in or interfere with ongoing

enforcement actions.  The Executive Branch would lose control of

the documents and thus would be unable to ensure that the

strengths and weaknesses of the government's case not be revealed

to the targets of the case under development.

As stated by the Attorney General, in explaining the bases

for the invocation of the privilege in the instant case, there is

ample historical precedent for the assertion of privilege to

preclude disclosure to the Congress of sensitive memoranda in

files of ongoing law enforcement cases.

> The policy which I reiterate here was first
> expressed by President Washington and has
> been reaffirmed by or on behalf of most of
> our Presidents including Presidents Jefferson,
> Jackson, Lincoln, Theodore Roosevelt,
> Franklin Roosevelt, and Eisenhower.  I am
> aware of no President who has departed from
> this policy regarding the general confiden-
> tiality of law enforcement files.

Perry Dec., Exhibit E at 5.

Executive privilege has been invoked throughout the history

of the United States by virtually all of our Presidents in

response to Congressional demands for information.  See The

Committee Report, p. 90 (Memorandum for the Attorney General,

History of Executive Privilege vis-a-vis Congress, December 14,

1982).  Many of these claims were made to prevent the disclosure

of investigatory files.  See id., p. 94-95 (President Monroe);

p. 96-97 (President Jackson); p. 99-100 (President Tyler); p. 103

President Buchanan); p. 103-04 (President Lincoln); p. 104 (Presi-
dent Johnson); p. 105 (President Cleveland); p. 106-07 (President
Theodore Roosevelt); p. 107 (President Coolidge); p. 107-08
(President Franklin Roosevelt); p. 109-110 (President Truman).
See also Cox, Executive Privilege, 122 U. Pa. L. Rev. 1383,
1400-02 and nn. 61-67.

Thus, it has been the general policy of the Executive Branch
throughout this Nation's history to withhold from Congress sensi-
tive documents from open law enforcement files except in the most
extraordinary circumstances.  For example, President Tyler invoked
executive privilege against a request by the House of Representa-
tives to the Secretary of War to produce investigatory reports
submitted to the Secretary by Lieutenant Colonel Hitchcock
concerning his investigation into frauds perpetrated against the
Cherokee Indians.  See The Committee Report, p. 99-100.
Similarly, President Truman invoked the privilege and directed
officials not to disclose files bearing on the loyalty of certain
State Department employees after the Senate subpoenaed those
files.  See id. at 109-110.  And President Franklin Roosevelt
directed Attorney General Jackson to invoke the privilege con-
cerning a House request to view certain FBI records.  See id. at
107-08.  As Attorney General Robert Jackson stated to Congress
over forty years ago:

> It is the position of [the] Department
> [of Justice], restated now with the approval
> of and at the direction of the President, that

> all investigative reports are confidential
> documents of the executive department of the
> Government, to aid in the duty laid upon the
> President by the Constitution to 'take care
> that that laws be faithfully executed,' and
> that congressional or public access to them
> would not be in the public interest.
>
> Disclosure of the reports could not do
> otherwise than seriously prejudice law
> enforcement.  Counsel for a defendant or
> prospective defendant, could have no greater
> help than to know how much or how little
> information the Government has, and what
> witnesses or sources of information it can
> rely upon.  This is exactly what these
> reports are intended to contain.

40 Op. A.G. 45, 46 (1941).

Attorney General Smith also relied upon the reasoning of

former Assistant Attorney General Thomas F. Kauper, who stated:

> The Executive cannot effectively investigate
> if Congress is, in a sense, a partner in the
> investigation.  If a congressional committee
> is fully apprised of all details of an
> investigation as the investigation proceeds,
> there is a substantial danger that congres-
> sional pressures will influence the course of
> the investigation.

Exhibit F, p. 3.

The Attorney General found that promises of confidentiality

by a congressional committee or subcommittee do not remove the

basis for the policy of nondisclosure of law enforcement files.

He agreed with the position stated by Attorney General Jackson in

writing to Congressman Carl Vinson, then Chairman of the House

Committee on Naval Affairs, in 1941:

> I am not unmindful of your conditional
> suggestion that your counsel will keep this
> information 'inviolate until such time as the
> committee determines its disposition.'  I have
> no doubt that this pledge would be kept and
> that you would weigh every consideration
> before making any matter public.  Unfortu-
> nately, however, a policy cannot be made
> anew because of personal confidence of the
> Attorney General in the integrity and good
> faith of a particular committee chairman.
> We cannot be put in the position of
> discriminating between committees or of
> attempting to judge between them, and their
> individual members, each of whom has access
> to information once placed in the hands of
> the committee.

As the Attorney General noted, Assistant Attorney General
Kauper articulated additional considerations in explaining why
congressional assurances of confidentiality could not overcome
concern over the integrity of law enforcement files:

> [S]uch assurances have not led to a relaxation
> of the general principle that open investiga-
> tive files will not be supplied to Congress,
> for several reasons.  First, to the extent
> the principle rests on the prevention of
> direct congressional influence upon
> investigations in progress, dissemination
> to the Congress, not by it, is the critical
> factor.  Second, there is the always present
> concern, often factually justified, with
> 'leaks.'  Third, members of Congress may
> comment or publicly draw conclusions from
> such documents, without in fact disclosing
> their contents.

Perry Dec., Exhibit F, p. 6.$\underline{}^{*/}$   There are, therefore, a
number of compelling reasons why documents such as those at issue
here must remain privileged and why "[a]t bottom, the President
has the responsibility vested in him by the Constitution to
protect the confidentiality of certain documents which he cannot
delegate to the Legislative Branch."  Id., p. 7.

C.   The Documents At Issue In This
Case Are Properly Subject To
A Claim Of Executive Privilege

The administration of the Superfund Act involves a continuous
process of investigation and law enforcement efforts.  The process
may ultimately result either in an administrative action, criminal

---

*/   Guarantees of confidentiality by the Levitas Subcommittee can
not overcome the concern over the integrity of law enforcement
files in this instance either.  Rule XI, cl.2, § 706c of the Rules
of the House of Representatives provides that "[a]ll committee
hearings, records, data, charts, and files . . . shall be the
property of the House and all members of the House shall have
access thereto . . . ." (emphasis added).  Thus, Subcommittee
access to the documents is equivalent to access by all of the
members of the House of Representatives and, accordingly, to the
general public.  Nor will an offer to receive the privileged
documents in "executive session" pursuant to Rule XI, cl.2, § 712
of the Rules of the House of Representatives alleviate that
concern.  The only protection given the documents by that
provision is that they shall not be made public without the
consent of the Subcommittee.  Since such consent could be given
any time in the future, this assurance fails to provide the
Executive the protection and control to which it is
constitutionally entitled.

Furthermore, there is always the possibility that information
will be leaked to the public by House members or their staffs.
Although the same danger exists in the Executive Branch, the
Executive can assert control over Executive Branch employees
through a variety of potential sanctions, including loss of
employment.  With disclosure of documents to Congress, the Execu-
tive Branch loses that power to ensure the confidentiality of its
records.  Ultimately, it is the Executive's responsibility to
enforce the law and to maintain the confidentiality of information
that is necessary for this purpose.

- 65 -

prosecution or civil litigation.   As such, the enforcement func-
tions of EPA under the Superfund are similar to those functions
carried out by the FBI or the Department of Justice in a criminal
prosecution.   Accordingly, the same concerns for protecting the
law enforcement investigatory files of those agencies are equally
applicable with respect to the enforcement of the Superfund
program.   Cf. Center for National Policy Review v. Weinberger, 502
F.2d 370, 373 (D.C. Cir. 1974).

The documents which form the focus of this dispute are all
part of open law enforcement case files.   A number of cases are in
early stages of investigation, where public disclosure could be
particularly destructive.   Many of the documents contain EPA's
proposed settlement strategies, including the bottom-line figure
it would accept from a particular responsible party.   The memo-
randa also describe, in detail, anticipated defenses, the elements
of proof required in a given case, the legal issues involved and
possible precedential impact.   Also included are lists of poten-
tial witnesses and descriptions of available evidence.   Perry
Dec., para. 16.

Threatened disclosure of these documents raises serious
fears.   The documents in question all stem from ongoing
enforcement actions which EPA and/or the Department of Justice are
developing for litigation or which are actually being litigated in
the courts.   Thus, disclosure of these documents would reveal the
strategy of the investigation and forewarn the suspects under
investigation.   It would also undercut the investigation of the
hazardous waste sites by premature disclosure of the facts of the
government's case.   Such information would be of obvious benefit

to the targets of the investigation and destroy the adversarial element crucial to the law enforcement process. For example, EPA would be at an enormous disadvantage in attempting to negotiate an environmentally appropriate settlement agreement with a party who knew EPA's bottom-line settlement position, its negotiation strategy, and its perception of the strengths and weaknesses in the government's case. In addition, the withheld documents identify potential targets for enforcement actions; the disclosure of those names could have great impact upon those persons identified, by harming the reputation of possibly innocent persons.

Moreover, the information sought is not factual data, which has already been made available to the Subcommittee. Rather, the documents withheld consist of legal and strategic analyses of individual cases, lists of potential witnesses, settlement considerations and similar materials. These are the kind of work product documents that would be immune from production under Fed. R. Civ. Proc. 26(b)(3).

Thus, in this instance, the need for the privilege is very strong. As demonstrated below, Congress cannot overcome the presumption of the privilege in this instance because it cannot establish a compelling and specific need for the documents.

> D.   Congress Has Not Shown A Specific
> And Compelling Need For Disclosure
> Of The Documents That Overcomes
> The Presumption Of Executive
> Privilege

Defendants seem to assert an absolute right to any documents held by the Executive; at least, they insist that the House should be the sole arbiter of what documents the Executive may withhold.

As discussed above, that simply is not the law.  Instead, while executive privilege is not absolute, it may be overcome only by a specific showing that Congress has a compelling need for the documents in question.  See pp. 54-55, supra.  In some cases, there may be a need for delicate balancing of competing interests.  Here, however, the decision is an easy one because the Subcommittee has made no showing whatsoever of a specific need for the documents in question.

The power of Congress to conduct investigations is inherent in the legislative process.  When this "power of inquiry" is directed at the Executive Branch, however, it is bounded by principles imposed by the separation of powers doctrine.  See Senate Select Committee v. Nixon, supra.  Thus, the power of Congress to investigate is subject to claims by the Executive that the release of certain information would impair the President's obligation to discharge the responsibilities assigned to him by the constitution.  See p. 54, supra.  When such a claim is interposed, it cannot be overcome absent a showing of some compelling need for the information sought.  See Senate Select Committee v. Nixon, supra, 498 F.2d at 730; United States v. A.T.&T., 567 F.2d 121 (D.C. Cir. 1977).  Indeed, this Circuit has held that the general oversight and fact-finding functions of a particular congressional committee were insufficient to override the interests of the Executive Branch in protecting privileged information from disclosure.  See Senate Select Committee v. Nixon, supra, 498 F.2d at 732.  The Court in Senate Select Committee contrasted the general congressional interest in oversight and fact-finding with the specific and compelling need for disclosure in the face of a

grand jury subpoena, such as that involved in <u>Nixon</u> v. <u>Sirica</u>, 487 F.2d 700 (D.C. Cir. 1973).

The subcommittee here has not and indeed cannot show any need -- much less any compelling need -- for the withheld documents sufficient to overcome the valid claim of privilege invoked by the Executive Branch. The Subcommittee issued the subpoena in question in order "to review the integrity and effectiveness of EPA's enforcement program and to evaluate the adequacy of existing law." The Committee Report, p. 61. (Legal Memorandum of the General Counsel to the Clerk of the House of Representatives to Chairman Levitas Regarding Executive Privilege, December 8, 1982). The information requested is very broad in scope and the reasons for the request are very general. It is difficult to understand why the withheld documents, a small number of sensitive materials from open law enforcement files, are necessary to enable the Subcommittee to conduct its investigation. What is critical, however, is that the House cannot possibly make a showing that they are necessary because the House has not reviewed the documents actually made available to it. In fact, the Subcommittee actually refused to inspect the documents produced. Perry Dec., para. 25. Since the Subcommittee refuses to inspect the tremendous bulk of material that has been offered, it cannot possibly show any compelling need for the miniscule number of documents that have been withheld.\*/

---

\*/   Moreover, the Subcommittee has not shown that whatever information it may have wanted from EPA could not have been obtained by some means other than the production of sensitive law enforcement documents from open Superfund Act enforcement files.

Moreover, the access that has been denied to the Subcommittee is only temporary. EPA has offered to turn over memoranda in the enforcement files as they lose their enforcement sensitivity. The Subcommittee has failed to demonstrate why its need to view these documents is critical at this point and cannot wait until the sensitive nature of the documents has abated.

Furthermore, the documents that have been made available to the Subcommittee may well fulfill its legislative needs. They consist of notes and internal memoranda from both open and closed cases involving enforcement of the Superfund. The documents include data on the amounts, nature, and origin of wastes present at hazardous waste sites; correspondence between EPA and the generators of the hazardous waste; records of interraction with state and local government officials; correspondence with responsible parties, contractors, state officials and representatives of other federal agencies; memoranda discussing the allocation of monies to particular sites by EPA; cooperative agreements arranged with the states involved; and memoranda reflecting the process of having the Superfund Office begin working on a site while initiating settlement negotiations with the contractor. Perry Dec., para. 16. A review of these materials would certainly enable the Subcommittee to conduct a detailed and comprehensive investigation of the adequacy of EPA's Superfund enforcement efforts. They reflect the various steps that have been taken concerning numerous hazardous waste sites. An evaluation of the effectiveness of the law as it has been applied and implemented by EPA clearly may be culled from these documents.

Accordingly, defendants have not and cannot meet their burden of demonstrating a specific, articulable need for the documents in question that would overcome the presumption of the asserted privilege. They have not even attempted to demonstrate such a specific need nor attempted to accommodate the interests of confidentiality required by the Executive in its law enforcement efforts. Instead, they continue to rely on the Subcommittee's generalized request for production of documents, failing to recognize that such a request is insufficient in and of itself to overcome the constitutionally protected interests of another branch of the government. Since defendants cannot establish any compelling need for the documents in question sufficient to over-come the claim of privilege, the Court should enter a judgment declaring that the Administrator acted lawfully in refusing to disclose them to the Subcommittee.

## CONCLUSION

For all of the foregoing reasons, the plaintiffs' motion for summary judgment should be granted.

Respectfully submitted,

J. PAUL McGRATH
Assistant Attorney General

STANLEY S. HARRIS
United States Attorney

RICHARD K. WILLARD
Deputy Assistant Attorney General

- 71 -

LEWIS K. WISE

ANDREW M. WOLFE

BETSY J. GREY

Attorneys, Department of Justice
Civil Division — Room 3531
10th & Pennsylvania Avenue, N.W.
Washington, D.C.   20530
Tel:   (202) 633-4020

Attorneys for Plaintiffs United
   States of America and Anne M.
   Gorsuch