**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Criminal No. 1:22-cr-00200-APM** |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION
TO DEFENDANT'S MOTION TO COMPEL DISCOVERY**

*Ipsit Dixit.* The Government would have this Court conclude that Dr. Navarro is not entitled to the discovery he seeks because, it asserts, he cannot prevail in any argument that he was selectively prosecuted and/or that the Government abused the grand jury process because it says so. Despite the opportunity to explain why the law favors its position, why the factual irregularities highlighted by Dr. Navarro are meaningless, or why the discovery Dr. Navarro seeks would not aid in his defense the Government does not. It does not because it cannot. Rather, in response to Dr. Navarro's Motion to Compel Discovery, the Government represented that it has "exceeded its discovery obligations and already provided the Defendant all discoverable material in its possession, custody, or control. While the volume of discovery might be small, its volume is not a reflection of its thoroughness." Opposition ("Opp.") at 1. This assurance by the Government that it had fully satisfied its discovery obligations followed similar statements in response to Dr. Navarro's Rule 16 requests.[1] Dr. Navarro has no basis to dispute that the Assistant U.S. Attorneys

---

[1] For example, on July 22, 2022, counsel for the Government advised the undersigned counsel as follows: "As an initial matter, your letter appears to suggest that President Biden, the White House Counsel's Office, the [Select Committee], and the [House Subcommittee on the Coronavirus Crisis] are part of the prosecution team in this case. They are not. We have provided all discoverable materials we have received from those parties and thus had nothing more to provide in response to requests in which you seek information in their possession."

who made those responses believe them to be true. Recent disclosures, however, reveal that the Government's representation in *this case* may not have been fully accurate.

Yesterday evening, Monday, August 22, 2022, defense counsel and Dr. Navarro learned for the first time that in April 2022, a member of the White House Counsel's Office engaged in conversations with the Department of Justice, the FBI, and the National Archives and Records Administration ("NARA"), in which the Biden Administration empowered NARA to waive any claims to executive privilege that President Trump might assert against any assertion of applicable privileges to the Department.[2] Specifically, we now know that White House Deputy Counsel, Jonathan Su, conveyed to NARA that President Biden would not object to waiving former President Trump's claims to executive privilege. NARA's Acting Archivist discussed the issue with the Department's Assistant Attorney General for the Office of Legal Counsel ("OLC") and then notified counsel for President Trump that she would not honor the former President's "protective" claim of privilege.[3] This correspondence occurred roughly at the same time that Mr. Su was conveying to President's Trump counsel that OLC memoranda did not preclude Dr. Navarro from testifying before the Select Committee.[4] Indeed, on February 28, 2022, two weeks after the Select Committee issued its subpoena to Dr. Navarro, White House Deputy Counsel, Jonathan Su, sent an unsolicited letter to him advising that President Biden had waived former

---

[2] https://justthenews.com/politics-policy/all-things-trump/biden-white-house-facilitated-dojs-criminal-probe-against-trump.

[3] Apparently, this was done so that the Department could obtain a grand jury subpoena compelling President Trump to turn over materials he possessed from his presidency.

[4] At the direction of former President Trump, Dr. Navarro invoked executive privilege as the basis of his refusal to respond to the Select Committee's subpoena.

President Trump's executive privilege in an attempt to neutralize Dr. Navarro's invocations to the Select Committee.[5]

The interplay between the White House and the Department indicates a greater level of coordination than was previously disclosed by the Government to Dr. Navarro. The correspondence between the White House, OLC, and NARA may help explain why the Department suddenly abandoned fifty years precedent by administrations of both parties that held that senior advisers to a President are "absolutely immune" from Congressional process. The disclosure of these coordinated activities is relevant to Dr. Navarro's defense and entitles him to discovery of related matters pursuant to Rule 16.[6]

## ARGUMENT

The positions taken by the Government in its Opposition to Dr. Navarro's discovery requests flow from a fundamental misunderstanding of the nature of this case, which the Government wrongly asserts is "straightforward," and that the only "question at trial is whether the Defendant was subpoenaed to provide documents and testimony in relation to the Committee's authorized investigation and whether his default was willful." (Dkt. No. 33 at 1, 10). Not surprisingly, that erroneous premise, which effectively short circuits any additional discovery, has led to the Government's flawed conclusions regarding the  Dr. Navarro's rights to discovery.

This is a case of first impressions with important historical and policy implications: This case stems from the intersection of a partisan weaponization of the House of Representative's investigatory powers clashing with the doctrine of executive privilege asserted by Presidents since

---

[5] When interviewed by the FBI on June 1, 2022, Mr. Su stated that he had first heard in the media that the Select Committee had issued a subpoena to Dr. Navarro. He also claimed to know Dr. Navarro's email address "from a separate, unrelated investigation regarding [January 6th]." (FBI 302 - 06/06/22).

[6] Communications among the White House, the Department, and NARA also are relevant to how the "prosecution team" is defined for purposes of the Government's discovery in this case. The significance of that matter is further discussed *infra*.

the founding of the Republic and validated for over five decades by the Department of Justice's OLC opinions from 1984 to the present. It is a test of the Separation of Powers between the Executive Branch and the Legislative Branch, where the criminal prosecution of a senior aide to the President should be barred as a matter of law or, at a minimum, be permitted to introduce evidence of his reliance on the Department's own legal positions in his defense at trial.[7]

This case also presents novel issues about a former President's authority to invoke executive privilege, whether the absolute immunity from congressional inquiry long recognized by the OLC continues to apply to senior advisers after they leave the White House, and the extent to which a President may waive those protections asserted by a former President. The Government appears to have decided those questions in a manner that is unfavorable to former President Trump and to Dr. Navarro; but those conclusions are also inconsistent with the Department's long-standing policies and legal rationale and changed without reasonable notice to Dr. Navarro. While the Government may be entitled to change its mind, it should not be permitted to move the goalposts in the middle of a game by criminally prosecuting Dr. Navarro for long established positions taken by the Department itself. It is this changing of the rules, potentially for improper political reasons, that entitles Dr. Navarro to further discovery about the interactions between the White House, the Department, NARA, and the Select Committee.

The information sought by Dr. Navarro in his Motion to Compel Discovery is not limited to information that either party may wish to use at trial. Fed. R. Crim. P. 16(a)(1)(E)(i) is the minimum standard that entitles Dr. Navarro to information that "is material to preparing the defense." A defendant also has a right to both inculpatory and exculpatory information that is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United*

---

[7] Dr. Navarro recently provided Notice pursuant to Fed. R. Crim. P. 12.3 of his intent to assert defenses of entrapment by estoppel and public authority (Dkt. No. 36).

*States*, 405 U.S. 150, 154 (1972). The Government argues that Dr. Navarro is not entitled to information that would support collateral attacks, such as a claim of selective prosecution, because such issues are not "material to preparing a defense." While not conceding that is true – surely there are situations where information might be helpful to the defense in both ways – Dr. Navarro has met the additional threshold of showing a discriminatory effect of the Government's prosecution in this case, as well as the likelihood of a discriminatory purpose.

Dr. Navarro therefore seeks information that would support his arguments that: (1) the indictment itself is invalid and must be dismissed: (2) he is a target of selective or disparate treatment of his case from other similarly situated high ranking White House officials; (3) the Grand Jury process was abused, including through undue political interference from the current White House in contravention of defendant's right to the appearance of impartiality in the prosecution of his case; and (4) the procedures employed to obtain the indictment contravened his right to due process.

## A.       Discovery that Negates "Willful" Mens Rea

The Government's argument that the term "willful" in the contempt of Congress statute does not require evidence that a defendant acted in bad faith or with knowledge that his conduct was unlawful (Dkt. 33 at p. 21) flies in the face of decades of jurisprudence interpreting that term to require specific intent. The Government relies on the D.C. Circuit's 1947 decision in *Fields v. United States*, 164 F.2d 97 (D.C. Cir. 1947), for the proposition that Dr. Navarro's claim that he relied on the OLC opinions, "cannot provide a defense because the contempt of Congress statute does not require that the Defendant have acted in bad faith or with knowledge that his conduct was unlawful. (Dkt. No. 33 at p. 21).[8]/

---

[8]/ The Government also references Judge Carl J. Nichols's Order and proceedings in *U.S. v. Bannon* without acknowledging that its argument in that case, and that Court's reluctant agreement, relied heavily on *Licavoli v. United*

*Fields,* however, involved a defendant's failure to produce records that were in his control after repeatedly representing to the committee that he would do so. Reasoning that "[t]he apparent objective of the statute involved here would be largely defeated if … a person could appear before a congressional investigating committee and by professing willingness to comply with its requests for information escape the penalty for subsequent default." *Id.* at 100. In contrast, Dr. Navarro's response to the Select Committee's subpoena was determined not by choice, but by his adherence to the direction of the President he had served for four years that he assert all applicable privileges and immunities.

Subsequent decisions in this Circuit and the Supreme Court have interpreted the term "willfully" to require a specific intent *mens rea*, where the Government must prove that a defendant understood that his actions were unlawful, and where a defendant is entitled to introduce evidence to the contrary. *See Bryan v. United States*, 524 U.S. 184, 191-192 (1998); *Ratzlaf v. United States,* 510 U.S. 135, 137 (1994); *United States v. Burden*, 934 F.3d 675, 692-692 (D.C. Cir. 2019) (acknowledging the Supreme Court's progression toward reading "willfully" as requiring proof that a defendant had a "culpable state of mind" and knew that his acts were unlawful); *United States v. Zeese*, 437 F. Supp. 3d 86, 94 (D.D.C. 2020) ("Generally, 'in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'"). Thus, Dr. Navarro is entitled to the discovery of information that might tend to exculpate him – *i.e.,* that may show that he relied on decades of Department policy when he asked the Select Committee to work through those issues with former President Trump in lieu of complying with its subpoena.

---

*States*, 294 F.2d 207 (D.C. Cir. 1961).  Dr. Navarro submits that Licavoli is abrogated by subsequent decisions in this Circuit and the United States Supreme Court.  In any event, Licavoli is inapplicable here, as it did not involve the constitutional implications of an assertion of Executive Privilege and absolute testimonial immunity by a close adviser to the President, and it did involve an assertion of attorney-client privilege that is not at issue here.

B.       **Application of OLC Memoranda**

In its Opposition, the Government engages in spectacular acrobatics in support of its assertion that "this case does not depart from the [OLC] opinions." (Dkt. No. 33 at p. 15).  It argues that "There is no OLC opinion holding that former White House staff members can invoke executive privilege or their own accord."[9]/ Dr. Navarro does not contend otherwise; he received President Trump's instruction to invoke executive privilege and communicated that to the Select Committee.

The Government argues that there is no OLC opinion "that holds that, even where a president invokes executive privilege … the summoned witness can then withhold all responsive records, whether privileged or not.  It ignores the fact that Dr. Navarro never took that position. Rather, his response to the Select Committee was that it should negotiate the parameters of any such production with President Trump and his attorneys. The Government also fails to acknowledge this Court's ruling nearly forty years ago – that "constitutional claims [of executive privilege] and other objections to congressional investigatory procedure may be raised as defenses in a criminal prosecution" – in a case where former EPA Administrator Anne Gorsuch refused to turn over subpoenaed documents. *United States v. United States House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983).

The Government also argues that there is "no OLC opinion holding that a former White House staff member to a former President has absolute testimonial immunity when summonsed by Congress," and that, "Indeed, there is not even an OLC opinion holding that all current White House staff members have such immunity—OLC has only ever found such immunity to apply to

_____

[9]/ President Trump publicly directed Dr. Navarro to assert privilege ion his behalf. To the extent that the Government may mean that President Trump's lawyers did not provide Dr. Navarro with a formal letter directing him to assert privilege, it cites no authority that requires a President to follow any specific process for the invocation of Executive Privilege.

a limited group of immediate advisers based on a fact-intensive review of those advisers' roles."
(Dkt. No. 33 at p. 16).

Dr. Navarro agrees that this case presents the novel issue of whether absolute immunity
applies to a criminal prosecution in the context of a *former* adviser to a *former* president, but
common sense and decades of OLC opinions clearly support an affirmative answer to that
question.[10]/ The common sense basis for that answer is acknowledged by OLC opinions and court
decisions dating back to the 1970s and 1980s. In his 1982 Memorandum for the Attorney General,
for example, Theodore Olson acknowledged that "[t]he necessity for confidentiality in the advisory
relationships between Cabinet advisers and the President, and their respective aides, is of both
constitutional and practical significance. 6 Op. O.L.C. 481 at 484 (1982), *citing United States v.*
*Nixon*, 418 U.S. 683 (additional citations omitted). *Such a protection would be of little value if it*
*evaporated when a president leaves office, leaving his confidential communications fair game for*
*his successor and political rival and committees of Congress controlled by the opposing party.*

That reasoning is echoed in a series of OLC opinions applying testimonial immunity to
*former* advisers of *sitting* Presidents. Harriet Miers was a *former* White House Counsel when the
House Judiciary Committee subpoenaed her to testify about the termination of several U.S.
Attorneys. *Immunity of the Former Counsel to the President from Compelled Congressional*
*Testimony*, 31 Op. O.L.C. 191 (2007). Donald McGahn was also a *former* White House Counsel
when the House Judiciary Committee subpoenaed him to testify about matters described in the
Mueller Report. *Testimonial Immunity Before Congress of the Former Counsel to the President*,

---

[10]/ However, the OLC has acknowledged on at least one occasion that "testimonial immunity continues after the tenure
of a particular Counsel to the President. … The privilege must outlast the tenure of a particular President because,
absent a guarantee of lasting confidentiality, "a President could not expect to receive the full and frank submissions
of facts and opinions upon which the effective discharge of his duties depends." *Memorandum For Pat A. Cipollone*
*Counsel To The President,* _ Op. OLC at 11 (May 20, 2019) citing *Nixon v. Adm'r of Gen.Servs.,* 433 U.S. 425, 449
(1997) and *United States v. Johnson*, 383 U.S. 169 (1966).

43 Op. O.L.C. __ (May 20, 2019). Robert Porter was a *former* Assistant to the President and Staff Secretary, and Rick Dearborn was a *former* Assistant to the President and Deputy Chief of Staff for Policy Implementation, when the House Judiciary Committee subpoenaed them to testify about matters described in the Mueller Report. *OLC Letters to Pat. A. Cipollone* (Sept. 16, 2019).

Dr. Navarro clearly qualifies as the type of close presidential adviser to whom executive privilege and immunity should apply. As the Government points out, the OLC considers "the day-to-day responsibilities of the adviser and the extent of his or her regular interaction with the President …" in determining whether immunity applies. During the time period at issue in the Select Committee's investigation (generously meaning November 1, 2020, through January 20, 2021), Dr. Navarro was nearing the end the Administration which he had served from its beginning in 2017. His title at that point was Assistant to the President and Director of the White House Office of Trade and Manufacturing Policy. During his tenure, he also served as the Defense Production Act policy coordinator during the COVID-19 pandemic.  Dr. Navarro had close, almost daily, interaction directly with the President on a range of issues, including the fallout from the 2020 election. Indeed, it is precisely for that reason that the Select Committee sought his testimony, as articulated in the Select Committee's February 9, 2022, letter accompanying its subpoena: "For example, you, then a White House trade advisor, reportedly worked with Steve Bannon and others to develop and implement a plan to delay Congress's certification of, and ultimately change the outcome of, the November 2020 presidential election." Put simply, there can be no real question that were Donald J. Trump the incumbent president, Dr. Navarro would be instructed, by OLC, that he need not appear in response to the Select Committee's subpoena.

Indeed, Dr. Navarro's position and interaction with the President was at least the same as that of a number of past White House advisers, to whom OLC has determined executive privilege and immunity have been extended. Those include: the EPA Administrator (8 Op. O.L.C. 101

(1984)); four current and former White House Counsels (20 Op. O.L.C. 308 (1996), 23 Op. O.L.C. 1 (1999), 31 Op. O.L.C. 191 (2007) and 43 Op. O.L.C. __(2019)); the Pardon Attorney (20 Op. O.L.C. 308 (1996)); an Assistant to the President and Director of the Office os Political Strategy and Outreach (38 Op. O.L.C. 5 (2014)a former Assistant to the President and Deputy Chief of Staff for Policy Implementation (2019); a former Assistant to the President and Staff Secretary (2019), and an Assistant to the President and Senior Counselor to the President (2019).  As such, Dr. Navarro fits squarely within the reach of executive privilege and immunity discussed in decades of OLC memoranda.

### C.      The "Prosecution Team"

We now understand that there was a concerted effort between the White House, the Justice Department's Office of Legal Counsel, and NARA to deprive President Trump of his ability to assert executive privilege over documents recently seized by the FBI at Mar-a-Lago. The article published yesterday reported that Jonathan Su of the White House Counsel's Office was engaged in conversations with the Department, the FBI, and the National Archives and Records Administration ("NARA") whereby the Biden Administration empowered NARA to waive any claims to executive privilege that President Trump might assert against the Department.[11]/ According to the article, by May 2022 White House Deputy Counsel Jonathan Su conveyed to NARA that President Biden would not object to waiving former President Trump's claims to executive privilege. Apparently, this was done so that the Department could obtain a grand jury subpoena compelling President Trump to turn over materials he possessed from his presidency. The article further stated that NARA made that decision "in consultation with the Assistant Attorney General for the Office of Legal Counsel.

---

[11]/ https://justthenews.com/politics-policy/all-things-trump/biden-white-house-facilitated-dojs-criminal-probe-against-trump.

The same actors feature prominently in Dr. Navarro's case.  The same Mr. Su wrote the unsolicited letter to Dr. Navarro just days before his deposition date to inform him that President Biden was not asserting executive privilege over his testimony. It is unlikely that he would have even known to do so without discussions with the Select Committee.  The same NARA prompted DOJ's Civil Division to issue a litigation demand letter to Dr. Navarro the day before his indictment seeking documents sought by the Coronavirus Subcommittee that had gone unaddressed for approximately six months.  It is not unreasonable to think that politics played a role in any of this and in the OLC's decision to change course from decades of memoranda and the legal basis behind them.  Dr. Navarro should be permitted to at least explore whether that is so.

**D.     Dr. Navarro Has Shown that he is Entitled to Discovery Regarding his Claim of Selective Prosecution and Undue Political Influence**

The Government implausibly asserts in its Opposition that Dr. Navarro is not entitled to discovery of his selective prosecution claim because that information "does not go to the elements of the offense or answering the Government's proof of them at trial." Opp. at 11. This fundamentally misunderstands that a claim for selective prosecution is "not a defense on the merits to the criminal charge itself, but an *independent assertion* that the prosecutor has brought the charge for reasons forbidden by" the equal protection component of the Fifth Amendment. *United States v. Armstrong,* 517 U.S. 456, 464 (1996) (Emphasis added).

The Government recognizes, as it must under *Armstrong,* that Dr. Navarro is entitled to discovery on his claim of selective prosecution if he can offer "some evidence of both discriminatory effect and discriminatory intent."[12]/ Opp. at 12. Admittedly, this is a challenging

---

[12]/ A defendant alleging selective prosecution must show two things. *First,* he must establish that the prosecutorial policy "had a discriminatory *effect*" on him. *Armstrong,* 517 U.S. at 465 (Emphasis provided). To show that, he must establish that the Government afforded "different treatment" to persons "similarly situated" to him. *Id.* at 470. When

standard because the Government rarely, if ever, concedes that it acted improperly in bringing criminal charges against a defendant. However, the circumstantial evidence currently available to Dr. Navarro more than satisfies the "rigorous" standard required by *Armstrong*.

The Government conflates what is discoverable as a matter of right from what is discoverable upon a requisite threshold showing of "necessary to obtain discovery in support of such a claim." *Armstrong*, 517 U.S. at 468. In *Armstrong*, the Court concluded, "the required threshold – a credible showing of different treatment of similarly situated persons – adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." *Id.* at 470. Unlike in *Armstrong*, the showing is readily met here. It is hard to imagine a more credible showing of disparate treatment than the one presented by this case.

Three individuals who served as senior advisers to the President at the time of the events that are relevant to the Select Committee's subpoenas – Mark Meadows, Dan Scavino and Dr. Navarro – were referred by the House of Representatives for contempt following their refusal to comply with those subpoenas.[13] It has charged only one of those individuals, Dr. Navarro. Although the Government makes a half-hearted attempt to differential between the three men, Opp. at 14, the near identical situations of all three is beyond serious dispute. As a purported reason

_____

a person's circumstances "present no distinguishable legitimate prosecutorial factors that might justify" different prosecutorial decisions between him and the defendant, that person is a similarly situated to the defendant. *Branch Ministries*, 211 F. 3d at 145. *Second*, a defendant must show that the prosecutorial policy had "a discriminatory *purpose*." *Armstrong*, 517 U.S. at 465 (Emphasis provided). Discriminatory purpose may be established either with direct evidence of the prosecutor's intent or by "evidence concerning the unequal application of the law, statistical disparities and other indirect evidence of intent." *Branch Ministries v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997). A colorable claim is one that presents "some evidence tending to show the existence of the essential elements" of selective prosecution. *Armstrong*, 517 U.S. at 467.

[13] The Government implausibly claims that a violation of 2 U.S.C. § 192, the criminal Contempt of Congress statue, has occurred when a defendant receives a subpoena and does not comply – without regard to any of the surrounding circumstances. Opp. at 1.

for declining to prosecute Messrs. Meadows and Scavino, while prosecuting Dr. Navarro, the Government suggests that Mr. Meadows's production of records to the Committee, or Mr. Scavino's protracted correspondence with Committee counsel, are differentiators. But the fact remains that (1) all three individuals declined to appear for the purportedly duly issued subpoenas, (2) all three were subsequently referred for contempt/[14]; and (3) 18 U.S.C. § 194 provides that the U.S. Attorney's Office for the District of Columbia *shall* refer all three to the Grand Jury for return of an indictment.[15]/ Dr. Navarro has thus met *Armstrong's* threshold showing of "different treatment of similarly situated persons."

The Government's *ipsit dixit* claim that Dr. Navarro cannot establish a defense of selective prosecution is, at best, premature before the transparency afforded by discovery. It is interesting, and we think highly significant, that the only one of the three similarly situated individuals to be charged is the same person who repeatedly publicly spoke out about his disdain for the Biden Administration and the Select Committee.[16]/ As the D.C. Circuit reiterated just last week, the Government is precluded from, "abridging the freedom of speech." *Guffey v. Mauskopf,* --- F.4th

---

[14]/ The House referred Mr. Scavino to the Department of Justice at the same time it referred Dr. Navarro for prosecution.

[15]/ The Government erroneously urges the Court to accept that this prosecution is "straightforward" and requires it to prove only that Dr. Navarro "received a subpoena, ignored the subpoenas document demand, and refused to appear for testimony despite the admonition that he must." Opp. at 1. Yet, both Mr. Meadows and Mr. Scavino were served with subpoenas and they refused to appear before the Select Committee for deposition. Upon referral by the House of Representatives, the Department declined to prosecute them under a statute that seemingly required it to do so. Fifty years of Department policy and OLC precedent support those decisions. The prosecution of Dr. Navarro is an outlier that the Department has thus far failed to adequately explain.

[16]/ This of course was Dr. Navarro's right under the First Amendment to the Constitution. Unfortunately, this prosecution is sadly reminiscent of political trials that occur in countries without the same democratic traditions as those in the United States. Can there be any doubt that the Department of Justice in a Republican administration would have declined to prosecute Dr. Navarro? Similarly, there was no criminal referral to the Department when then-Attorney General Eric Holder defied a subpoena from the Republican led House Oversight Committee which sought information from the Democrat controlled Department of Justice. Up until now, political prosecutions arising from disputes between the Executive and Legislative branches have been avoided by administrations of both political parties. It would be tragic if that moment in our Nation's history has passed.

--- 2022 WL 3364545 (Aug 16, 2022). A prosecution of that is motivated by Dr. Navarro's political speech would unequivocally be a violation of his First Amendment rights and compelling evidence of selective prosecution where others otherwise similarly situated were not so prosecuted. *See id.* at 7 ("Time and again, the Supreme Court has held that political speech must receive 'the highest level of First Amendment protection'" (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 443 (2015)).[17]/

Similarly, this prosecution of Dr. Navarro arguably conflicts with his protection from discrimination based on political affiliation. Specifically, the DC Human Rights Act prohibits discrimination based on one's political affiliation. *See Blodgett v. Univ. Club*, 930 A.2d 210, 222 (D.C. 2007). Here, the Government's prosecution is overtly discriminatory in that it punishes Dr. Navarro for being outspokenly critical of the Biden Administration, the opponent of the party with whom he affiliates politically.

The Government contends that Dr. Navarro has failed to show that its prosecution of him is without discriminatory *effect* even though Mark Meadows and Dan Scavino, who also were senior advisors to President Trump, did not comply with the Select Committee's deposition subpoenas for reason of executive privilege. Searching for a way to explain its disparate treatment of these similarly situated[18]/ individuals, the Government feebly contends that "the circumstances

---

[17]/ The Government's meager assertion that Messrs. Meadows and Scavino "appear to also frequently make public statements about their political beliefs" does not adequately rebut Dr. Navarro's assertion that his prosecution is discriminatory based upon his *expression* of his political affiliation. The fact of the matter is that neither Messrs. Meadows, Scavino or Navarro appeared for deposition at the time indicated in their subpoenas. Yet, the only one of these to be prosecuted was openly outspoken about the Select Committee and the Biden Administration. *See Gay Rights Coalition of Georgetown University Law Center v. Georgetown University*, 536 A.2d 1, 43 (D.C. 1987) (Pryor, J., concurring) ("By incorporating these exceptions into the Human Rights Act, the District of Columbia Council signaled its awareness of the special role that religious and political belief plays in our constitutional order.").

[18]/ Messrs. Meadows and Scavino are not simply "similarly situated" to Dr. Navarro. All three individuals notified the Select Committee that they could not appear for deposition because they had been instructed by President Trump to invoke executive privilege on his behalf. In that sense they were *identically* situated.

of their communications with the Committee and refusal to comply were different in almost every way" from that of Dr. Navarro. This is simply false. Indeed, how the "circumstances" were different and why that is relevant to a discriminatory *effect* analysis the Government does not say. In reality, its decision to decline prosecution of Messrs. Meadows and Scavino evidences a discriminatory effect on Dr. Navarro for the identical conduct which the Department declined to prosecute.

The House of Representatives made its criminal referrals for all three men for exactly the same reason: they had asserted executive privilege on behalf of President Trump and declined on that basis to appear for deposition.[19] After the House referred the matters to the Department of Justice, ████████████████████████████████████████████████████████████

████████████████████████████████████ █ ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ It elected to prosecute Dr. Navarro but declined to do so for the same conduct by Mr. Meadows and Mr. Scavino.

Having identified no meaningful distinction in the discriminatory *effect* of the prosecution against Dr. Navarro, the Government next argues that he has failed to satisfy the second prong of

---

[19] Mr. Meadows produced documents to the Committee but refused to appear for deposition. Neither Dr. Navarro nor Mr. Scavino produced documents or agreed to be deposed by the Select Committee.

[20] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

the *Armstrong* test, discriminatory *purpose*.[21]/ Here too, the Government's position fails to adequately address Dr. Navarro's colorable claim of improper intent. The courts have recognized that direct evidence of discriminatory purpose is rarely available so they permit defendants to use statistical disparities or other indirect evidence to show intent. *See United States v. Khanu,* 664 F. Supp. 2d 28, 22 (D.D.C. 2009). Before discovery is allowed, a defendant must present "at least a colorable claim" of selective prosecution, *Att'y Gen. v. Irish People, Inc.,* 684 F.2 d 928, 932 (D.C. Cir. 1982), that presents "some evidence tending to show the existence of the essential elements. *Armstrong*, 517 US at 468; *United States v. Judd,* WL 6134590 (D.D.C. 2021).

Dr. Navarro has good reason to believe that the Government's decision to file criminal charges against him, while declining to prosecute Mr. Meadows and Mr. Scavino, was based on unlawful and discriminatory reasons involving his public expression of political beliefs. If we assume that the Government's decision was not entirely irrational, there must be some understandable reason it decided to prosecute only Dr. Navarro. He does not, of course, yet have access to direct evidence of the Government's motivation but the circumstantial evidence that is available raises an inference of discriminatory motive related to Dr. Navarro's public expression of his political beliefs.

Unlike Mr. Meadows and Mr. Scavino, who did not widely discuss their views about the Select Committee or the Government, Dr. Navarro regularly exercised his First Amendment rights of free expression concerning the Committee's investigation and its issuance of the subpoena. The Select Committee report that referred Dr. Navarro for prosecution includes reference to several of

---

[21]/ Although a prosecutor has broad discretion to enforce the criminal laws, the decision to file charges may not be based on improper arbitrary classifications such as a defendant's "exercise of constitutional rights through participation in political activity." *Branch Ministries v. Rossotti*, 40 F. Supp. 2d 15, 21 (D. D. C. 1999), *aff'd* 211 F. 3D137 (D. C. Cir. 2000); *United States v. Judd,* 2021 WL 6134590 (D.D.C. 2021) (the Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's "political beliefs"). The decision to prosecute may not be based upon the exercise of protected statutory and constitutional rights. *See United States v. Goodwin*, 457 U.S. 368, 372 (1982).

his public statements. It indicates, for example, that "[w]ithin hours of receiving the subpoena, Dr. Navarro released a public statement that clearly indicated he had no intention of complying with the Select Committee …."[22]/ House Report at 3. The House Report states that Dr. Navarro also "appeared on national television on February 10, 2022, discussing subjects that with a focus of the Select Committee's subpoena to him (footnote omitted)." *Id.* The House Report goes on to say that rather than appear for his deposition, Dr. Navarro "issued a public statement regarding his deposition (footnote omitted)." House Report at 5.

The Government attempts in its Opposition to ignore this evidence by arguing that the Select Committee, not the Department of Justice, made the statements. Nonetheless, the Committee's public statements regarding Dr. Navarro helped create an environment in which the Government made its prosecution decision, clearly signaling that such a prosecution was expected. Dr. Navarro's public objections to the Select Committee's subpoena, and his reasons for noncompliance, likely angered the Committee and its members and may have influenced the Government's decision to prosecute him. Dr. Navarro does not know whether the Committee communicated that anger to the Department of Justice before or after it made its criminal referral, but the Department seems to have acted in similar manner in response to Dr. Navarro's public expressions of dissent.

E.     **The Government Must Provide Information that Tends to Show that the Indictment was Invalid Because the Government Abused the Grand Jury Process.**

---

[22]/ According to the Select Committee's report, Dr. Navarro's public statement said that "President Trump has invoked Executive Privilege; and it is not my privilege to waive.[The Select Committee] should negotiate any waiver of the privilege with the president and his attorneys directly, not through me. I refer to this tribunal to Chapter 21 of In Trump Time for what is in the public record about the Green Bay's we plan to insure [sic] election integrity []. House Report at 3.

Based  on the limited discovery the Government has thus far made available to the defense,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

At this stage of the case, the Government has provided only a small amount of information regarding proceedings before the Grand Jury and Dr. Navarro therefore is unable to formally challenge those proceedings. Nonetheless, the discovery provided thus far raises the possibility

████████████████████████████████████████████████████

██████. As noted in Dr. Navarro's opening Motion, a prosecutor has the responsibility to advise the Grand Jury on the law and to present evidence for its consideration. Justice Manual § 9-11.010. When a prosecutor conducting a Grant Jury inquiry is personally aware of substantial evidence that directly negates the guilt of the subject of the investigation, he or she must present or otherwise disclose such evidence to the Grand Jury before seeking an indictment against such a person." Justice Manual § 9-11.23.

Dr. Navarro's concerns about the Grand Jury proceedings in this respect go well beyond a "mere suspicion" that it was improperly instructed on the law, or that exculpatory evidence was not provided by the prosecutor. ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████

The Government as a litigant is, of course, subject to the rules of discovery. *See e.g., United States v. Procter & Gamble,* 356 U.S. 677, 681 (1958). The present case involves important issues that can only be developed by the defense with sufficient information concerning the matters that

occurred before the Grand Jury. Based on the limited information the Government has disclosed to date, █████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████ This information, or the absence thereof, is most certainly included in the minutes of the Grand Jury proceedings Indictment in this case.

Dr. Navarro understands that minutes of Grand Jury proceedings are not discoverable in the absence of a showing of "particularized need". However, the Supreme Court has long held that there are occasions, *see United States v. Procter & Gamble,* 356 U.S. at 683 (disclosure will be authorized in instances of compelling necessity that outweigh the usual policy of Grand Jury secrecy if the defendant shows "particularized need") when the trial judge may in the exercise of his or her discretion order the minutes of a grand jury witness produced to the defendant. Certainly 'disclosure is wholly proper where the ends of justice require it.' *United States v. Socony-Vacuum Oil Co., supra,* 310 U.S. at page 234, 60 S.Ct. at page 849. The burden, however, is on the defense to show that 'a particularized need' exists for the minutes which outweighs the policy of secrecy. *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 400 (1959).

The Government claims that it has already provided Dr. Navarro with all records obtained in response to Grant Jury subpoenas and all witness testimony and exhibits presented to the Grand Jury. Opp. at 20. This, it says, is all Dr. Navarro needs to be able to make claims about █████

█████████████████████████████████████████████████████████████ *Id.* This is clearly insufficient and fails to satisfy the Government's discovery obligations. Dr. Navarro is entitled to

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ The defense is unable to determine that on

the current record and has made a sufficient showing of "particularized need" to support discovery

of the proceedings before the grand jury.[23]/

## CONCLUSION

For the foregoing reasons, Defendant Peter K Navarro, respectfully requests that this Court

compel the Government to comply with its discovery obligations and provide the materials

identified in this Motion to Compel Discovery.


Dated: August 23, 2022                          Respectfully Submitted,

                                                E&W Law, LLC


                                                _____/s/ John S. Irving_____
                                                John S. Irving (D.C. Bar No. 460068)
                                                1455 Pennsylvania Avenue, N.W., Suite 400
                                                Washington, D.C. 20004
                                                Telephone: (301) 807-5670
                                                Email: john.irving@earthandwatergroup.com


                                                SECIL LAW PLLC


                                                _____/s/ John P. Rowley, III_____
                                                John P. Rowley, III  (D.C. Bar No. 392629)
                                                1701 Pennsylvania Ave., N.W., Suite 200
                                                Washington, D.C. 20006
                                                Telephone: (703) 417-8652
                                                Email: jrowley@secillaw.com

---

[23]/ In determining whether to dismiss an indictment for errors in grand jury proceedings, a court must assess if the alleged violation " 'substantially influenced the grand jury's decision to indict,' or if there [was] 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (quoting *United States v. Mechanik,* 475 U.S. 66, 78, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986)) (applying "harmless error" standard where dismissal sought for non-constitutional error).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **Criminal No. 1:23-cr-00200-APM** |
| v. | ) | |
| | ) | |
| **PETER K. NAVARRO,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

On August 23, 2022, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed under seal via the CM/ECF system and copies were electronically mailed to counsel for the Government and Chambers.

     /s/ John S. Irving     
John S. Irving (D.C. Bar No. 460068)