**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Criminal No. 1:22-cr-00200-APM** |
| **v.** ) | |
| **PETER K. NAVARRO,** ) | |
| **Defendant.** ) | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION**
**TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

Unsurprisingly, the Government fails to meaningfully address the issue central to this action: what privileges and immunities does a former president have with respect to the official acts of his Administration? That question is central for this Court's determination of the efficacy of this prosecution because, assuming a former President does have *some* privilege, then Dr. Navarro cannot be prosecuted for refusing to waive any such privilege.

As Justice Kavanaugh recently emphasized, "[a] former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanagh, J., respecting denial).

> If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of continuing confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends

*Id.* at 681. Of course, the existence of such a protection was recognized long ago by the Supreme Court. *See Nixon v. GSA*, 433 U.S. 425 (1977) ("We reject the argument that only an incumbent

1

President may assert [the Presidential privilege of confidentiality] and hold that appellant, as former President, may also be heard to assert them."). Most recently, the United StatesDistrict Court for the Southern District of Florida concluded that, "[t]hus, even if any assertion of executive privilege by [the former president] ultimately fails in this context, that possibility, even if likely, does not negate a former President's ability to raise the privilege as an initial matter." *Trump v. United States*, No. 22-81294-CIV, 2022 U.S. Dist. LEXIS 159738, at *24 (S.D. Fl. Sep. 5, 2022).

When the Select Committee subpoenaed Dr. Navarro seeking testimony and records from the time period for which he served as a senior presidential adviser, it necessarily implicated the former President's privilege. Rather than address this reality, the Government instead asserts that *Dr. Navarro* has failed to show that the former President "even attempted to [invoke the Privilege]." Gov't Opp. at 5 (Aug. 31, 2022) (ECF No. 44). Setting aside the question of what burden Dr. Navarro has to prove *anything* at this stage (and neither the indictment, nor any grand jury testimony suggest the former President chose not to assert any applicable privilege), the Government presupposes a process by which such privilege is properly invoke rather than directly addressing its implication in *this case.*

## I.  Dr. Navarro was entitled to Absolute Testimonial Immunity as a Former Senior Adviser to a Former President

The existence of an Executive Privilege is beyond dispute. Because "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately," *United States v. Nixon*, 418 U.S. at 708, the privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch." *Mazars*, 140 S. Ct. at 2032. Thus, the Government has long held the clear position that a senior adviser to the President is absolutely

immune from congressional process. The Justice Department's Office of Legal Counsel (OLC) has explained:

> This *testimonial immunity is distinct from, and broader than, executive privilege*. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making. *See United States v. Nixon*, 418 U.S. 683, 705 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process."). But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself.

*Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __ at p. 4 (May 20, 2019)(emphasis added). The purpose of testimonial immunity, OLC has explained, is threefold: (1) to avoid the "inherent and substantial risk of inadvertent or coerced disclosure of confidential information" in compelled congressional testimony; (2) to prevent "chill[ing] presidential advisers from providing unpopular advice or from fully examining an issue with the President or others;" and (3) because requiring senior aides to appear only to repeatedly assert executive privilege is unlikely "to promote any valid legislative interests." *Id*. at pp. 6-7.

The Justice Department has also consistently taken the position, as recently as 2019, that absolute immunity applies to *former* senior presidential advisers. Harriet Miers was a *former* White House Counsel when the House Judiciary Committee subpoenaed her to testify about the termination of several U.S. Attorneys. *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191 (2007). Donald McGahn was also a *former* White House Counsel when the House Judiciary Committee subpoenaed him to testify about matters described in the Mueller Report. *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __ (May 20, 2019). Robert Porter was a *former* Assistant to the President and Staff Secretary, and Rick Dearborn was a *former* Assistant to the

President and Deputy Chief of Staff for Policy Implementation, when the House Judiciary Committee subpoenaed them to testify about matters described in the Mueller Report. *OLC Letters to Pat. A. Cipollone* (Sept. 16, 2019).

It clearly follows that the same "chilling" risk applies to the former advisers to *former* Presidents, where such a protection would be of little value if it evaporated when a president leaves office, leaving his confidential communications fair game for his successor and political rival and committees of Congress controlled by the opposing party. The OLC has acknowledged on at least one occasion that "testimonial immunity continues after the tenure of a particular Counsel to the President. . . . The privilege must outlast the tenure of a particular President because, absent a guarantee of lasting confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which the effective discharge of his duties depends." *Memorandum For Pat A. Cipollone Counsel To The President*, __ Op. OLC at 11 (May 20, 2019) (citing *Nixon v. Adm'r of Gen.Servs.*, 433 U.S. 425, 449 (1997); *United States v. Johnson*, 383 U.S. 169 (1966)).

Until its very recent tack into the political winds, the Justice Department wholeheartedly agreed that it was precluded from prosecuting a senior presidential aide under 2 U.S.C. §192:

> [W]hen the only alleged criminal conduct of the putative defendant consists of obedience to an assertion of executive privilege by the President from whom the defendant's governmental authority derives, the defendant is not really being prosecuted the conduct of his own. He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress. *It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute, at least where there is an alternative means for vindicating congressional investigative interests and forgetting the legal issues into court.*

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted Claim of Executive Privilege*, Op. OLC (May 30, 1984) (emphasis added). For the same reason, the Attorney General Michael Mukasey refused to prosecute former White House Counsel Harriett

Miers and former Chief of Staff Josh Bolten in 2008, stating that their noncompliance with House Judiciary subpoenas "did not constitute a crime". *Letter from Michael B. Mukasey to Speaker of the House of Representatives* (February 29, 2008).[1]/

Indeed, the Department maintained its position on testimonial immunity when the Judiciary Committee brought a *civil* enforcement action to enforce its subpoena to Ms. Miers. In the Government's Memorandum in Support of Ms. Miers's Motion to Dismiss that action, then Principal Deputy Associate Attorney General Carl J. Nichols argued that because Ms. Miers held "a constitutional immunity from compelled congressional testimony based on her position as the Counsel to the President; that immunity, without more, makes the Committee's subpoena unenforceable...," and that "[t]he President's interest in protecting the autonomy and confidentiality of his Office applies even though Ms. Miers no longer serves as his close adviser." Mot. Dismiss  at 56, *Committee on the Judiciary v. Miers*, No. 1:08-cv-00409 (D.D.C. 2008) (ECF No. 17).

The Department's arguments in *Miers* were later (and recently) echoed its opposition to a similar civil enforcement action by the same Committee seeking to compel the testimony of former White House Counsel Don McGahn in 2019. In its Motion for Summary Judgment in that case, the Department stated that, as a senior advisor to the President, McGahn is "absolutely immune" from compelled congressional testimony about his official duties. Mot. Summ. J. at 47, *Committee on the Judiciary v McGahn*, No. 1:19-cv-02379 (FYP) (D.D.C. 2019) (ECF No. 32). The Government also argued that McGahn remained immune from compelled congressional testimony about his duties "even though he no longer serves as counsel to the President." *Id.* at 57.

---

[1]/    Available    at    https://1wh5e1460wvi1xmab2umuziv-wpengine.netdna-ssl.com/wp-content/uploads/2012/06/Mukasey-Letter-refusing-to-submit-congressional-contempt-to-grand-jury-2008.pdf.

While the issue of absolute testimonial immunity for former presidential aides in the context of a civil action remains unresolved by the D.C. Circuit,[2] the issue here is whether Dr. Navarro reasonably relied on the Government's own long-held position that he was immune from congressional process, and whether the Government was precluded from criminally prosecuting him for his refusal to comply with the Select Committee's subpoena. At the very least, the Government's novel posture in this case requires the Court to dismiss the indictment under the rule of lenity because he had no notice that the Government had changed its position with respect to former presidential advisers. *See Liparota v. United States*, 471 U.S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

## II.  The Former President's Privilege Was Asserted as to the Select Committee.

Even were the Court to conclude, for the first time, that former Presidents do not imbue absolute testimonial immunity upon their senior advisers, it is beyond reasonable dispute that they have some privilege and the Select Committee's failure to parse the application of that privilege renders the Government's indictment fatally flawed.  Specifically, for the first time in this matter, the Government argues that Dr. Navarro has failed to sufficiently demonstrate that President Trump invoked executive privilege with respect to the Select Committee's subpoena. The Government points to the fact that President Trump issued a press release on November 20, 2021, clearly directing Dr. Navarro "to protect executive privilege and not let these unhinged Democrats

---

[2] Both of these civil actions were dismissed by the parties after the District Court rejected the Justice Department's argument that a President can demand that his aides ignore a subpoena that Congress issues on the basis of absolute testimonial immunity, but that issue was left undecide decided by the Court of Appeals after the parties resolved their dispute. *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008), *appeal dismissed by* 2009 U.S. App. LEXIS 29374; *Comm. On Judiciary v. McGahn*, 973 F.3d 121 (D.C. Cir. 2020) (concluding Congress lacks the ability to seek a declaratory judgment that a subpoena is valid and enforceable); *appeal dismissed by*, 2021 U.S.App. LEXIS 20759 (D.C. Cir. 2021).

discredit our great accomplishments." Although it is true that directive predates the Select Committee's subpoena, that remained President Trump's standing order to Dr. Navarro with respect to the Select Committee's subpoena irrespective of any instruction to the contrary by President Biden's White House Counsel's Office.

The Government cites *Cheney v. U.S. Dist. Ct. for Dist. Of Colum.*, 542 U.S. 367 (2004), and *United States v. Reynolds*, 345 U.S. 1 (1953), for the proposition that a President is required to make a formal invocation of executive privilege with respect to specific communications. Both of those cases involved private-party civil lawsuits against the Government and are utterly inapposite to this case. *Cheney* involved litigation against the Vice President and Government officials alleging violations of the Federal Advisory Committee Act related to a task force called the National Energy Policy Development Group, where the Supreme Court vacated and remanded the D.C. Circuit's dismissal of a writ of mandamus and attempted interlocutory appeal related to the District Court's discovery orders. *Reynolds* was a Tort Claims Act suit against the government after a B-29 airplane crashed, killing its crew and three civilians. Plaintiffs sought discovery of the Air Force's official accident investigation, which the government opposed because the aircraft was engaged in a highly secret mission. The Supreme Court ultimately agreed with the government's argument that its interest in the protection of military secrets outweighed civil litigants' "dubious showing of necessity". *Id*. at 26.

Although the ultimate holdings of neither case are remotely relevant to any of the issues presented here, the Supreme Court in *Cheney* distinguished and noted the limitations of *United States v. Nixon*, 418 U.S. 683 (1974), which required a particularized assertion of executive privilege in the context of a criminal case, where a Special Prosecutor issued a subpoena for the President's records to be used at trial against the President's indicted coconspirators – *i.e.*, where

the defendants' liberty interests needed to be weighed against the President's executive privilege.

*Id.* at 363. The Court in *Cheney* held in relevant part:

> … our precedent provides no support for the proposition that the Executive Branch "shall bear the burden" of invoking executive privilege with sufficient specificity and of making particularized objections. To be sure, *Nixon* held that the President cannot, through the assertion of a "broad [and] undifferentiated" need for confidentiality and the invocation of an "absolute, unqualified" executive privilege, withhold information in the face of subpoena orders. It did so, however, only after the party requesting the information--the special prosecutor--had satisfied his burden of showing the propriety of the requests… .  In these circumstances, Nixon does not require the Executive Branch to bear the onus of critiquing the unacceptable discovery requests line by line. Our precedents suggest just the opposite.

*Id*. at 388 (citations omitted).  While *Cheney* cites *Reynolds* for the proposition that "executive privilege is an extraordinary assertion of power 'not to be lightly invoked.'" *Id*. at 390 citing *Reynolds*, 345 U.S. at 7, that quote is immediately followed by the following statement:

> Once executive privilege is asserted, coequal branches of the Government are set on a collision course. The Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives. This inquiry places courts in the awkward position of evaluating the Executive's claims of confidentiality and autonomy, and pushes to the fore difficult questions of separation of powers and checks and balances. *These "occasion[s] for constitutional confrontation between the two branches" should be avoided whenever possible.*

*Id*. at 389-390 quoting *United States v. Nixon* at 692 (emphasis added).

The Government appears to suggest, without elaborating, that there are formal requirements that must be followed by the President of the United States, former or incumbent, when invoking executive privilege and by presidential aides in asserting both executive privilege and absolute immunity from congressional process. It notes that other cases have involved complex OLC memoranda and analysis of whether a subpoenaed adviser rises to the level of a "senior presidential adviser." The Government refers to communications between the White House Counsel's Office and congressional committees. It quotes *Reynolds* as requiring that: "There must

be formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." Govt. Opp. at 7 (Aug. 31, 2022) (ECF No. 44). But *Reynolds*, a civil case involving the Department of Defense, should not be read to provide the standard that applies to the United States' President's assertion of his own privilege. Despite its efforts, the Government provides no authority for precluding the President himself from simply directing a senior adviser to "protect executive privilege," as was the case with Dr. Navarro; or that a President is prohibited from issuing that as a standing order that would remain in force unless and until rescinded with respect to subsequent congressional inquiries. That certainly is Dr. Navarro's understanding of the directive, which he communicated repeatedly to the Select Committee. The fact that Dr. Navarro, who was not represented at the time by counsel, repeatedly communicated that as he did, instead of through lengthy letters eloquently quoting OLC opinions and other legal authority, is of no moment.

To be sure, the Select Committee was not without recourse; To the extent that there was any question that former President Trump had directed Dr. Navarro to assert executive privilege and to invoke his absolute immunity as a former senior presidential adviser, all the Select Committee needed to do was ask and engage in the process of negotiation and accommodation, as Dr. Navarro repeatedly advised, and as the Supreme Court has repeatedly instructed. *See Cheney, Cheney*, 542 U.S. 367, at 390; *Trump v. Mazars*, LLP, 140 S. Ct. 2019, 2031 (2020) (". . . Congress and the Executive have nonetheless managed for over two centuries to resolve such disputes among themselves without the benefit of guidance from us. Such longstanding practice 'is a consideration of great weight' in cases concerning 'the allocation of power between [the] two elected branches of Government,' and it imposes on us a duty of care to ensure that we not needlessly disturb 'the compromises and working arrangements that [those] branches . . . themselves have reached.'" (internal quotations and citations omitted)).

Indeed, Dr. Navarro's assertion of executive privilege on behalf of President Trump did not occur in a vacuum. The Select Committee's February 9, 2022, subpoena directed Dr. Navarro to provide documents by February 23, 2022, and testimony on March 2, 2022. By that point, the Select Committee was certainly well accustomed to the assertion of privilege by Trump Administration officials. It subpoenaed Mark Meadows on September 23, 2021, and referred him to the Justice Department on December 13, 2021 (H. Rep. 117-216). It subpoenaed Dan Scavino on October 6, 2021. Former President Trump himself initiated litigation against the Select Committee on October 18, 2021. *See Trump v. Thompson*, 20 F. 4th 10, 33 (D.C. Cir. 2021)).

Instead of seeking to clarify Dr. Navarro's assertions, as though there was any ambiguity, and engaging in discussions with President Trump, the Select Committee, and now the Justice Department, apparently satisfied themselves with the assumption that an incumbent President can decline to assert any applicable privilege of a former President, as evidenced by the letter sent by Mr. Su of the White House Counsel's Office to Dr. Navarro. In so doing, the Legislative and Executive Branches have imposed upon the Judicial Branch – this Court – to determine the extent of a former president's privilege. At the very least, the Government's novel posture in this case requires the Court to dismiss the indictment under the rule of lenity because Dr. Navarro had no notice that the Government would require a special assertion of privilege by a former president and/or advocate for the novel position that an incumbent president can decide the extent and applicability of a former president's privilege. *Liparota*, 471 U.S. at 427.

* * *

Because it is beyond any reasonable dispute that former President's enjoy *some* privilege as to the official acts of their Administration, no prosecution for contempt of congress of a former adviser to *that* President can follow absent a resolution of the extent and scope of the privilege to the desired testimony and/or documents. To that end: "Historically, disputes over congressional

demands for presidential documents have not ended up in court. Instead, they have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2029 (2020). It is beyond dispute that Dr. Navarro asserted President Trump's privilege – the application of which the Select Committee admittedly refused to recognize. But that confluence of events, alone, ought not give rise to a prosecution for criminal contempt and the potential deprivation of liberty. In reality, we now know that Dr. Navarro faced a Hobson's choice: defy the former President's assertion of privilege, *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, 213 n.34 (D.D.C. 2019) (A President's identification of information that is subject to the executive privilege, "gives rise to a legal duty on the part of the aide to invoke the privilege on the President's behalf . . . ."), or accept the loss of his liberty.

### III. Even Were Former President Trump's Privilege Not to Preclude Prosecution, the Indictment Nevertheless Violates Dr. Navarro's Due Process Rights and Must be Dismissed.

Even were the Court to conclude that former President Trump's privilege does not preclude a prosecution of contempt of congress, the indictment nevertheless must be dismissed because it violates Dr. Navarro's due process rights in so far as (a) the Select Committee failed to follow its own rules such that the Government cannot state an offense for contempt of congress; (b) the Government has selectively prosecuted Dr. Navarro; and/or (c) the Government abused the Grand Jury process in seeking an indictment as against Dr. Navarro.

A.  **Dr. Navarro Did Not Waive Objections to the Select Committee's Failure to Follow its Own Rules and Those of the U.S. House of Representatives Selective Prosecution**

The Government argues that Dr. Navarro waived any objection based on the Select Committee's improper constitution – *i.e.*, that it lacks the requisite number of Members and has no Ranking Minority Member as required by its authorizing resolution – because he failed to raise those objections before the Select Committee in response to its subpoena. The Government misinterprets the law to stand for the proposition that a defendant can waive their substantive due process rights by asserting them for the first time in the only forum where their efficacy can actually be resolved – an Article III Court.

"By . . . making the federal judiciary the affirmative agency for enforcing the authority that underlies the congressional power to punish for contempt, Congress necessarily brings into play the specific provisions of the Constitution relating to the prosecution of offenses and those implied restrictions under which courts function." *Watkins v. United* States, 354 U.S. 178, 217 (1957) (Frankfurter, J., concurring). Of course, the judiciary is itself bound by the "restrictions" imposed upon it by, *inter alia*, the Due Process Clause of the Fifth Amendment to the Constitution and every defendant in a prosecution for criminal contempt of congress is entitled to, "the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense." *Watkins*, 354 U.S. at 187. *See also Russell v. United States*, 369 U.S. 749, 755 (1962) ("The obvious consequence, [in enacting 18 U.S.C. § 192], was to confer upon the federal courts the duty to accord a person prosecuted for this statutory offense every safeguard which the law accords in all other federal criminal cases."). Among the elements of any prosecution for contempt of congress include the authorization of the congressional committee to conduct the inquiry in question. *See Gojack v. United States*, 384 U.S. 702, 708 (1966) ("There is no basis for invoking criminal sanctions to punish a witness for refusal to cooperate in an inquiry

12

which was never properly authorized."). Here, Dr. Navarro has raised several challenges to the composition and functions of the Select Committee, all of which invalidate the Select Committee's authority, thus directly implicating his fundamental due process rights under the Constitution. The waiver of such rights is not a matter to be taken lightly. *Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.").

The Supreme Court's opinion in *United States v. Bryan*, 339 U.S. 323 (1950), is not inapposite although its holding should be questioned. There, the Supreme Court considered whether, in a prosecution for contempt of congress, a subpoenaed recipient could assert for the first time at trial the fact that the congressional committee in question lacked a quorum at the time the defendant refused to comply with the otherwise lawful subpoena. *Id.* at 326. The Court's opinion in *Bryan*, followed its opinion, a year earlier, in *Christoffel v. United States*, 338 U.S. 84 (1949), where the Court held that, an element of the offense of perjury includes proof that purported perjury occurred in the presence of a "competent tribunal," and that to be competent, a quorum of the committee in question was required to be present. *Id.* at 89-90. To hold otherwise, the Court concluded, would be to "den[y] [the defendant] a fundamental right[;] [t]hat right is that he be convicted of a crime only on proof of all the elements of the crime charged against him." *Id.* at 90. In *Bryan*, however, the Court concluded that the competency of the tribunal was not an element of the offense of contempt of congress and that, therefore, an objection to the committee's lack of a quorum had been waived when not lodged at the time for producing the documents in question. *Bryan*, 339 U.S. at 329-330.

It's difficult to reconcile the Court's holdings in *Christoffel* and *Bryan*, a fact noted by Justice Jackson in his concurrence: "I do not see how we can say that what was timely for

Christoffel is too late for Bryan. It is plain we are not following the Christoffel decision so I think we should candidly overrule it." *Bryan*, 339 U.S. at 344 (Jackson, J., concurring). The Court did not overrule *Christoffel*, however, and did not address the issue for another ten (10) years. In, *McPhaul v. United States*, 364 U.S. 372 (1960), the defendant did not argue until the case was before the Supreme Court, that the documents sought by an otherwise valid subpoena did not exist and that, therefore, the defendant could not be prosecuted for contempt of congress for failing to produce them. *Id.* at 378-79. Citing *Bryan*, however, the *McPhaul* Court concluded that once the Government established a *prima facie* case of willful failure to comply with the subpoena – by proving that the defendant had failed to produce any records in response to the subpoena – "[t]he burden shifted to the [defendant] to present some evidence to explain or justify his refusal." *Id.* at 379.

Contrary to the Government's suggestion, any so-called "*Bryan-McPhaul* rule" does not stand for the proposition that an objection to a congressional committee's subpoena or procedures is waived, "where the basis for the objection was apparent at the time of default." Govt. Opp. Mot. Compel at 4 (Aug. 15, 2022) (ECF No. 26) (citing *Liveright v. United States*, 347 F.2d 473, 475-76 (D.C. Cir. 1965)). Rather, the only way to reconcile *Christoffel* and *Bryan-McPhaul* is to recognize the distinction between the substantive due process guarantees afforded every defendant, *see Estelle v. Williams*, 425 U.S. 501, 503, (1976) ("The right to a fair trial is a fundamental liberty secured by the due process guarantee of the Fifth and Fourteenth Amendments."), with those objections that are waivable if not otherwise asserted. *See, e.g.*, *Ruhrgas Ag. v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("Personal jurisdiction . . . represents a restriction on judicial powers . . . as a matter of individual liberty. Therefore, a party may insist that the limitation be observed, or he may forego that right, effectively consenting to the court's exercise of adjudicatory authority." (internal quotations omitted)). Thus, where a congressional committee fails to adhere to its own

rules in such a manner that gives rise to a violation of substantive due process rights, because the federal courts tasked with overseeing any prosecution for contempt arising from any such failure must "safeguard" all due process guarantees, any waiver must be knowing and explicit. *See Brady*, 397 U.S. at 748 ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."). *See also Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("It has been pointed out that courts indulge every reasonable presumption against waiver of fundamental constitutional rights and that we do not presume acquiescence in the loss of fundamental rights. A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." (internal quotations marks omitted). It is thus completely proper for a defendant to raise such an objection, even if for the first time, with the only body that can properly resolve such an objection, an Article III Court.

Indeed, three (3) years after *McPhaul*, the Court held in *Yellin v. United States*, 374 U.S. 109 (1963), that a conviction for contempt of congress must be reversed where the committee in question failed to, "adhere to its own rules." *Id.* at 123. *Without reference either to Bryan or McPhaul*, the Court concluded that it would prejudice the defendant to require him to have known, at the time of his alleged contempt, that the committee had failed to adhere to its own rules: "It was not until petitioner's trial, *when his attorney for the first time had an opportunity for searching examination*, that it became apparent the Committee was violating its rules." *Id.* at 123. (emphasis added). Thus, although the D.C. Circuit in *Liveright*, did reference, two years after *Yellin*, a so-called *Bryan-McPhaul* rule, it did so while holding that the rule was inapplicable where the committee in question had failed to comply with its authorizing resolution concerning the issuance of subpoenas because, "there is nothing in the record to suggest that, at the time of his appearance,

appellant was aware, or had any reason to be aware, of the improper issuance of his subpoena." *Liveright*, 347 F.2d at 475-76.[3]

In summary, the Government would have the Court conclude that Dr. Navarro has waived any challenge to the congressional process and/or the validity congressional subpoena giving rise to this prosecution. Contrary to the Government's assertion, *Bryan*, does *not* stand for the proposition that a defendant can waive their substantive due process rights by asserting them for the first time in the only forum where their efficacy can actually be resolved – an Article III Court. To the extent *Bryan* remains the law following *Yellin*, at most the Court's decision stands for the proposition that non-procedural due process rights may be waived if not asserted at the time for appearance pursuant to the subpoena in question prior to any prosecution for contempt of congress.[4] Here, Dr. Navarro challenges the Select Committee's failure to follow its own rules as well as its pertinence – challenges that directly implicate his procedural due process rights and

---

[3] It's unclear precisely what the "record" revealed about Liveright's knowledge of the committee's compliance with its own rules. Of note, the prosecution of *Liveright*, like that of Dr. Navarro, involved multiple individuals who were referred and ultimately prosecuted for contempt of congress. At least one such defendant did raise the question of the committee's compliance with its own rules.

[4] The remaining cases cited directly, or indirectly, by the government are similarly inapposite. The footnote in *Yellin* cited by the government observed, "[a]lthough, *as a matter of due process*, a witness is entitled to an explanation of the pertinency of a question, if he asks for it, *it appears* he may lose that right if he fails to make a timely objection." 374 U.S. at 122 n.8 (emphasis added) (citing *Deutch v. United States*, 367 U.S. 456, 468-469 (1961); *Barenblatt v. United States*, 360 U.S. 109, 123-124 (1959); *Watkins v. United States*, 354 U.S. 178, 214-215 (1957)). In *Deutch*, the Supreme Court held that the government's failure to affirmatively establish the pertinency of the subjects under inquiry, irrespective of whether the defendant objected to the same, gave rise to a violation of the defendant's due process rights pursuant to *Watkins*. *Deutch*, 367 U.S. at 468-469 (*citing Wilkinson v. United States*, 365 U.S. 399, 407 (1961)). In *Barenblatt*, the Court, *in dicta*, questioned whether the defendant had properly lodged a pertinency objection but nevertheless concluded that the pertinency of the matter under inquiry had been sufficiently established so as to not infringe upon the defendant's due process rights. *Barenblatt*, 360 U.S. at 123-124. And in *Watkins*, of course, the Court concluded that to prevail in a prosecution for contempt of congress, it is necessary to establish the pertinence of an inquiry. *Watkins*, 354 U.S. at 214-215. The government's reliance on *Hutcheson v. United States*, 369 U.S. 599 (1962), is similarly distinguishable. There, the defendant, "with counsel at his side, unequivocally and repeatedly disclaimed any reliance on the Fifth Amendment privilege" – a right that he later claimed barred the inquiry at hand. *Id.* at 609-611. Here, the government does not point to any such unequivocal waiver. It does not, because it can not.

thus challenges that may be lodged with this Court and that may result in the dismissal of the indictment against him.

### B.  The Court Must Require the House of Representatives to Adhere to its Own Rules

The reason Dr. Navarro has not waived any objection is because the Select Committee's failure to adhere to its own rules necessarily violates his due process rights, *see Barenblatt v. United States*, 360 U.S. 109, 112 (1959) ("Congress, in common with all branches of Government, must exercise its powers subject to the limitations placed by the Constitution on governmental action, more particularly in the context of this case the relevant limitations of the Bill of Rights."), for which no knowing or voluntary waiver was obtained. *See Brady*, 397 U.S. at 748.

For this reason, both the Government and the House General Counsel are incorrect in asserting that, Dr. Navarro's "attacks on the validity of the Select Committee's subpoena ignore the deference a court owes the House regarding the meaning and application of its own rules and procedures, and the presumption of regularity due Congress." Brief of *Amicus Curiae* at 3 (Sep. 9, 2022) (ECF No. 49-2).  To that end, the judicial scrutiny of "what rules the House has established and whether they have followed them," *Christoffel v. United States*, 338 U.S. 84, 88-89 (1949), including those rules conferring the lawful authorization of any inquiry, *Gojack v. United States*, 384 U.S. 702, 708 (1966) ("There is no basis for invoking criminal sanctions to punish a witness for refusal to cooperate in an inquiry which was never properly authorized."), is permissible where said rules are "sufficiently clear." *United States v. Rostenkowski*, 59 F.3d 1291, 1306 (D.C. Cir. 1995). See *Christoffel*, 338 at 88-89 ("The question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. The question is rather what rules the House has established and whether they have followed them."). *See also Yellin v. United States*, 374 U.S. 109, 124 (1963) ("The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting to

require that the Committee be equally as meticulous in obeying its own rules."). However, "[w]here . . . a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that Rulemaking Clause reserves to each House alone." *Rostenkowski*, 59 F.3d at 1306-1307.

The House General Counsel turns this doctrine on its head and asserts, incorrectly, that, "a defendant may [not] identify [an ambiguous] rule, unrelated to the elements of the offense, and claim that it shields him from prosecution." Brief of *Amicus Curiae* at 13 (Sep. 6, 2022) (ECF No. 49-2). As the Supreme Court acknowledged in *Gojack*, when a rule relates to the lawful authorization for an inquiry, it "must be strictly observed." *Gojack*, 384 U.S. at 708. Nor does the Government dispute that the authority to investigate is an element of the offense. *See* Opp. Mot. Dismiss at 21 (Aug. 31, 2022) (ECF No. 44). Nor can it reasonably be challenged that the validity of the subpoena is a necessary element of the offense.

At best, Dr. Navarro has identified two areas where the House rules are vague and/or ambiguous and thus not subject to interpretation. *Rostenkowski*, 59 F.3d at 1306. The word "shall" in House Resolution 503 § 2(a) is not permissive; it does not mean "may." And House Resolution 503 similarly expressly refers to the need for consultation with, "the ranking minority member," a term that is undisputedly nowhere defined within the House rules.

Despite this ambiguity, both the Government and the House General Counsel suggest that the House may offer post-hac interpretation of its rules, whether "after a full review of its applicable rules," or otherwise, is of no bearing here. Were the standard otherwise, then future House General Counsels, for example after a change in control of the House from one political party to another, could submit briefs altering "the House's" interpretation of a given rule to suit the political whims of that Party. Indeed, what would prevent a Republican House from submitting

a subsequent brief of *amicus curiae* to a hypothetical Circuit Court reviewing a determination in this case that takes a contrary view from the House General Counsel now? It is precisely this potential conflict in interpretation that led to the D.C. Circuit in *Rostenkowski* to conclude that *only when* a rule is unambiguous – "sufficiently clear" – may the Court conclude that an otherwise valid prosecution for contempt of congress is permissible insofar as the House properly followed its own Rules in pursuing the contempt referral giving rise to the prosecution for contempt. *See Yellin v. United States*, 374 U.S. 109, 124 (1963) ("The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting to require that the Committee be equally as meticulous in obeying its own rules.").

## C.  The Government Cannot Establish Pertinence

Dr. Navarro's challenge to the Government's ability to establish pertinence is not precluded by the fact that the Government believes pertinence may be established at trial.  To the contrary, the Government cannot establish the requisite pertinence because the Select Committee failed to establish any nexus as between the information sought from Dr. Navarro and the purported legitimate legislative purpose of its inquiry. *See Deutch v. United States*, 367 U.S. 456, 467-469 (1961) ("As our cases make clear, two quite different issues regarding pertinency may be involved in prosecution under 2 U.S.C. § 192.  One issue reflects the requirement of the Due Process Clause of the Fifth Amendment that the pertinency of the interrogation to the topic under the congressional committee's inquiry must be brought home to the witness at the time the questions are put to him. . . . . The other and different pertinency issue stems from the prosecution's duty at the trial to prove that the questions propounded by the congressional committee were in fact 'pertinent to the question under inquiry' by the committee. . . . These two basically different issues must not be blurred by treating them as a single question of 'pertinency'"). The Government submits that as pertinency is an element of the alleged offense, *see Russell*, 369 U.S. at 755, it can prove at trial

that subjects of inquiry propounded to Dr. Navarro sought information pertinent to Select Committee's purported legitimate legislative purpose.  to address whether the Select Committee properly put Dr. Navaro on notice of the nexus between the information it sought from him and the stated pertinency of its investigation.  This position, however, is irreconcilable with the Government's failure to produce any discovery – indisputably material – concerning what information the Select Committee sought from Dr. Navarro and its nexus to the stated pertinency of the Select Committee's investigation.  Indeed, for more than a century, the validity of an indictment has required a finding that the accused: "know the nature and cause of the accusation against him, and that a charge must be sufficiently definite to enable him to make his defense . . . and the elements of the offense must be set forth in the indictment with reasonable particularity of the time, place and circumstances." *Armour Packing Co. v. United States*, 209 U.S. 56, 83 (1908). Put more simply, it is not uncommon for congressional committees to seek information under the guise of a legitimate legislative purpose while failing to aver how the information sought has any nexus as to that legitimate legislative purpose.  And yet it is irrefutable that there are limitations on what information congress may seek as part of its legislative function.  *See Mazars*, 140 S. Ct. at 2031 ("Because [the power to issue subpoenas] is 'justified solely as an adjunct to the legislative process,' it is subject to several limitations." (*Watkins*, 354 U.S. at 187)).

### D.  The Government's Selective Prosecution of Dr. Navarro Requires Dismissal

The Government argues in its opposition that Dr. Navarro has failed to meet the high standard of demonstrating discriminatory effect and purpose necessary to dismiss the indictment on Due Process grounds due to selective prosecution and undue political influence. On this, we agree, which is precisely why Dr. Navarro has asked the Court to order the Government to provide additional discovery beyond the Government's narrow reading of the "prosecution team" in order to obtain the information that would be necessary to support such a claim.

As explained in his Motion to Compel Discovery and Reply to the Government's Opposition thereto, the Government's decision to indict Dr. Navarro, but not to indict Mark Meadows and Dan Scavino, is evidence of a discriminatory effect, where those individuals are not just similarly, but identically, situated. None of the three men complied with the Select Committee's demand for testimony. Mr. Meadows produced some documents to the Select Committee but asserted Executive Privilege over others, and Mr. Scavino produced none. The fact that their attorneys engaged in a letter-writing campaign with the Select Committee is not, in and of itself, sufficient to explain the disparate treatment Dr. Navarro faced. To that end, if something in their correspondence triggered some inability of the Department of Justice to charge either individual, it should not require much effort for the Government to establish as much.

The Government's  position is particularly tenuous given its position that the "willfully" *mens rea* requirement under 2 U.S.C. §192 means only that a defendant was aware of the fact that he failed to comply with a congressional subpoena and requires no evidence that he knew that he was violating the statute when he did so. The Government cannot have it both ways – either its refusal to indict Mr. Meadows and Mr. Scavino amounts to a discriminatory effect, or the statute requires a defendant's specific intent to violate the law.

Dr. Navarro likewise has articulated a basis to believe that the Government acted with discriminatory purpose, *i.e.*, that he was prosecuted on the impermissible basis that he vocally exercised his First Amendment rights in his criticism of the Select Committee, and he has asked the Court will provide him access to the information necessary to determine whether that is the case. Dr. Navarro has explained that he was far more outspoken than Mr. Meadows and Mr.

Scavino in his criticism of the Select Committee.[5]/ As additional circumstantial evidence of animus and discriminatory purpose, Dr. Navarro pointed to the circumstances of his arrest, President Biden's October 2021 call for the criminal prosecution of individuals who defy the Select Committee's subpoenas, the White House Counsel's Office's unsolicited letter to Dr. Navarro informing him of President Biden's decision not to invoke executive privilege, and other evidence of improper communications between the Select Committee, the White House, and Justice Department officials beyond the Government's narrowly defined "prosecution team." To dismiss those circumstances as "fantasy" (Opp. at p. 32), especially where the Government refuses to provide Dr. Navarro access to the information he seeks, strains credulity.

**E. The Grand Jury Could Not have been Properly Instructed.**

As with selective prosecution, Dr. Navarro has sought additional discovery in order to determine whether there were constitutional deficiencies with respect to the Government's presentation of evidence and instructions on the law to the Grand Jury that returned the indictment in this matter. As further evidence that might well be the case, the Government asserts that the "willfully" *mens rea* requirement of 2 U.S.C. §192 simply means that he was aware of the fact he was not complying, and that "[t]he Defendant's belief – even if held in good faith – that he could refuse to comply based on executive privilege or the Department's interpretation of it does not provide a defense." (Opp. at p. 35).

The Government's reliance on *Licavoli v. United States*, 294 F.2d 207, 208 (D.C. Cir. 1961) (and, thus, the Court's Orders in *United States v. Bannon*, 21-CR-670 (CJN) (D.D.C. 2022)) is misplaced. To start, this case does not involve a defense of advice of counsel, as was the case in

---

[5]/ As promised in the hearing on Defendant's Motion to Compel Discovery on August 31, 2022, Dr. Navarro is filing a supplement to his Motion to Dismiss on the issue of the extent of his criticisms of the Select Committee compared to public statements by Mark Meadows and Dan Scavino.

*Licavoli* and *Bannon*, and neither of those cases involved an assertion of executive privilege or testimonial immunity with respect to a senior presidential adviser at the time of the events being investigated by the Select Committee. Unlike attorney-client privilege, where a witness has a choice whether to follow the advice of his lawyer, Dr. Navarro had no such choice in light of President Trump's instruction that he protect executive privilege – which is precisely why decades of OLC opinions confirm that a person in Dr. Navarro's situation cannot be criminally prosecuted. Indeed, we are unaware of a single reference to the 1961 *Licavoli* decision in any of the more than a dozen OLC opinions stretching back to 1982. That presumably is because *Licavoli* has nothing to do with executive privilege or testimonial immunity, and not simply because Theodore Olsen and his successors at OLC failed to notice the case.

If, as Dr. Navarro argues consistent with six decades of jurisprudence in this Circuit and elsewhere, the statute requires specific intent to violate the law, then it is the Government's burden under the circumstances to demonstrate to the Grand Jury and at trial that he did not reasonably rely on President Trump's exercise of executive privilege or the Justice Department's decades-old position that senior presidential advisers are absolutely immune from congressional process.

Even if those facts are, instead, defenses that Dr. Navarro would need to assert, the Grand Jury should have been advised of them and properly instructed as to the statute's *mens rea* element. Consistent with what appears to be a pattern of ignoring its own guidance, the Government seeks to avoid this issue altogether by arguing that it is not required to present exculpatory information to the Grand Jury. That is inconsistent with the Justice Manual's directive that "When a prosecutor conducting a Grant Jury inquiry is personally aware of substantial evidence that directly negates the guilt of the subject of the investigation, he or she must present or otherwise disclose such evidence to the Grand Jury before seeking an indictment against such a person." Justice Manual § 9-11.23. It also amounts to a situation where "the structural protections of the Grand Jury have

23

been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). If, in fact, the Government failed to advise the Grand Jury of Dr. Navarro's reasonable reliance on President Trump's assertion of executive privilege and the Justice Department's own legal positions, and it improperly instructed the Grand Jury on the element of *mens rea*, those are Due Process violations, where prejudice is presumed and that do not require the harmless error analysis, as suggested by the Government in its Opposition.

## CONCLUSION

Wherefore, for the reasons set forth above and in his Motion to Dismiss the Indictment, Dr. Navarro respectfully requests an Order dismissing the indictment with prejudice.

Dated: September 9, 2022

Respectfully Submitted,

E&W LAW, LLC

*/s/ John S. Irving*
John S. Irving (D.C. Bar No. 460068)
1455 Pennsylvania Avenue, N.W., Suite 400
Washington, D.C. 20004
Telephone: (301) 807-5670
Email: john.irving@earthandwatergroup.com

SECIL LAW PLLC

*/s/ John P. Rowley, III*
John P. Rowley, III  (D.C. Bar No. 392629)
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
Telephone: (202) 417-8652
Email: jrowley@secillaw.com

BRAND WOODWARD LAW, LP

*/s/ Stanley E. Woodward, Jr.*
Stan M. Brand (D.C. Bar No. 213082)
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
1808 Park Road NW

Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*Counsel to Dr. Peter K. Navarro*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| | ) **Criminal No. 1:23-cr-00200-APM** |
| **v.** | ) |
| | ) |
| **PETER K. NAVARRO,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## <u>CERTIFICATE OF SERVICE</u>

On September 9, 2022, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed and copies were provided to all registered parties via the CM/ECF system.

_____*/s/ John S. Irving*_____
John S. Irving (D.C. Bar No. 460068)