# H. Res. 503

## *In the House of Representatives, U. S.,*

*June 30, 2021.*

Whereas January 6, 2021, was one of the darkest days of our democracy, during which insurrectionists attempted to impede Congress's Constitutional mandate to validate the presidential election and launched an assault on the United States Capitol Complex that resulted in multiple deaths, physical harm to over 140 members of law enforcement, and terror and trauma among staff, institutional employees, press, and Members;

Whereas, on January 27, 2021, the Department of Homeland Security issued a National Terrorism Advisory System Bulletin that due to the "heightened threat environment across the United States," in which "[S]ome ideologically-motivated violent extremists with objections to the exercise of governmental authority and the presidential transition, as well as other perceived grievances fueled by false narratives, could continue to mobilize to incite or commit violence." The Bulletin also stated that—

(1) "DHS is concerned these same drivers to violence will remain through early 2021 and some DVEs [domestic violent extremists] may be emboldened by the January 6, 2021 breach of the U.S. Capitol Building in Washington, D.C. to target elected officials and government facilities."; and

GOVERNMENT
EXHIBIT

1

2

(2) "Threats of violence against critical infrastructure, including the electric, telecommunications and healthcare sectors, increased in 2020 with violent extremists citing misinformation and conspiracy theories about COVID–19 for their actions";

Whereas, on September 24, 2020, Director of the Federal Bureau of Investigation Christopher Wray testified before the Committee on Homeland Security of the House of Representatives that—

(1) "[T]he underlying drivers for domestic violent extremism – such as perceptions of government or law enforcement overreach, sociopolitical conditions, racism, anti-Semitism, Islamophobia, misogyny, and reactions to legislative actions – remain constant.";

(2) "[W]ithin the domestic terrorism bucket category as a whole, racially-motivated violent extremism is, I think, the biggest bucket within the larger group. And within the racially-motivated violent extremists bucket, people subscribing to some kind of white supremacist-type ideology is certainly the biggest chunk of that."; and

(3) "More deaths were caused by DVEs than international terrorists in recent years. In fact, 2019 was the deadliest year for domestic extremist violence since the Oklahoma City bombing in 1995";

Whereas, on April 15, 2021, Michael Bolton, the Inspector General for the United States Capitol Police, testified to the Committee on House Administration of the House of Representatives that—

(1) "The Department lacked adequate guidance for operational planning. USCP did not have policy and procedures in place that communicated which personnel were responsible for operational planning, what type of oper-

3

ational planning documents its personnel should prepare, nor when its personnel should prepare operational planning documents."; and

(2) "USCP failed to disseminate relevant information obtained from outside sources, lacked consensus on interpretation of threat analyses, and disseminated conflicting intelligence information regarding planned events for January 6, 2021."; and

Whereas the security leadership of the Congress under-prepared for the events of January 6th, with United States Capitol Police Inspector General Michael Bolton testifying again on June 15, 2021, that—

(1) "USCP did not have adequate policies and procedures for FRU (First Responder Unit) defining its overall operations. Additionally, FRU lacked resources and training for properly completing its mission.";

(2) "The Department did not have adequate policies and procedures for securing ballistic helmets and vests strategically stored around the Capitol Complex."; and

(3) "FRU did not have the proper resources to complete its mission.": Now, therefore, be it

*Resolved,*

**SECTION 1. ESTABLISHMENT.**

There is hereby established the Select Committee to Investigate the January 6th Attack on the United States Capitol (hereinafter referred to as the "Select Committee").

**SEC. 2. COMPOSITION.**

(a) APPOINTMENT OF MEMBERS.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader.

4

(b) DESIGNATION OF CHAIR.—The Speaker shall designate one Member to serve as chair of the Select Committee.

(c) VACANCIES.—Any vacancy in the Select Committee shall be filled in the same manner as the original appointment.

**SEC. 3. PURPOSES.**

Consistent with the functions described in section 4, the purposes of the Select Committee are the following:

(1) To investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex (hereafter referred to as the ''domestic terrorist attack on the Capitol'') and relating to the interference with the peaceful transfer of power, including facts and causes relating to the preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement agencies in the National Capital Region and other instrumentalities of government, as well as the influencing factors that fomented such an attack on American representative democracy while engaged in a constitutional process.

(2) To examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted vi-

5

olence and domestic terrorism relevant to such terrorist attack.

(3) To build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other executive branch, congressional, or independent bipartisan or nonpartisan commission investigations into the domestic terrorist attack on the Capitol, including investigations into influencing factors related to such attack.

**SEC. 4. FUNCTIONS.**

(a) FUNCTIONS.—The functions of the Select Committee are to—

(1) investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol, including facts and circumstances relating to—

(A) activities of intelligence agencies, law enforcement agencies, and the Armed Forces, including with respect to intelligence collection, analysis, and dissemination and information sharing among the branches and other instrumentalities of government;

(B) influencing factors that contributed to the domestic terrorist attack on the Capitol and how technology, including online platforms, financing,

6

and malign foreign influence operations and campaigns may have factored into the motivation, organization, and execution of the domestic terrorist attack on the Capitol; and

(C) other entities of the public and private sector as determined relevant by the Select Committee for such investigation;

(2) identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol regarding—

(A) the command, control, and communications of the United States Capitol Police, the Armed Forces, the National Guard, the Metropolitan Police Department of the District of Columbia, and other Federal, State, and local law enforcement agencies in the National Capital Region on or before January 6, 2021;

(B) the structure, coordination, operational plans, policies, and procedures of the Federal Government, including as such relate to State and local governments and nongovernmental entities, and particularly with respect to detecting, preventing, preparing for, and responding to targeted violence and domestic terrorism;

7

(C) the structure, authorities, training, manpower utilization, equipment, operational planning, and use of force policies of the United States Capitol Police;

(D) the policies, protocols, processes, procedures, and systems for the sharing of intelligence and other information by Federal, State, and local agencies with the United States Capitol Police, the Sergeants at Arms of the House of Representatives and Senate, the Government of the District of Columbia, including the Metropolitan Police Department of the District of Columbia, the National Guard, and other Federal, State, and local law enforcement agencies in the National Capital Region on or before January 6, 2021, and the related policies, protocols, processes, procedures, and systems for monitoring, assessing, disseminating, and acting on intelligence and other information, including elevating the security posture of the United States Capitol Complex, derived from instrumentalities of government, open sources, and online platforms; and

(E) the policies, protocols, processes, procedures, and systems for interoperability between the United States Capitol Police and the National

8

Guard, the Metropolitan Police Department of the District of Columbia, and other Federal, State, and local law enforcement agencies in the National Capital Region on or before January 6, 2021; and

(3) issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary.

(b) REPORTS.—

(1) INTERIM REPORTS.—In addition to the final report addressing the matters in subsection (a) and section 3, the Select Committee may report to the House or any committee of the House from time to time the results of its investigations, together with such detailed findings and legislative recommendations as it may deem advisable.

(2) TREATMENT OF CLASSIFIED OR LAW ENFORCEMENT-SENSITIVE MATTER.—Any report issued by the Select Committee shall be issued in unclassified form but may include a classified annex, a law enforcement-sensitive annex, or both.

(c) CORRECTIVE MEASURES DESCRIBED.—The corrective measures described in this subsection may include changes in law, policy, procedures, rules, or regulations that could be taken—

(1) to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions;

(2) to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans; and

(3) to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism.

(d) NO MARKUP OF LEGISLATION PERMITTED.—The Select Committee may not hold a markup of legislation.

**SEC. 5. PROCEDURE.**

(a) ACCESS TO INFORMATION FROM INTELLIGENCE COMMUNITY.—Notwithstanding clause 3(m) of rule X of the Rules of the House of Representatives, the Select Committee is authorized to study the sources and methods of entities described in clause 11(b)(1)(A) of rule X insofar as such study is related to the matters described in sections 3 and 4.

(b) TREATMENT OF CLASSIFIED INFORMATION.—Clause 11(b)(4), clause 11(e), and the first sentence of clause 11(f) of rule X of the Rules of the House of Representatives shall apply to the Select Committee.

(c) APPLICABILITY OF RULES GOVERNING PROCEDURES OF COMMITTEES.—Rule XI of the Rules of the House of

10

Representatives shall apply to the Select Committee except as follows:

(1) Clause 2(a) of rule XI shall not apply to the Select Committee.

(2) Clause 2(g)(2)(D) of rule XI shall apply to the Select Committee in the same manner as it applies to the Permanent Select Committee on Intelligence.

(3) Pursuant to clause 2(h) of rule XI, two Members of the Select Committee shall constitute a quorum for taking testimony or receiving evidence and one-third of the Members of the Select Committee shall constitute a quorum for taking any action other than one for which the presence of a majority of the Select Committee is required.

(4) The chair of the Select Committee may authorize and issue subpoenas pursuant to clause 2(m) of rule XI in the investigation and study conducted pursuant to sections 3 and 4 of this resolution, including for the purpose of taking depositions.

(5) The chair of the Select Committee is authorized to compel by subpoena the furnishing of information by interrogatory.

(6)(A) The chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to

subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress.

(B) Depositions taken under the authority prescribed in this paragraph shall be governed by the procedures submitted by the chair of the Committee on Rules for printing in the Congressional Record on January 4, 2021.

(7) Subpoenas authorized pursuant to this resolution may be signed by the chair of the Select Committee or a designee.

(8) The chair of the Select Committee may, after consultation with the ranking minority member, recognize—

(A) Members of the Select Committee to question a witness for periods longer than five minutes as though pursuant to clause 2(j)(2)(B) of rule XI; and

(B) staff of the Select Committee to question a witness as though pursuant to clause 2(j)(2)(C) of rule XI.

(9) The chair of the Select Committee may postpone further proceedings when a record vote is ordered on questions referenced in clause 2(h)(4) of rule XI, and

may resume proceedings on such postponed questions at any time after reasonable notice. Notwithstanding any intervening order for the previous question, an underlying proposition shall remain subject to further debate or amendment to the same extent as when the question was postponed.

(10) The provisions of paragraphs (f)(1) through (f)(12) of clause 4 of rule XI shall apply to the Select Committee.

**SEC. 6. RECORDS; STAFF; TRAVEL; FUNDING.**

(a) SHARING RECORDS OF COMMITTEES.—Any committee of the House of Representatives having custody of records in any form relating to the matters described in sections 3 and 4 shall provide copies of such records to the Select Committee not later than 14 days of the adoption of this resolution or receipt of such records. Such records shall become the records of the Select Committee.

(b) STAFF.—The appointment and the compensation of staff for the Select Committee shall be subject to regulations issued by the Committee on House Administration.

(c) DETAIL OF STAFF OF OTHER OFFICES.—Staff of employing entities of the House or a joint committee may be detailed to the Select Committee to carry out this resolution and shall be deemed to be staff of the Select Committee.

13

(d) USE OF CONSULTANTS PERMITTED.—Section 202(i) of the Legislative Reorganization Act of 1946 (2 U.S.C. 4301(i)) shall apply with respect to the Select Committee in the same manner as such section applies with respect to a standing committee of the House of Representatives.

(e) TRAVEL.—Clauses 8(a), (b), and (c) of rule X of the Rules of the House of Representatives shall apply to the Select Committee.

(f) FUNDING; PAYMENTS.—There shall be paid out of the applicable accounts of the House of Representatives such sums as may be necessary for the expenses of the Select Committee. Such payments shall be made on vouchers signed by the chair of the Select Committee and approved in the manner directed by the Committee on House Administration. Amounts made available under this subsection shall be expended in accordance with regulations prescribed by the Committee on House Administration.

**SEC. 7. TERMINATION AND DISPOSITION OF RECORDS.**

(a) TERMINATION.—The Select Committee shall terminate 30 days after filing the final report under section 4.

(b) DISPOSITION OF RECORDS.—Upon termination of the Select Committee—

(1) the records of the Select Committee shall become the records of such committee or committees designated by the Speaker; and

14

(2) the copies of records provided to the Select Committee by a committee of the House under section 6(a) shall be returned to the committee.

Attest:

*Clerk.*

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Peter K. Navarro

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 1540A Longworth House Office Building, Washington, DC 20515

Date: February 23, 2022     Time: 10:00 AM

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: United States Capitol Building, Washington, DC 20515, or by videoconference

Date: March 2, 2022     Time: 10:00 AM

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____     Time _____

*To* any authorized staff member or the United States Marshals Service

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 9th day of February , 20 22 .

_____
*Chairman or Authorized Member*

Attest _____

*Clerk*

GOVERNMENT
EXHIBIT
2

**Sel. Comm. 0001**

# PROOF OF SERVICE

Subpoena for

    Peter K. Navarro

Address  801 Pennsylvania Ave., NW, Apt. 1021

 Washington, DC 20004

before the  Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

---

Served by (print name)

Title

Manner of service

Date

Signature of Server

Address

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

## One Hundred Seventeenth Congress
## Select Committee to Investigate the January 6th Attack on the United States Capitol

February 9, 2022

VIA ELECTRONIC MAIL

Peter Navarro
801 Pennsylvania Ave NW
Apt. 1021
Washington, DC 20004

Dear Mr. Navarro:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying schedule by February 23, 2022, and to appear for a deposition on March 2, 2022.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations. The inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

Based on publicly available information and information produced to the Select Committee, we believe that you have documents and information that are relevant to the Select Committee's investigation. For example, you, then a White House trade advisor, reportedly worked with Steve Bannon and others to develop and implement a plan to delay Congress's certification of, and ultimately change the outcome of, the November 2020 presidential election.[1] In your book, you reportedly described this plan as the "Green Bay Sweep" and stated that it was designed as the "last, best chance to snatch a stolen election from the Democrats' jaws of deceit."[2] In an interview, you reportedly added that former President Trump was "on board with the strategy", as were "more than 100" members of Congress including Representative Paul Gosar and Senator Ted Cruz.[3] That, of course, was not the first time you publicly addressed purported fraud in the election. You also released on your website a three-part report, dubbed the "Navarro

---

[1] Tim Dickinson, ROLLING STONE, *Trump Adviser Worried He's Not Getting Enough Credit for Trying to Ruin American Democracy* (December 28, 2021) available at https://www.rollingstone.com/politics/politics-news/jan6-peter-navarro-ted-cruz-green-bay-sweep-1276742/.
[2] *Id.*
[3] Jose Pagliery, THE DAILY BEAST, *Trump Adviser Peter Navarro Lays Out How He and Bannon Planned to Overturn Biden's Electoral Win* (December 27, 2021) available at https://www.thedailybeast.com/trump-advisor-peter-navarro-lays-out-how-he-and-steve-bannon-planned-to-overturn-bidens-electoral-win.

Sel. Comm. 0003

Mr. Peter Navarro
Page 2

Report", repeating many claims of purported fraud in the election that have been discredited in public reporting, by state officials, and courts.[4] And, because you have already discussed these and other relevant issues in your recently published book, in interviews with reporters, and, among other places, on a podcast,[5] we look forward to discussing them with you, too.

Accordingly, the Select Committee seeks documents and a deposition regarding these and other matters that are within the scope of the Select Committee's inquiry. A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

---

[4] Peter Navarro, *The Navarro Report* available at https://peternavarro.com/the-navarro-report/; *see also* Joe Walsh, FORBES, *White House Advisor Peter Navarro Releases Dubious Voter Fraud Report* (December 17, 2020) available at https://www.forbes.com/sites/joewalsh/2020/12/17/white-house-advisor-peter-navarro-releases-dubious-voter-fraud-report/?sh=23b88c221205.
[5] Ewan Palmer, *Steve Bannon Was 'The Heron on Jan. 6,' Says Peter Navarro* (December 17, 2021) available at https://www.newsweek.com/peter-navarro-steve-bannon-hero-january-6-capitol-riots-1660421.

Mr. Peter Navarro
Page 3

## SCHEDULE

In accordance with the attached definitions and instructions, you, Peter Navarro, are hereby required to produce all documents and communications in your possession, custody, or control— including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal accounts, and/or on personal applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period September 1, 2020, to present.

1.  All documents and communications referring or relating in any way to plans, efforts, or discussions regarding challenging, decertifying, delaying the certification of, overturning, or contesting the results of the 2020 Presidential election.

2.  All communications, and documents related to communications, in which you were a participant or witness, relating in any way to the security of election systems in the United States.

3.  All communications, documents, and information that are evidence of the claims of purported fraud in the three-volume report you wrote, *The Navarro Report*.

4.  All documents and communications referring or relating to, Steve Bannon, Members of Congress, state and local officials, White House officials/employees, representatives of the Trump reelection campaign, and national and local party officials relating to election fraud or malfeasance, as well as delaying or preventing the certification of the November 2020 election. This includes all documents and communications related to the creation or implementation of what you have described publicly as the "Green Bay Sweep."

5.  Final or draft press releases, letters, reports, or other documents that you, or someone on your behalf, released addressing election fraud or malfeasance, as well as delaying or preventing the certification of the election.

6.  All documents and communications referring or relating in any way to electoral votes in the 2020 presidential election, including, but not limited to, drafts or final versions of documents purporting to be or related to Electoral College votes, meetings and preparations for meetings of purported electors for former President Trump and former Vice President Pence on or about December 14, 2020, and the actual or potential selection of an alternate slate of electors by any state legislature or executive.

7.  All documents and communications referring or relating in any way to John Eastman, Rudolph Giuliani, Boris Epshteyn, Bernard Kerik, Jenna Ellis, or Mark Martin.

8.  All documents and communications relating in any way to protests, marches, public assemblies, rallies, or speeches in Washington, D.C., on November 14, 2020, December 12, 2020, January 5, 2021, or January 6, 2021 (collectively, "Washington Rallies").

Sel. Comm. 0005

Mr. Peter Navarro
Page 4

9.  All documents and communications referring or relating to the financing or fundraising associated with the Washington Rallies and any individual or organization's travel to or accommodation in Washington, D.C., to attend or participate in the Washington Rallies.

10. All documents and communications related to the January 6, 2021, attack on the U.S. Capitol.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.  In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.  Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee').

3.  In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.  The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.  Electronic document productions should be prepared according to the following standards:

    a.  If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    b.  All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

        BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.  Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.  Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.  When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.  The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10. The pendency of or potential for litigation shall not be a basis to withhold any information.

11. In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14. In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16. If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18. All documents shall be Bates-stamped sequentially and produced sequentially.

19. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2. The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3. The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4. The term "including" shall be construed broadly to mean "including, but not limited to."

5. The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6. The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7. The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8. The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9. The term "individual" means all natural persons and all persons or entities acting on their behalf.

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

─────────

### 117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*
MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record,
Sincerely,

JAMES P. McGOVERN,
*Chairman, Committee on Rules.*
REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the Chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the Chair that is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

─────────

### REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*
MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.
Sincerely,

JAMES P. McGOVERN,
*Chairman,*
*Committee on Rules.*
REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

Sel. Comm. 0011

# H. Res. 8

## *In the House of Representatives, U. S.,*

*January 4, 2021.*

*Resolved,*

### SECTION 1. ADOPTION OF THE RULES OF THE ONE HUNDRED SIXTEENTH CONGRESS.

The Rules of the House of Representatives of the One Hundred Sixteenth Congress, including applicable provisions of law or concurrent resolution that constituted rules of the House at the end of the One Hundred Sixteenth Congress, are adopted as the Rules of the House of Representatives of the One Hundred Seventeenth Congress, with amendments to the standing rules as provided in section 2, and with other orders as provided in this resolution.

### SEC. 2. CHANGES TO THE STANDING RULES.

(a) CONFORMING CHANGE.—In clause 2(i) of rule II—

    (1) strike the designation of subparagraph (1); and

    (2) strike subparagraph (2).

(b) OFFICE OF DIVERSITY AND INCLUSION AND OFFICE OF THE WHISTLEBLOWER OMBUDS.—

16

### SEC. 3. SEPARATE ORDERS.

(a) MEMBER DAY HEARING REQUIREMENT.—During the first session of the One Hundred Seventeenth Congress, each standing committee (other than the Committee on Ethics) or each subcommittee thereof (other than a subcommittee on oversight) shall hold a hearing at which it receives testimony from Members, Delegates, and the Resident Commissioner on proposed legislation within its jurisdiction, except that the Committee on Rules may hold such hearing during the second session of the One Hundred Seventeenth Congress.

(b) DEPOSITION AUTHORITY.—

(1) During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.

(2) Depositions taken under the authority prescribed in this subsection shall be subject to regulations issued by the chair of the Committee on Rules and printed in the Congressional Record.

(c) WAR POWERS RESOLUTION.—During the One Hundred Seventeenth Congress, a motion to discharge a measure introduced pursuant to section 6 or section 7 of the War

Sel. Comm. 0013

# PROOF OF SERVICE

Subpoena for

    Peter K. Navarro

Address  801 Pennsylvania Ave., NW, Apt. 1021

Washington, DC 20004

before the  Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

---

Served by (print name)  DANIEL GEORGE

Title  SENIOR INVESTIGATIVE COUNSEL

Manner of service  EMAIL TO MR. PETER NAVARRO

(CONFIRMED EMAIL SERVICE EARLIER FEB 9)

Date  FEB 9, 2022

Signature of Server

Address  SELECT COMMITTEE TO INVESTIGATE THE JAN 6 ATTACK
1540A LONGWORTH HOB WASHINGTON DC 20515

GOVERNMENT
EXHIBIT
3

Sel. Comm. 0020

| | |
|---|---|
| **From:** | George, Dan |
| **To:** | pknavarro |
| **Subject:** | RE: U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol |
| **Date:** | Thursday, February 24, 2022 4:06:00 PM |

Mr. Navarro —

I'm following up on the Select Committee's subpoena to you.

The subpoena required you to produce documents to the Select Committee by yesterday, February 23, 2022. We have not received any documents or an indication that you have no documents that are responsive to the subpoena's document schedule.

Also, the date for your deposition is Wednesday, March 2, 2022, at 10:00 AM, and we will convene in a room in the House office buildings. Please contact me at your earliest convenience to discuss the details. Alternatively, please let me know if you do not plan to appear on March 2.

Thank you,
Dan


Daniel George
Senior Investigative Counsel
Select Committee to Investigate the January 6th Attack
on the United States Capitol
U.S. House of Representatives


**From:** George, Dan
**Sent:** Wednesday, February 9, 2022 4:21 PM
**To:** pknavarro <pknavarro@protonmail.com>
**Subject:** RE: U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol

Mr. Navarro —

As promised, attached is a subpoena from the Select Committee, issued today.

Please let me know if you have any questions or would like to discuss.

Thanks,
Dan

Daniel George
Senior Investigative Counsel
Select Committee to Investigate the January 6th Attack



GOVERNMENT
EXHIBIT
4

**Sel. Comm. 0001**

on the United States Capitol

U.S. House of Representatives

---

**From:** George, Dan
**Sent:** Wednesday, February 9, 2022 2:20 PM
**To:** pknavarro <pknavarro@protonmail.com>
**Subject:** RE: U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol

Thank you for the quick response. I'll send you the subpoena shortly at this email address and please let me know if you'd prefer service another way.

Thanks again,
Dan

---

**From:** pknavarro <pknavarro@protonmail.com>
**Sent:** Wednesday, February 9, 2022 2:19 PM
**To:** George, Dan <Dan.George@mail.house.gov>
**Subject:** Re: U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol

yes. no counsel.
Executive privilege

Sent with ProtonMail Secure Email.

------- Original Message -------
On Wednesday, February 9th, 2022 at 2:16 PM, George, Dan <Dan.George@mail.house.gov> wrote:

Mr. Navarro –

I am a Senior Investigative Counsel for the U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol. The Select Committee is seeking your deposition testimony and documents relevant to issues it is examining. Please confirm whether you are willing to accept service of a subpoena over email. If you are represented by counsel, please let me know his or her name and contact information and we will reach out as soon as possible.

Thank you,
Dan

Daniel George
Senior Investigative Counsel
Select Committee to Investigate the January 6th Attack
on the United States Capitol
U.S. House of Representatives

Sel. Comm. 0002

**From:**     George, Dan
**To:**        pknavarro
**Subject:**  RE: Navarro
**Date:**     Sunday, February 27, 2022 6:13:00 PM

Mr. Navarro –

No, it will not be public or open to the press. It will be a staff-led deposition, which members of the Select Committee may also join and in which they may participate.

If you have a scheduling conflict with that date, please let me know and we would be happy to work with to find a date to be scheduled within a reasonable time. Also, please let me know when you anticipate providing documents that are responsive to the subpoena schedule, or a log of specific documents that you are withholding and the basis for withholding, such as executive privilege.

Thank you,
Dan

**From:** pknavarro <pknavarro@protonmail.com>
**Sent:** Sunday, February 27, 2022 4:43 PM
**To:** George, Dan <Dan.George@mail.house.gov>
**Subject:** RE: Navarro

Will this event be open to the public and press?

Sent with ProtonMail Secure Email.

------- Original Message -------
On Sunday, February 27th, 2022 at 4:27 PM, George, Dan <Dan.George@mail.house.gov> wrote:

> Mr. Navarro –
>
> Thank you for your email. There are topics, including those discussed in the Chairman's letter, that the Select Committee believes it can discuss with you without raising any executive privilege concerns at all. In any event, you must appear to assert any executive privilege objections on a question-by-question basis during the deposition. This will enable the Select Committee to better understand your objections and, if necessary, take any additional steps to address them.
>
> With that in mind, can you please let us know whether you intend to appear for deposition testimony on Wednesday, March 2, 2022, at 10:00 AM as scheduled by the subpoena? For convenience, I'm also attaching my email to you dated Thursday, February 24, 2022.
>
> Thank you again for your email.

GOVERNMENT
EXHIBIT
5

Sel. Comm. 0009

Dan

Daniel George
Senior Investigative Counsel

Select Committee to Investigate the January 6th Attack
on the United States Capitol

U.S. House of Representatives

---

**From:** pknavarro <pknavarro@protonmail.com>
**Sent:** Sunday, February 27, 2022 4:00 PM
**To:** George, Dan <Dan.George@mail.house.gov>
**Cc:** pknavarro <pknavarro@protonmail.com>
**Subject:** Navarro

March 1, 2022


Daniel George
Senior Investigative Counsel
Select Committee to Investigate the January 6 Attack
US House of Representatives

Dear Mr. George:

Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied.

Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter.

In closing, I note that the United States government is in possession of all my official White House communications which your committee has requested. While I do not give my permission for your Select Committee to access this information as it involves privilege, I am at least advising you of this fact.

Thank you,


Peter Navarro

| | |
|---|---|
| **From:** | George, Dan |
| **To:** | pknavarro |
| **Subject:** | RE: Navarro |
| **Date:** | Tuesday, March 1, 2022 9:43:00 PM |
| **Attachments:** | RE Navarro.msg |
| | RE U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol.msg |

Mr. Navarro –

Thank you for your email. As I mentioned to you in the attached emails, there are topics that the Select Committee believes it can discuss with you without raising any executive privilege concerns at all, including, but not limited to, questions related to your public three-part report about purported fraud in the November 2020 election and the plan you described in your book called the "Green Bay Sweep." If there are specific questions that raise executive privilege concerns, you can assert your objections on the record and on a question-by-question basis.

It is unclear from your correspondence whether you plan attend tomorrow's deposition, as required by the subpoena. We plan to proceed with the deposition at 10 AM in the O'Neill House Office Building at 200 C Street SW, Washington DC 20024. Please feel free to contact me when you arrive so someone can escort you to the conference room.

Thank you,
Dan

---

**From:** pknavarro <pknavarro@protonmail.com>
**Sent:** Monday, February 28, 2022 11:32 AM
**To:** George, Dan <Dan.George@mail.house.gov>
**Subject:** RE: Navarro

Please be advised I have been clear in my communications on this matter.  Below is my response.  As I note, privilege is not mine to waive and it is incumbent on the Committee to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter.

March 1, 2022

Daniel George
Senior Investigative Counsel
Select Committee to Investigate the January 6 Attack
US House of Representatives

Dear Mr. George:

Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied.

GOVERNMENT
EXHIBIT
6
——————

Sel. Comm. 0004

Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter.

In closing, I note that the United States government is in possession of all my official White House communications which your committee has requested. While I do not give my permission for your Select Committee to access this information as it involves privilege, I am at least advising you of this fact.

Thank you,


Peter Navarro

1

2

3

4   SELECT COMMITTEE TO INVESTIGATE THE

5   JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

6   U.S. HOUSE OF REPRESENTATIVES,

7   WASHINGTON, D.C.

8

9

10

11   DEPOSITION OF:    PETER K. NAVARRO (NO-SHOW)

12

13

14

15                                   Wednesday, March 2, 2022

16

17                                   Washington, D.C.

18

19

20          The deposition in the above matter was held in room 5480, O'Neill House Office

21   Building, commencing at 10:04 a.m.



GOVERNMENT
EXHIBIT
7
_____

Sel. Comm. 0014

1

2     <u>Appearances:</u>

3

4

5     For the SELECT COMMITTEE TO INVESTIGATE

6     THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

7

8     MARGARET EMAMZADEH, STAFF ASSOCIATE

9     MARC HARRIS, SENIOR INVESTIGATIVE COUNSEL

10    EVAN MAULDIN, CHIEF CLERK

11    DENVER RIGGLEMAN, SENIOR TECHNICAL ADVISOR

12    GRANT SAUNDERS, PROFESSIONAL STAFF MEMBER

1

2          Mr. Harris.    We are on the record.    Today is March 2nd, 2022.    The time is

3    10:04.    We're convened in the Longworth House Office Building -- excuse me, we're in

4    the O'Neill House Office Building for the deposition of Peter Navarro to be conducted by

5    the House Select Committee to Investigate the January 6th Attack on the United States

6    Capitol.    My name is Mark Harris.    I am the designated select committee senior

7    investigative counsel for this proceeding.    I am accompanied by Grant Saunders, staff of

8    the select committee.

9          For the record, it's 10:04 a.m.    Mr. Peter Navarro is not present.    The person

10   transcribing this proceeding is the House stenographer and notary public authorized to

11   administer oaths.

12          I want to put on the record, briefly, the facts with respect to Mr. Navarro being

13   given notice of this proceeding.

14          On February 9th, Chairman Bennie Thompson issued a subpoena to Mr. Navarro

15   both to produce documents by February 23rd, 2022, and to testify at a deposition on

16   March 2nd, 2022, at 10 a.m.    The subpoena pertains to the select committee's

17   investigation into the facts, circumstances, and causes of the January 6th attack and

18   issues related to the peaceful transfer of power in order to identify and evaluate lessons

19   learned, and to recommend to the House and its relevant committees corrective laws,

20   policies, procedures, rules, or regulations.

21          On February 9th, 2022, Dan George, senior investigative counsel for the select

22   committee, reached out to Mr. Navarro by email and asked whether he would be willing

23   to accept the service -- accept service of a subpoena for deposition and documents by

24   email.    Mr. George's email also asked Mr. Navarro if he was represented by counsel.

25          Mr. Navarro responded to Mr. George on the same day, stating that he would be

1  willing to accept service of the subpoena by email and that he was not represented by

2  counsel in the matter.    Mr. Navarro also wrote in the email, quote "executive privilege,"

3  close quote.    He did not explain what he meant by that.

4      Mr. George, following up on Mr. Navarro's email, served Mr. Navarro with the

5  subpoena, which we will attach to the record as exhibit 1.

6                          [Navarro Exhibit No. 1

7                          Was marked for identification.]

8      Mr. Harris.    And the subpoena called for, as I noted, production of documents by

9  February 23rd, 2022, and testimony on March 2nd, 2022, at 10 a.m.

10      On February 24th, 2022, having not heard back from Mr. Navarro in response to

11  the subpoena and having received no documents in response to subpoena, Mr. George

12  reached out for Mr. Navarro, again, reminded him of the subpoena compliance date and

13  indicated we had not received any documents.    Mr. George also reminded Mr. Navarro

14  that his deposition was set for March 2nd, 2022, at 10 a.m., and that we would be

15  convening in one of the House Office Buildings.

16      Mr. Navarro wrote back on February 27th, 2022, and advised Mr. George that

17  President Trump had invoked executive privilege in this matter, and it was neither his

18  privilege to waive nor President Biden's privilege to waive.    He stated, quote,

19  "Accordingly, my hands are tied," close quote.

20      Mr. George responded the same day, Sunday, the 27th, to Mr. Navarro and

21  stressed to him that there were topics that would be included in the deposition and were

22  referenced in the chairman's letter that he, Mr. Navarro, could discuss without raising any

23  potential claim of executive privilege.

24      Mr. George also reminded Mr. Navarro that he would have to assert executive

25  privilege on a question-by-question basis during the deposition and that he was expected

1    to comply with the deposition and appear on March 2nd, at 10 a.m., as noted in the

2    subpoena.

3           Mr. Navarro responded that same afternoon asking, will this event be open to the

4    public and press?

5           Mr. George responded by email the same afternoon answering Mr. Navarro's

6    questions.

7           On the next day, February 28th, Mr. Navarro emailed Mr. George:    Please be

8    advised, I have been cleared in my communications on this matter.    Below is my

9    response.    As I note, privilege is not mine to waive.    And it is incumbent on the

10   committee to directly negotiate with President Trump and his attorneys regarding any

11   and all things related to this matter.

12          And Mr. Navarro included some further comments, dated March 1st, in that

13   February 28th letter, along the lines of what I just stated that was in the email.

14          On Tuesday, March 1st, Mr. George again emailed Mr. Navarro thanking him for

15   his email, reminding him that there were topics that we would be talking about at the

16   deposition that did not implicate any executive privilege concerns.    And Mr. George

17   provided examples to Mr. Navarro of some of those types of questions, again reminding

18   him that he could assert objections on the record on a question-by-question basis.

19          Mr. George asked Mr. Navarro to clarify whether he intended to appear at the

20   deposition scheduled for March 2nd, as required by the subpoena.    He advised Mr.

21   Navarro that the deposition would begin at 10 a.m. at the O'Neill House Office Building,

22   provided the address, and asked Mr. Navarro to contact him when he arrives so that he

23   could be escorted to the conference room.    That email was sent on the night of

24   March 1st -- last night.    Now, March 2nd, after 10 a.m., Mr. Navarro has not appeared

25   for his deposition.

1                   With that, I will note for the record that the current time is 10:11.    Mr. Navarro

2         still has not appeared or communicated to the select committee that he will appear

3         today, as required by the subpoena.    Accordingly, the record is now closed.    And we

4         can go off the record.

5                   [Whereupon, at 10:13 a.m., the deposition was concluded.]

6