UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| | : | CRIMINAL NO. 22-cr-200 (APM) |
| v. | : | |
| | : | |
| PETER K. NAVARRO, | : | |
| | : | |
| Defendant. | : | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL**

A jury in the District of Columbia convicted Defendant Peter K. Navarro of two counts of Contempt of Congress because he intentionally defied a Congressional subpoena. Now, he asks the Court to take extraordinary action and declare a mistrial pursuant to Federal Rule of Criminal Procedure 33 without any legal or factual basis. This Court should deny the Defendant's baseless motion.

**I.     Legal Standards Governing Defendant's Rule 33 Motion**

Pursuant to Rule 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Motions for a new trial are "not favored and are viewed with great caution." *United States v. Borda*, 786 F. Supp. 2d 25, 31 (D.D.C. 2011) (internal citations omitted). "Despite the court's broad authority to order a new trial, it should be exercised sparingly and limited to situations presenting a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* at 32 (cleaned up).

"A mistrial is a severe remedy – a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor. In deciding whether a mistrial is warranted, the single most important factor for the district court to consider is the extent to which

the defendant was prejudiced." *United States v. Clarke*, 24 F.3d 257, 270 (D.C. Cir. 1994) (internal citations and quotations omitted). The Defendant bears the burden of proof to demonstrate that a new trial is warranted. *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982).

## II.     Procedural Background Relevant to Defendant's Motion

The jury returned its guilty verdict on September 7, 2023. During deliberations and before returning its verdict, the jury took a short break outside the entrance to the Courthouse located in John Marshall Park. Before the verdict was returned, in a manner unspecified, the Defendant learned that the jury had taken this break. 9/7/23 Trial Tr. at 687. After the verdict was returned and the jury dismissed, but before the parties were dismissed, the Defendant asked the Court to declare a mistrial because, "there's a number of protesters right now standing outside the John Marshall side of the courthouse. They have signs that talk about January 6th. There are people that are shouting concerning January 6th…it's impossible for us to know what influence that, if anything, had on the verdict that they apparently reached upon coming into the building."[1]  9/7/23 Trial Tr. at 687.

The Court held a hearing on the Defendant's motion on September 13, 2023. At the hearing, the Court heard testimony from Court Security Officer (CSO) Rosa Toldan Torres, and admitted into evidence Defense Exhibit 1 (Photo of Jurors with CSO outside the Courthouse). 9/13/23 Hrg. Tr. at 26 (admitting Defense Exhibit 1, but not Defense Exhibits 2-4). The Court also provided the parties with footage from a YouTube video containing no time stamps ("Jericho

---

[1] The Defendant, by his own admissions, learned of the jury's break before the verdict was returned. Had the Defendant also learned of the alleged protestors before the verdict was returned, then his delinquency in bringing the matter to the Court's attention only after the verdict deprived the Court of the opportunity to remind the jurors of the Court's instruction to base its decision only on the evidence admitted at trial. Such a strategic decision also provides a basis for this Court to treat the Defendant's mistrial argument as waived.

2

Video"), and footage from two Court Security cameras ("Cam 01 Video" and "CS CSt-JM Video").[2]

The Defendant filed a written motion in support of his oral mistrial request on October 6, 2023. Because the Defendant's written motion references disputed facts not in the record, the Court ordered the Defendant to "produce by October 11, 2023, the evidence he contends 'confirms' and makes 'undisputed' that protestors were actually present in the John Marshall Park, and carrying the signs he identifies, when the jurors took their break on the afternoon of September 7, 2023." *See* October 10, 2023, Minute Order.

On October 11, 2023, the Defendant filed supplemental briefing. ECF No. 141. The briefing references two videos. One of them is the Jericho Video previously provided by the Court. The other video was identified by the Defendant as available at https://rumble.com/v3oe44g-pool-cam-footage-just-prior-to-and-during-navarro-press-conference-post-ver.html. As of October 27, 2023, when viewed by the Government, this unauthenticated video essentially begins with footage of the Defendant's post-verdict press conference, after the juror break that is the subject of the Defendant's motion. Thus, it tells one little, if anything, about what the jurors observed during their break.

### III. Facts Relevant to Defendant's Motion

On September 7, 2023, before the verdict was returned, the jury took a short break in John Marshall Park, located on the west side of the Courthouse. They were escorted by a CSO Torres. She testified that the jurors had requested a break for fresh air. 9/13/23 Hrg. Tr. at 6. CSO Torres took the jurors outside and confirmed that Defense Exhibit 1 depicts her doing so. *Id.* at 6, 15. She

---

[2] Information provided to law enforcement suggests that the person who filmed the Jericho Video is an individual known to a one-time assistant of the Defendant; law enforcement, to-date, has not evaluated that claim.

3

escorted them, "to the John Marshall Park area, away from everybody, away from the media, and anybody else that was there at the time." *Id.* Specifically, she took them to the right side of the building up a ramp. *Id*. at 7-8. According to CSO Torres, the jurors were outside for approximately 10-15 minutes. She was with them the entire time, observed them the entire time, and escorted them back into the building. *Id*. at 10-11. Not once did anyone approach the jurors or say anything directed at them. *Id*. at 6-7, 10. Moreover, the jurors did not display their juror badges on them during the break. *Id*. at 7.

When CSO Torres first exited the building, she observed members of the news media with cameras and an individual holding an American flag. *Id*. at 8. There was a barrier behind them. *Id*. at 25. The person with the flag also had a sign and was placed approximately 25-30 feet away from the jurors. *Id*. at 9. CSO Torres did not recall what the sign said. The person did not speak to the jurors. *Id*. at 10. There is no evidence in the record confirming whether the jury observed this individual. To the extent there were other individuals or signs beyond the barrier behind the media, according to CSO Torres, the jurors would not have been able to see them during their break. *Id*. at 26.

The Jericho Video, Cam 01 Video and CS CSt-JM Video each depict footage consistent with CSO Torres's testimony. The Cam 01 Video shows the jurors turning in their juror badges and exiting the Courthouse. The CS CSt-JM Video shows the jurors standing on the ramp described by CSO Torres. The Jericho video depicts the jurors and CSO Torres exiting the building, and then shows them standing on the ramp to the right of the exit. At 15:17, as noted by the Defendant, the camera pans towards the jurors who appear to be engaged only with each other; only one juror is even arguably looking in the direction of the area where the media was set up. During other parts of the Jericho Video a handful of people can intermittently be seen holding

4

signs or wearing shirts expressing views about the events of January 6, 2021.

**IV. There is No Basis to Grant Defendant's Motion**

Defendant Navarro has failed to meet his burden for a new trial for several reasons, not the least of which is because there is no evidence in the record to show that the jurors saw the purported signs and shirts, much less were influenced by them. Thus, there is no miscarriage of justice such that the Court should grant a Rule 33 motion.

Even had the jurors seen the signs or shirts, however, there would be no reason to disturb the verdict. The Court repeatedly instructed the jury to not discuss the case with anyone, and avoid media coverage, internet research, or any communications about the case. *See e.g.*, 9/6/23 Trial Tr. at 213. The Court also instructed the jury to consider only the evidence properly admitted in the trial. 9/7/23 Trial. Tr. at 15. The jury is presumed to follow the Court's instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

Further, the Defendant was convicted of contempt of Congress for defying a subpoena issued by the Congressional Committee investigating the insurrection at the Capitol on January 6. As the Defendant concedes, this case is not about what happened at the Capitol on January 6. *See e.g.,* 9/6/23 Trial Tr. at 46 (Defense Opening Statement) ("[L]adies and gentlemen, about the attack on the Capitol? You won't hear evidence about that. That's not what this case is about."). Thus, as a threshold matter, there is no basis to conclude that any January 6 protestors, either in support or against the insurrectionists, could have influenced the jury.

The Defendant cites to *United States v. Crews*, 856 F.3d 91 (D.C. Cir. 2017) for the legal standard this Court should apply to evaluate his mistrial claim. In *Crews*, the defendant objected to testimony relating to a coconspirators' injury, and the Circuit Court evaluated whether the testimony was unfairly prejudicial. In doing so, the Court affirmed that a "mistrial is warranted if inadmissible evidence is erroneously presented to the jury that is so 'highly prejudicial' that the jury cannot

5

reasonably be expected to ignore it." *Crews*, 856 F.3d at 96 (D.C. Cir. 2017).  Here, there was no inadmissible evidence presented to the jury such that this analytical framework even applies.  To the extent the jury did see the purported protestors, it is exceedingly reasonable to assume both that they understood it was not evidence, and that they ignored it —as they were specifically instructed.

The Defendant also cites to *United States v. Campbell*, 684 F.2d 141, 151 (D.C. Cir. 1982) to argue that extraneous influences on the jury require a mistrial.  ECF No. 138 at 7.  Here too, the Defendant plays fast and loose with both the facts and the law as applied to his case.  In *Campbell*, a "extraneous influence" was defined as:

> "[P]ublicity received and discussed in the jury room, consideration by the jury of evidence not admitted in court, and communications or other contact between jurors and third persons, including contacts with the trial judge outside the presence of defendant and his counsel."

*Campbell*, 684 F.2d 141, 151 (D.C. Cir. 1982).  There is nothing in this record indicating that there was extraneous influence consistent with *Campbell*.  The record is void of any evidence that the jury discussed publicity, considered evidence not admitted, or had communication or other contact with third persons or the trial judge.

Defendant's reliance on an out of circuit case, *United States v. Concepcion Cueto* 515 F. 2d 160 (1st Cir. 1975) is similarly misguided.  In *Concepcion Cueto*, several jurors admitted reading an article specifically about the defendant mid-deliberations, and others acknowledged discussing it in the jury room.  The Court ordered a new trial because of the prejudicial nature of the article, and its timing prior to closing arguments.  *Id*. at 164.  Here, there is no evidence that the jurors read the signs, discussed them, or that they were particularly prejudicial.  Moreover, the First Circuit suggested that an anticipatory warning not to consider media reports – exactly like the ones given here – was the Court's best "defense weapon" against a reversal. *Concepcion Cueto*, 515 F.2d 160, 164 (1st Cir. 1975).

## V.    Conclusion

Just as with his serial failure to support his pretrial claims about executive privilege with even a wisp of evidence, yet again, the Defendant was offered numerous opportunities to support his baseless claims and failed to meet his burden.  The Defendant's motion should be denied.

                                        Respectfully submitted,

                                        MATTHEW M. GRAVES
                                        United States Attorney
                                        D.C. Bar No. 481052

By:   */s/Elizabeth Aloi*
       John Crabb
       Elizabeth Aloi (D.C. Bar No. 1015864)
       Assistant United States Attorneys
       United States Attorney's Office
       601 D Street, N.W.
       Washington, D.C. 20530
       (202) 252-7212 (Aloi)
       elizabeth.aloi@usdoj.gov