## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| **UNITED STATES OF AMERICA** | ) | |
|  | ) | |
| **v.** | ) | **Case No. 22-cr-00200 (APM)** |
|  | ) | |
| **PETER K. NAVARRO,** | ) | |
|  | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

### I.      INTRODUCTION

On September 7, 2023, a jury convicted Defendant Peter Navarro of two counts of contempt of Congress in violation of 2 U.S.C. § 192.  During its deliberations, the jury took an approximately eight-minute outdoor break in John Marshall Park adjacent to the courthouse.  Some individuals were in the Park at that time, seemingly prepared to protest January 6-related matters.  Soon after their break, the jurors delivered their verdicts.

Defendant asserts that the jurors' exposure to these individuals in John Marshall Park had an unduly prejudicial effect on the deliberations, which requires a new trial under Rule 33 of the Federal Rules of Criminal Procedure.  For the reasons that follow, the court denies the motion.

### II.      BACKGROUND AND PROCEDURAL HISTORY

#### A.      Trial and the Jury's Verdict

Defendant was a senior advisor to former President Donald J. Trump.  Indictment, ECF No. 1, ¶ 6.  On June 2, 2022, a grand jury charged him with two counts of contempt of Congress.  *Id.* ¶¶ 22–25.  The charges arose from a subpoena issued to Defendant by the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the

U.S. Capitol ("Select Committee").  *Id.* ¶ 7.  The subpoena required Defendant to produce documents and appear before the Select Committee for a deposition.  *Id.* ¶ 9.  Defendant did neither.  *Id.* ¶¶ 15, 21.  According to the indictment, his defiance was willful.  *Id.* ¶¶ 22, 25.

Defendant proceeded to a jury trial on the two counts.  The trial began on September 5, 2023.  Following a day of evidence, the jury began its deliberations on the morning of September 7, 2023.  Trial Tr. at 664:7 (Sept. 7, 2023 AM) [hereinafter Trial Tr.], ECF No. 153.  Later that day, at 3:40 p.m., the jury reported that it had reached a verdict.  Jury Note, ECF No. 126.  Before calling in the jury, the court asked if there was "anything anybody would like to request or raise" or if any side wished to poll the jury.  Trial Tr. at 680:12-14 (Sept. 7, 2023 PM), ECF No. 154.  The government responded that it had nothing for the court to consider.  *Id.* at 680:15.  The defense asked only whether counsel could speak to the jurors afterwards.  *Id.* at 680:16–683:4.  After a brief discussion on that subject, the court confirmed with the defense that it wished to poll the jury in the event of a guilty verdict.  *Id.* at 683:5-11.  The jury then returned and delivered its verdict, finding Defendant guilty on both counts.  *Id.* at 683:20–684:6; Jury Verdict, ECF No. 128.

The defense almost immediately thereafter moved for a mistrial.  Counsel said, "Not ten minutes before [the courtroom deputy] notified us that the jury had reached a verdict, we became aware that the jury . . . left the courthouse out the John Marshall exit."  Trial Tr. at 687:1-8.  He continued, "[T]here's a number of protestors right now standing outside the John Marshall side of the courthouse.  They have signs that talk about January 6th. . . . [T]he jury would have heard those protestors.  They certainly would have seen the signs that are there . . ."  *Id.* at 687:9-16.  Noting that the jury's verdict had come not long after their break, counsel suggested that the jurors had been unduly influenced by the protestors.  *Id.* at 687:16-20, 689:18-19.

Rather than attempt to resolve the matter that afternoon, the court set a briefing schedule for a new trial motion. *Id.* at 690:17-23.

### B. Developing the Record

According to Supreme Court precedent, where confronted with a claim of improper external influence upon a jury, the trial court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer v. United States*, 347 U.S. 227, 230 (1954). The court began to fulfill its obligations immediately after trial concluded.

That same day, the court identified and obtained video evidence. The court first ordered the U.S. Marshal Service to save and extract relevant security camera footage. That effort produced two videos: one of the interior courthouse exit to John Marshall Park and one of John Marshall Park itself. The former video showed the jurors leaving for and returning from their break. The latter video contained footage depicting the jurors while outside, but at some distance. Neither video contained audio. In addition, the U.S. Marshal Service identified a third video from YouTube, apparently taken by an individual who was in John Marshall Park while the jurors were on break. The Marshal Service copied that video and provided it to the court ("Jericho Video"). The court disclosed the three videos to the parties.[1]

The court also learned that a Court Security Officer (CSO) had escorted the jurors outside and accompanied them for the duration of the break. The court identified the CSO as Rosa Toldan Torres.

On September 13, 2023, the court held an evidentiary hearing at which CSO Torres testified. During the hearing, the court led the questioning, but afforded government and defense

---

[1] These three video exhibits are: (1) Cam 01 Video; (2) CS CSt-JM Video; and (3) Jericho Video.

counsel the opportunity to examine CSO Torres.  Both sides questioned her.  Defense counsel presented CSO Torres with four images; the court admitted one as evidence and the others served as demonstratives.

Following the hearing, Defendant filed his motion for a new trial.  Mot. for New Trial, ECF No. 138 [hereinafter Def.'s Mot.].  The defense motion contained a hyperlink to another online video, apparently taken by a different person who was present in John Marshall Park during the jurors' break ("Freedom Media Express Video").  *Id.* at 4.  The defense motion also included images of various signs that purportedly were present at the relevant time, *id.* at 3–4, as well as snap shots from the Jericho Video.  At the court's request, Minute Order, Oct. 10, 2023, Defendant filed a supplement identifying the sources of the images contained in his motion.  Def.'s Suppl. in Supp. of Def.'s Mot., ECF No. 141 [hereinafter Def.'s. Suppl.].

No party asked the court to recall the jurors for questioning.

## III.    FACTUAL FINDINGS

The court has carefully considered the entire record relevant to the post-trial motion.  That includes the four videos, CSO Torres's testimony, and the images submitted by the defense during the evidentiary hearing and in its filings.  The court makes the following findings of fact.

Around 3:00 p.m. on September 7, 2023, the jury asked to take its afternoon break outdoors. CSO Torres, whom the court found to be credible, testified that she "took [the jurors] to the John Marshall Park area, away from everybody, away from the media, and anybody else that was there at that time."  Hr'g Tr. at 6:22-23 (draft) (September 13, 2023) [hereinafter Hr'g Tr.].  CSO Torres observed the jurors the entire time they were on break.  *Id.* at 6:24-7:2.  None of the jurors wore their juror badges while they were outside.  *Id.* at 7:18-20.  Although CSO Torres recalled that the

jurors were outside for approximately 10 to 15 minutes, *id.* at 8:12-13, video time stamps establish that the jurors were in John Marshall Park for approximately eight minutes. *See infra.*

Once outside, the jurors as a group walked towards C Street, N.W., up the inclined sidewalk. Hr'g Tr. at 7:24-25, 8:1-8. The jurors remained there for the duration of the break, *id.* at 10:5-8, and only interacted with each other, *id.* at 12:4-10. CSO Torres said that, upon exiting the courthouse, she saw members of the media. *Id.* at 8:19-21. No member of the media addressed the jurors as they walked outside, or at any time later. *Id.* at 11:21-12:3. CSO Torres also saw a man holding an American flag situated about 25 to 30 feet from the courthouse doors. *Id.* at 9:1-17. The man with the flag also had a poster, which he held below his waist. *Id.* at 9:19-25. He never raised the poster above his head, and she could not recall what it said. *Id.* at 11:17-20. The man never spoke to the jurors. *Id.* at 11:13-16.

According to CSO Torres, while outside, no one approached the jurors, spoke to them, or asked them any questions. *Id.* at 10:9-11, 10:12-14, 12:4-10. She also noted no expressions of concern by any juror. *Id.* at 10:22-25.

The two online videos corroborate CSO Torres' testimony and provide additional facts. The Jericho Video was filmed by a man wearing a black t-shirt. Def.'s Suppl. at 2 (top photograph).[2] The t-shirt bore an image of Ashli Babbitt, the protester shot and killed on January 6. *Id.* The man appears to be the person that CSO Torres described as holding an American flag and a sign. The sign, which rested on his tripod, said, "J6 was a set up." *Id.*

The Jericho Video only briefly captures the jurors. It depicts the jurors and CSO Torres exiting the courthouse and walking up the inclined walk towards C Street. Jericho Video at 13:10–13:42. Approximately two minutes later, the video quickly pans past the jurors, who can be seen

---

[2] The court has considered this image because it appears authentic. Its source, however, is not identified in Defendant's filing.

standing together on the sidewalk.  *Id.* at 15:17.  The video does not capture any jurors looking towards the camera.

The Jericho Video is over 22 minutes long and, at various points, pans around John Marshall Park.  It shows that, at the time the jury was outside, a second person is present who could be considered a protestor, a man wearing a white t-shirt.  The back of his t-shirt has an image of Rosanne Boyland, who died on January 6.[3]  *Id.* at 14:11, 14:27.  There is no reason to believe that any juror saw this image or was aware of Boyland's connection to January 6.  The man in the white t-shirt had his own video camera on a tripod and a sign that read, "Free J6 Political Prisoners Now."

Shortly after the jurors' arrival, this man walked in front of the person filming the Jericho Video, away from the jurors, and towards the members of the media, holding the sign down by his side.  *Id.* at 14:04.  He remained at that location, near the press, for the remainder of the video.  *Id.* at 21:22.  The video does not depict the man ever directing his sign towards the jury or holding it above his head.  The sign remained on the ground, propped against his tripod.  *Id.* at 21:23.  Notably, the Jericho Video has audio.  At no point in the video can either of the two men or the press be heard directing any comments towards the jurors.  Nor does the Jericho Video capture any audible sounds of protest.

The second online video, the Freedom Media Express Video, appears to have been filmed by the man in the white t-shirt.  That video captured the jurors emerging from the courthouse with CSO Torres.  Freedom Media Express Video at 2:03:06.  The jurors walked past him, one or two glanced briefly in his direction, and left the frame.  *Id.* at 2:03:40.  The man filming then picked up his tripod, walked towards the media and away from the jurors, and set up his camera facing

---

[3] Evan Hill, Arielle Ray & Dahlia Kozlowsky, *Videos Show How Rioter Was Trampled in Stampede at Capitol*, N.Y. Times (Jan. 15, 2021), https://www.nytimes.com/2021/01/15/us/rosanne-boyland-capitol-riot-death.html.

the courthouse doors. *Id.* at 2:04:02-10. Approximately eight minutes after the jurors left the courthouse, the video captures them walking back inside. *Id.* at 2:11:50–2:12:14. No one approached the jurors as they returned to the courthouse. The Freedom Media Express Video also has audio. Neither the man recording the video nor anyone else ever spoke to the jurors. The audio reflects no audible sounds of protest.

One other person with a sign appears to have been present that afternoon, based on an image in Defendant's supplement. Def.'s Suppl. at 2 (top photograph). A man in a dark shirt (and perhaps wearing dark hat) stood near the jurors as they reentered the courthouse. *Id.* The man held a "Defend Democracy" sign below his waist. *Id.* The Freedom Media Express Video does not show this person or the sign. That said, the video does not reflect any harassment of the jurors as they approached the courthouse. Freedom Media Express Video at 2:11:50–2:12:05.

The two court security videos provide less information. The interior camera captures the jurors leaving and later reentering the courthouse after their break. Cam 01 Video at 0:01-30. The video confirms that no juror was wearing a juror badge while outside. *Id.* The external camera pans back and forth from C Street to the entrance of John Marshall Park. CS CSt-JM Video. It shows the jurors together on the sidewalk and confirms that no one approached them as they stood there, but otherwise shows little else. *Id.* at 1:58–8:53.

In summary, the record establishes that, in addition to members of the media, there were three men with signs in John Marshall Park when the jurors were on their break. Of the three men, two were filming and a third was not. None of them, nor anyone else, approached the jurors or directed any words towards them. None of the men pointed their signs towards the jurors. In fact, the two men filming did not seem to recognize the group as jurors, let alone the jurors in Defendant's case. Furthermore, the evidence does not establish that the jurors saw either of the

signs held by the two men filming or what those signs said.  (It is possible that a juror saw the sign held by the third man given his proximity to them as they returned to the courthouse.)  Nor does the evidence show that any juror saw the images of Ashli Babbitt worn by the man in the black t-shirt or Rosanne Boyland worn by the man in the white t-shirt.

Importantly, the court finds that the jurors would not have seen an additional sign contained in Defendant's motion.  Likely referring to Defendant, that sign said, "Bro, should've Plead the 5th Peter 4 Prison."  Def.'s Mot. at 3.  Defendant's supplement identifies the source of this image as a video "created to assist defense counsel" and posted to the site Rumble ("Rumble Video").  Def.'s Suppl. at 1.  But the Rumble Video does not depict the eight minute-period when the jurors were outside on break.  It instead captures the moments before and after Defendant emerges from the courthouse after the verdict, long after the jurors had left John Marshall Park.  The sign in question appears in no other video evidence.

## IV.   LEGAL STANDARD

Defendant moves for a new trial under Rule 33, which provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The defendant bears the burden to demonstrate that a new trial is warranted.  *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982).  "Trial courts enjoy broad discretion in ruling on a motion for a new trial."  *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014).  The D.C. Circuit has said that "granting a new trial motion is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred[,]'" *id.* (quoting *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990)), though it has not provided any further guidance on what types of errors or circumstances rise to a "serious miscarriage of justice."

A new trial is not warranted unless a defendant demonstrates prejudice. In an analogous context, the D.C. Circuit has said that the trial court must "inquire whether any particular intrusion showed enough of a 'likelihood of prejudice' to justify assigning the government a burden of proving harmlessness." *United States v. Williams-Davis*, 90 F.3d 490, 497 (D.C. Cir. 1996). *Williams-Davis* involved a claim of private communications with the jury's foreperson and communications between a juror and an alternate who was dismissed before deliberations, among other issues. *Id.* at 495. The court rejected the notion that prejudice should be presumed from such contact. *Id.* at 496–97. Instead, it "focus[ed] on the specific facts of the alleged conduct" and acknowledged the "broad discretion in the trial court to assess the effect of alleged intrusions." *Id.* Ultimately, the Circuit held that the trial court had properly rejected the new trial request after concluding that the external influence "would not have been prejudicial." *Id.* at 497, 499.

## V.      DISCUSSION

### A.      Waiver

To begin, the court holds that Defendant waived the argument that the jury's verdict was tainted by improper external influence because he failed to raise it with the court before the verdict. *See* Gov't Opp'n to Def.'s Mot., ECF No. 143, at 2 n.1. Although the D.C. Circuit has not addressed the question, other circuit courts routinely have applied the rule that when a defendant learns of a potential juror-related issue before the verdict but fails to raise it with the court, the defendant has waived his claim for a new trial on those grounds.

Perhaps the leading case is *United States v. Dean*, an en banc decision from the Eighth Circuit. 667 F.2d 729 (8th Cir. 1982) (en banc). There, a juror made an out-of-court statement during the trial about the defendant's guilt and certainty of conviction. *Id.* at 730–31. Defense counsel learned of the misconduct from an anonymous note during trial but did not raise it with the court. *Id.* The trial judge declined to grant a new trial on the grounds that counsel knew about

the juror misconduct and failed to bring it to the court's attention. *Id.* at 731. The Eighth Circuit affirmed. It observed that "in those cases studied which have dealt with the timeliness of an objection to juror misconduct during trial, a finding of untimeliness has not been dependent on a consideration of the degree of prejudice resulting from the alleged misconduct." *Id.* at 732 (citing cases). The court further said that "[a] party may not stand idly by, watching the proceedings and allowing the Court to commit error of which he subsequently complains." *Id.* at 733–34 (quoting *United States v. Nance*, 502 F.2d 615, 621 (8th Cir. 1974)). Ultimately, it held that "appellant, by not bringing the question of juror misconduct to the attention of the trial court before the verdict was returned, thereby waived his right to a new trial." *Id.* at 734.

Other circuits have followed *Dean*'s waiver rule. In *United States v. Gootee*, the Seventh Circuit affirmed the denial of a new trial when the defense knew—but did not tell the trial court— that a security officer had confiscated books about the law from a juror. 34 F.3d 475, 478–79 (7th Cir. 1994). Citing *Dean* and a host of other cases, the Seventh Circuit held that "by failing to bring the information surrounding the possible juror misconduct to the court when he learned of it [the defendant] waived his claim." *Id.* at 479.

The same result was reached in *United States v. Bolinger*, 837 F.2d 436 (11th Cir. 1988) (per curiam). There, counsel learned of a juror's potential bias during the jury's deliberations but remained silent. *Id.* at 438. The court observed that "where the defendant or defense counsel knows of juror misconduct or bias before the verdict is returned but fails to share this knowledge with the court until after the verdict is announced, the misconduct may not be raised as a ground for a new trial." *Id.* at 439. Applying that rule, the court held that defense counsel's "decision to gamble on the jury rather than inform the court of the problem in time to allow the court to determine if corrective action was possible prior to verdict is fatal[.]" *Id.*

One more example.  In *United States v. Morris*, defense counsel overheard jurors speaking in Spanish during deliberations but only after the verdict asserted that, because not all jurors spoke Spanish, there could be no guarantee that all jurors had properly participated in the deliberations. 977 F.2d 677, 685 (1st Cir. 1992).  Applying the principle that "a defendant who becomes aware of juror misconduct prior to the rendering of the verdict but fails to inform the court before the conclusion of deliberations, waives the right to complain about such conduct after an adverse verdict," the First Circuit affirmed the denial of a new trial.  *Id.* at 685–86 (citing cases and treatise).

Other Circuits have articulated the waiver concept in similar ways.  *See, e.g.*, *United States v. Parse*, 789 F.3d 83, 109 (2d Cir. 2015) ("[I]f the defendant knew prior to the end of trial that a prospective juror had given false voir dire responses and did not then reveal the disqualifying falsehoods or nondisclosures to the court, the 'interest of justice,' Fed. R. Crim. P. 33(a), generally will not require a new trial."); *United States v. O'Keefe*, 722 F.2d 1175, 1178 n.1 (5th Cir. 1983) (citing *Dean* for the principle that "defendants implicitly waive objections to juror misconduct when their counsel fails to act, before verdict, upon information known to defendants or counsel"); *United States v. Johnson*, 213 F.3d 633, 2000 WL 535280, at *2 (4th Cir. 2000) (per curiam) (unpublished) (citing *Dean* and holding that because the defendant "failed to promptly bring to the court's attention any sleeping or unattentive jurors, the district court correctly found that Johnson waived his right to a new trial based upon juror misconduct").

Although this case does not involve juror misconduct, the logic underlying the waiver rule applies with equal force.  A defendant cannot learn of alleged improper external influence on the jury, remain silent and gamble on a favorable verdict, only to complain afterwards that a new trial

is warranted because the jury was unduly prejudiced by that outside influence. *See United States v. Jones*, 597 F.2d 485, 489 n.3 (5th Cir. 1979). That is precisely what occurred here.

Defense counsel admitted that they knew of the jury's potential exposure to protestors before the verdict, but nevertheless failed to timely raise it with the court. Within minutes after the court dismissed the jury, defense counsel said that they had learned that the jurors had gone outside for a break where January 6 protesters were present. Trial Tr. at 687:1-8. Counsel represented, "Not ten minutes before [the courtroom deputy] notified us that the jury had reached a verdict, we became aware that the jury . . . left the courthouse out the John Marshall exit . . . There's a number of protestors right now standing outside the John Marshall side of the courthouse. They have signs that talk about January 6th. . . . [T]he jury would have heard those protestors. They certainly would have seen the signs that are there . . ." *Id*. at 687:1-17. Yet, when the court asked counsel *before* calling in the jury whether they had any issues to raise, the defense offered only the issue of speaking to the jurors after the verdict. *Id*. at 680:12–681:2. They said not a word about outside influence, which they now claim was unduly prejudicial and warrants a new trial.

Had the defense brought their concerns to the court's attention, the court had at least two remedial tools at its disposal. First, the court could have questioned the jurors about what they had observed and experienced during their break. *See* Fed. R. of Evid. 606(b) (generally prohibiting inquiry of a jury's deliberations but permitting questioning as to "whether any outside influence was improperly brought to bear upon any juror"); *Williams-Davis*, 90 F.3d at 496 (stating that Rule 606(b) permits "testimony about the fact and nature of the contact (the input, as it were), but not the effect it produced on the juror's state of mind"). Defense counsel's silence robbed the

court of the contemporaneous opportunity to determine precisely what transpired during the jurors'
break.

Second, with or without having questioned jurors, the court could have admonished them
once more to base their verdict on the evidence alone and not on any external considerations.
*See* Final Jury Instructions, ECF No. 133, at 2 ("Function of the Jury"), 4 ("Considering the
Evidence in the Case").  The court would have then directed the jury to continue its deliberations
in light of that instruction.  If the jury after further deliberations returned verdicts of guilt, the
presumption would have been that the court's instruction had ameliorated the prejudicial effect of
any outside influence.  *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting "the almost
invariable assumption of the law that jurors follow their instructions"); *United States v. Perholtz*,
842 F.2d 343, 361 (D.C. Cir. 1988) ("Courts have often emphasized the curative power of a trial
court's instructions.").  But by sitting on their hands, defense counsel foreclosed the court from
doing so.

Accordingly, the court holds that, by failing to timely raise the claim that improper outside
influence had infected the jury, Defendant waived it as grounds for a new trial.

### B.      Lack of Prejudice

In any event, Defendant's motion also fails on the merits.  Defendant has not shown that
any prejudice resulted from the jury's eight-minute break outside the courthouse.  *United States v.
Clarke*, 24 F.3d 257, 270 (D.C. Cir. 1994) ("In deciding whether a mistrial is warranted, the 'single
most important factor' for the district court to consider is the extent to which the defendant was
prejudiced." (quoting *United States v. Tarantino*, 846 F.2d 1384, 1413 (D.C. Cir. 1998)).

The evidence establishes that the jurors only interacted with each other and CSO Torres in
John Marshall Park.  No one directed any words or displayed any signs at them.  No one

approached them.   Moreover, the scene itself was relatively placid.   There was no indiscriminate yelling or chanting.   No one held a sign above their head.   There were no activities resembling a "protest."   As for the Ashli Babbitt and Rosanne Boyland t-shirts, the evidence does not establish that any juror saw these images, let alone understood their significance.   Defendant not only fails to demonstrate prejudice, he has not shown that any juror was actually exposed to any improper external influence.

Defendant relies on two out-of-circuit cases, but neither helps him.   Def.'s Mot. at 9–10. First, in *United States v. Concepcion Cueto*, on the last day of trial, jurors confirmed that they had read or had heard about an article that described the defendant as "as one of the most important and most dangerous drug traffickers in Puerto Rico, Miami and the Caribbean," and that he was "a very fat fish for the federal agents."   515 F.2d 160, 163 (1st Cir. 1975) (internal quotation marks omitted).   The article reported that the defendant "had fled from two previous attempts to arrest him, on the second occasion engaging in a 'shoot-out' with authorities for which he was also charged[,]" and that he was detained in jail.   *Id.*   The First Circuit remanded for a new trial because "the content and timing of the material went beyond anything [the court felt] able to assume the average juror could withstand," particularly in the context of the defendant's drug-related charges and the timing just before closing argument.   *Id.* at 163–64.   This case bears no resemblance to *Concepcion Cueto*.

Second, Defendant cites a District of Nebraska case in which the court ordered a new trial after a jury in a bank robbery case was exposed to a newscast about a witness appearing "apprehensive" and then going missing shortly before trial.   *United States v. Titsworth*, 422 F. Supp. 587, 589 (D. Neb. 1976).   The jury also learned that another key government witness was a cousin of the third participant in the robbery, thus undermining the defense strategy of

attacking the witness's credibility on the basis that he was protecting a different family member. *Id.* at 591. The court reasoned that the collective impact of this information "went beyond tolerable limits under the circumstances of the instant case." *Id.* The differences between *Titsworth* and this case are self-evident.

Simply put, Defendant has failed to show that he was prejudiced in any way by the jury's brief break in John Marshall Park.

## VI.    CONCLUSION AND ORDER

For the foregoing reasons, the court denies Defendant's Rule 33 motion for a new trial, ECF No. 138.

Dated:  January 16, 2024

Amit P. Mehta
United States District Judge