**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 22-cr-200 (APM)** |
| **v.** | : | |
| | : | |
| **PETER K. NAVARRO,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' SENTENCING MEMORANDUM**

When Peter K. Navarro was served with a subpoena from the House Select Committee to Investigate the January 6th Attack on the United States Capitol ("the Committee"), he thumbed his nose at Congressional authority and refused to comply – even before knowing what information the Committee sought.  He cloaked his bad-faith strategy of defiance and contempt behind baseless, unfounded invocations of executive privilege and immunity that could not and would never apply to his situation.  The Committee sought documents and testimony from the Defendant pertinent to a matter of national importance – the circumstances that led to the violent attack on the Capitol on January 6, 2021, and the disruption of the peaceful transfer of power.  But the Defendant, like the rioters at the Capitol, put politics, not country, first, and stonewalled Congress's investigation.  The Defendant chose allegiance to former President Donald Trump over the rule of law even after being apprised that executive privilege would not excuse his default.  For his sustained, deliberate contempt of Congress, the Defendant should be sentenced to six months' imprisonment for each count—the top end of the applicable United States Sentencing Guidelines' range—and fined $200,000.

## PROCEDURAL BACKGROUND

As this Court is aware, and as elaborated below, on February 23, 2022, the Defendant defaulted on the Committee subpoena's demand for documents. ECF No. 1 (Indictment), ¶ 15. One week later, on March 2, he defaulted again, this time on the Committee subpoena's demand for deposition testimony. *Id.* ¶ 21. The United States House of Representatives voted on April 6, 2022, to hold the Defendant in contempt and referred his conduct to the United States Attorney for the District of Columbia as provided for by law. H. Res. 1037, 117th Cong. (2022). On June 2, 2022, a federal grand jury in the District of Columbia returned an indictment charging the Defendant with two counts of contempt of Congress, in violation of 18 U.S.C. § 192—one count for each of his willful defaults—*see* ECF No. 1, and on September 7, 2023, a federal petit jury found him guilty as charged, ECF. No. 128 (Verdict Form). The Defendant is scheduled to be sentenced on January 25, 2024.

## RELEVANT SENTENCING EVIDENCE

To determine an appropriate sentence, the Court may consider all evidence relevant to the conduct of conviction, including evidence not presented to the jury, without regard to the rules of admissibility at trial. *United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (citing *Rita v. United States*, 551 U.S. 338, 352 (2007)); U.S.S.G. § 6A1.3(a). The Court's findings of fact at sentencing are subject to clear error review. *United States v. Bikundi*, 926 F.3d 761, 796 (D.C. Cir. 2019).

At the Defendant's trial, the reason he willfully defaulted—that is, why he deliberately chose not to comply with the subpoena—was not relevant. Now, at sentencing, it is. The Court can and should consider the Defendant's motive as part of his history and characteristics, and as part of the nature and circumstances of the offense. *See Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) (confirming that "[t]he defendant's motive for committing the offense is [an] important

factor" to consider when imposing sentence). The factual record in this case is replete with proof that with respect to the Committee's subpoena, the Defendant consistently shielded his defiance behind claims of executive privilege he knew to be meritless, and did so because of his contempt for the Committee and its mission. The sentence imposed on the Defendant must vindicate the authority of Congress to investigate matters of national importance and demonstrate that attacks on Congress's lawful authority as a co-equal branch of government will not be tolerated.

## **The Defendant's Default**

On June 30, 2021, the U.S. House of Representatives established the Committee to investigate the facts, circumstances, and causes of the January 6, 2021, attack on the U.S. Capitol. Indictment, ECF No. 1, ¶¶ 1-3. The resolution establishing the Committee also tasked it with, at the conclusion of its investigation, making recommendations for corrective measures to protect the United States' democracy against future domestic attacks. *Id.* ¶ 4.

As part of its investigation, the Committee identified the Defendant as someone with information relevant to its inquiry. They did as much based on the Defendant's own public statements, and a book he had written about the 2020 election. Trial Ex. 2. As the Committee noted, the Defendant was willing to talk with many others about these issues – but not Congress. Ironically, the Defendant all but dared the Committee to issue the subpoena, taunting them, to do so, stating publicly that, "[t]hey don't want any part of me. I exonerate Trump and Bannon."[1]

On February 9, 2022, a Committee staff member emailed the Defendant and asked if the Defendant would accept service of a subpoena from the Committee by email. Trial Ex. 4 at 2.

---

[1] *See* Jose Pagliery, ''Trump Adviser Peter Navarro Lays Out How He and Bannon Planned to Overturn Biden's Electoral Win,'' The Daily Beast, (December 27, 2021), available at https:// *https://www.thedailybeast.com/trump-advisor-peter-navarro-lays-out-how-he-and-steve-bannon-planned-to-overturn-bidens-electoral-win* (last accessed January 17, 2024).

The Defendant responded within three minutes and stated only, "yes. no counsel. Executive privilege." *Id.* In other words, he decided to hide behind claims of privilege before even reviewing the subpoena. He had forecasted his disdain for the Committee, refusing to acknowledge that contempt of Congress was even a crime, tweeting on October 21, 2021, "[i]f contempt of Congress were a crime, 80% of America would be in jail. Bannon an American hero."[2]

Later that day, the staff member emailed the Defendant the subpoena at issue in this case. Trial Ex. 4 at 1. The subpoena required the Defendant to appear before the Committee on February 23, 2022, and produce various documents relating to the Defendant's role in the lead-up to and events of January 6, 2021, and also to appear on March 2, 2022, for deposition testimony. Trial Ex. 2. In a cover letter accompanying the subpoena, the Committee gave the Defendant some examples of why the Committee believed the Defendant had relevant information, including that it had been reported that the Defendant had worked with various individuals to change the outcome of the 2020 presidential election and that the Defendant had publicly repeated discredited claims of election fraud. *Id.*

Between the time the subpoena was served and the deadline for the document production on February 23, 2022, the Defendant did not communicate with the Committee in any way, and he did not produce a single document by the deadline.

On February 24, 2022, the staff member emailed the Defendant and confirmed he was in default of the subpoena's document demand. Trial Ex. 4. In the same email, the staff member also confirmed that the Defendant still was required to appear for his deposition and instructed the Defendant to contact the Committee to discuss the details. *Id.* The Defendant responded three

---

[2] *See* https://twitter.com/RealPNavarro/status/1451292969076727809?s=20&t=bkT-Ao30z9PrV5JNPad3HA (last accessed, January 16, 2024).

days later, after his default, and stated that former President Trump had "invoked Executive Privilege in this matter" and that he would not, therefore, comply.  Trial Ex. 5.  In response to the Defendant's email, the Committee rejected the Defendant's wholesale refusal to comply on executive privilege grounds, instructed him to appear for his deposition as required and, to the extent the Defendant believed there were privileged matters, to invoke privilege on a question-by-question basis. *Id.*

On February 28, 2022, the Defendant again refused to comply, asserting the "privilege is not mine to waive."  Trial Ex. 6.  Later that same day, the White House Counsel's Office sent the Defendant a letter, notifying him that President Joseph R. Biden had "determined that an assertion of executive privilege is not in the national interest, and therefore is not justified, with respect to the particular subjects within the purview of the Select Committee."  ECF 79-2.  After listing several of the subjects over which President Biden had decided not to invoke privilege, the letter continued:

> President Biden accordingly has decided not to assert executive privileged as your [sic] testimony regarding those subjects, or any documents you may possess that bear on them.  For the same reasons underlying his decision on executive privilege, President Biden has determined that he will not assert immunity to preclude you from testifying before the Select Committee.

*Id*.

Despite the letter from President Biden and an additional admonition to comply from the Committee on March 1, 2022, the Defendant did not appear as required for his deposition on March 2, 2022.  At no time did the Defendant provide the Committee with any evidence supporting his assertion that the former President had invoked executive privilege over the information the Committee's subpoena sought from the Defendant, or otherwise challenge the Committee's authority or composition.

**The Defendant's Motivation and Unfounded Executive Privilege Claims**

On August 17, 2022, the Defendant sought to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12 because "when a former president invokes Executive Privilege as to a senior presidential adviser, the adviser cannot thereafter be prosecuted."  ECF No. 34 at 17. As the *only* proof of former President Trump's invocation of executive privilege, the Defendant offered a November 20, 2021, press release by the former President, issued well over two months before the Committee even contacted the Defendant, and claimed it constituted an invocation of executive privilege over the information sought by the Committee's not-yet-issued subpoena.  ECF No. 34 at 5.

The Government responded to the Defendant's motion on August 31, 2022.  ECF No. 44. The Government agreed that it has been the Department of Justice's position that if a sitting president made a plausible assertion of privilege and directed a current adviser not to comply with a subpoena seeking testimony about presidential communications, the adviser is not in contempt of Congress, and the Executive Branch may not bring a contempt charge.  *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 at 102 (May 30, 1984).  But the Government noted the obvious: that those circumstances were not met with regard to the Defendant because, among other reasons, there had been no actual invocation of executive privilege as to the subpoena – which at all times the Defendant was well aware.

The Court first heard argument on the Defendant's motion on November 4, 2022. Throughout, the Court asked repeatedly for the Defendant to provide evidence of former President Trump's invocation of executive privilege.  *See, e.g.,* Hrg.  Tr. 11/4/22 at 8 ("So what I'm wondering is by – is there any other evidence other than that single statement in which you claim

the President of the United States invoked executive privilege as to Dr. Navarro with respect to this subpoena?").  The Court evaluated the parties' pleadings and made its factual findings: there was no invocation.  *See* Mem. Op., January 19, 2023, ECF No. 68 at 3-4.

Nevertheless, the Defendant continued to obfuscate – falsely arguing to the Court and the public that there had been an invocation of privilege, all while dodging inquiries about the specific details.   Following protracted litigation, the Court again held an evidentiary hearing on the Defendant's false executive privilege claims, including testimony from the Defendant, and again found that there was no invocation.  *See* Hrg. Tr. 8/30/23 at 24-25 ("The Court finds, based upon all of the evidence, including Dr. Navarro's testimony, that he has not carried his burden of establishing a formal claim of privilege from President Trump after his personal consideration of the Select Committee subpoena, or that President Trump had authorized him to make a determination about whether to invoke executive privilege with respect to the subpoena.").  As the Court emphasized, the Defendant presented nothing – no words from the former President, no "smoke signal" from any conversation nor anything conveyed by another – that would constitute an actual assertion of the privilege.  *See* Hrg. Tr. 8/28/23 at 102.  The Court was left with only the Defendant's fan fiction version of what the Defendant wished or hoped the former President might have wanted but left unsaid.

In short, the Defendant knew all along that the former President had not actually invoked executive privilege with regard to the information sought by the Committee's subpoena. At most, giving the Defendant the benefit of the doubt, one could speculate that while he knew that the former President had not invoked, the Defendant may have actually believed that the former President wanted the Defendant to nonetheless to make privilege claims.  But the Defendant's defiance, and his purported assertion of "executive privilege," began well before he could have

had any basis to assert it – and continued well after he had an opportunity to discuss the subpoena with the former President.

The Defendant's bad-faith invocation is belied by his own evidence.  He repeatedly cited a January 23, 2023, letter from lawyer for President Trump for support full well knowing that it lent none.  As this Court is aware, the letter states only that the Defendant, in general, "had an obligation to assert executive privilege," over *communications with the former President*.  ECF No. 71-1.  It does not suggest that this general obligation excused his compliance with the Committee's subpoena, nor does the letter contain evidence that former President Trump made a "formal claim of privilege" after "personal consideration" with respect to the Select Committee subpoena, in the manner this Court suggested would be required for an executive privilege assertion.  Mem.  Op. ECF No. 68 at 5.  It also does not state that former President Trump had or would have directed the Defendant not to comply with the subpoena's requirements altogether.  And, perhaps most importantly, the *Defendant has claimed that he never spoke directly with the former President* about his plans in the lead up to January 6, 2021 – information he freely shared with the press.[3]  In other words, his position was all along that there was no information over which the former President wanted him to assert privilege – because he did not have any communications with the President regarding the subpoena's topics.

---

[3] *See* Jose Pagliery, ''Trump Adviser Peter Navarro Lays Out How He and Bannon Planned to Overturn Biden's Electoral Win,'' The Daily Beast (December 27, 2021), available at https://www.thedailybeast.com/trump-advisor-peter-navarro-lays-out-how-he-and-steve-bannon-plannedto-overturn-bidens-electoral-win (last accessed January 17, 2024) (When asked if Trump himself was involved in the strategy [to stop the January 6 certification], Navarro said, "I never spoke directly to him about it.  But he was certainly on board with the strategy.  Just listen to his speech that day.  He'd been briefed on the law, and how Mike [Pence] had the authority to it.").  Certainly, the ability to probe the veracity of this statement was essential to the Committee's work and highlights the extent to which the Defendant's contempt thwarted it.

The Defendant now claims he has accepted responsibility for his conduct, but for his executive privilege-based legal challenge.  This flies in the face of the facts; he never accepted responsibility for his conduct, and his legal challenges were always predicated on false pretenses.  This begs the question: why did the Defendant do this?  The answer is clear.  Like Stephen Bannon before him, throughout the pendency of this case, the Defendant has exploited his notoriety—through courthouse press conferences, his books, and through podcasts—to display to the public the reason for his failure to comply with the Committee's subpoena: a disregard for government processes and the law, and in particular, the work of the Committee.

The Defendant wrote a book on the very topic that was the subject of the Committee's subpoena.  He was happy to tell the world what he knew – but not Congress.  He made his reasons for this abundantly clear – his placed his support for former President Trump over the rule of law: For example:

– He repeatedly refers to the Committee as a "kangaroo court" involved in what he describes as a witch hunt of the former President.[4]

– He remains in denial about the nature and scope of his conduct, going so far as to state in a post-verdict press conference that, "I was not tried for contempt of congress today. That's not what the trial was about. . . . I'm not here convicted because of contempt of congress.  I'm here because of association with J6."[5]

– He lamented in a fundraising email, "[w]hy do Nancy Pelosi and Joe Biden want to put Peter Navarro in prison now?  Because Peter is standing up to a Kangaroo Congressional Committee and standing tall for our Constitution, President Trump, and our country…."[6]

---

[4] *See, e.g.,* YouTube video, available at
https://m.facebook.com/85452072376/videos/766847251178208/?__so__=permalink&locale=hi
_IN (last accessed January 16, 2024).

[5] A YouTube video of the press conference is available at
https://www.youtube.com/watch?v=HCYqueidUEA (last accessed January 17, 2024).  This
particular statement can be found near the 5:10 mark.

[6]  *See* ECF No. 156 (Presentence Investigation Report) ("PSR") ¶ 88.

– In a June 1, 2022, opinion article in The Washington Times, titled, "Jan. 6 committee is a kangaroo committee," he accused the Committee of using unauthorized subpoenas, "clearly seeking to punish Mr. Trump and his most senior advisors."[7]

For all his complaints, not once did the Defendant raise any concerns about the Committee's constitution or legitimacy to the Committee itself. The Defendant's own statements prove that his contempt was not aimed at protecting executive privilege or the Constitution, rather it was aimed at undermining the Committee's efforts to investigate a historic attack on government.

## The Presentence Investigation

After the Defendant was found guilty, the Probation Office initiated its routine presentencing investigation in preparation for the sentencing hearing. *See* 18 U.S.C. § 3552(a); Fed. R. Crim. P. 32(c). For any defendant convicted of a federal offense and facing sentencing, that investigation typically includes a personal interview, *see* Fed. R. Crim. P. 32(c)(2), and an assessment of the defendant's financial condition, *see* Fed. R. Crim. P. 32(d)(2)(ii). For the Defendant's part, he cooperated in that investigation only insofar as it was convenient to his interests. He freely answered questions about his family, professional life, personal background, and health. But the Defendant refused to disclose his financial records, instead insisting that he is willing and able to pay any fine imposed. PSR ⁋ 85. The Probation Office's investigation of the Defendant's financial condition was, therefore, curtailed to commercially available and other public sources. *See id.* ⁋⁋ 84-86.

---

[7] *See* Peter Navarro, "Jan. 6 committee is a kangaroo committee," The Washington Times (June 1, 2022) (available at https://www.washingtontimes.com/news/2022/jun/1/jan-6-committee-is-a-kangaroo-committee/) (last accessed January 18, 2024).

## ALLOCUTION

The mandatory minimum sentence of one month in prison is insufficient to account for, punish, and deter the Defendant's criminal offenses. For each Count, the Court should instead impose a sentence of six months' imprisonment—the top end of the applicable Guidelines' advisory sentencing range—and fine the Defendant $100,000.

### Statutory Penalty

The first step in determining the appropriate sentence is to look to the statute of conviction itself. The plain terms of Section 192 require that the Defendant be sentenced to a term of imprisonment of at least one month for each count of conviction. *See United States v. Bloch*, 762 F. Supp. 2d 115, 123 (D.D.C. 2011) ("Congress expressly provided for a mandatory minimum sentence of one month, evidencing its intention to do so"); *see also United States v. Bannon*, 21-CR-670 (CJN) (transcript of sentencing hearing at 18-19) (attached as Exhibit 1) ("I hold that 2 U.S. Code Section 192 imposes a mandatory minimum sentence of incarceration of 1 month . . . ."); *United States v. Bloch*, 10-MJ-215, April 3, 2011 Mem. Op. and Order (RCL) at 10 (attached as Exhibit 2) ("The Court pauses here to note that 2 U.S.C. § 192 plainly states that misdemeanor Contempt of Congress is "punishable by a fine of not more than $1,000 nor less than $100 *and imprisonment in a common jail for not less than one month* nor more than twelve months.") (emphasis in original); U.S. Sent. Comm. 2011 Report to the Congress: Mandatory Minimum Penalties in the Fed. Crim. Justice System, Appendix A (noting that 2 U.S.C. § 192 requires mandatory term of one month's incarceration).[8] The terms of imprisonment may be imposed concurrently. *See* 18 U.S.C. § 3584. Although Section 192 provides for a maximum fine

---

[8]   Available at https://www.ussc.gov/research/congressional-reports/2011-report-congress-mandatory-minimum-penalties-federal-criminal-justice-system (last accessed January 18, 2024).

of $1,000, 18 U.S.C. § 3571(b) provides that the maximum fine for Class A misdemeanors is the greater of either the amount specified in the law setting forth the offense or $100,000.

Accordingly, the Court must sentence the Defendant to at least one month in prison on each count, which can be imposed concurrently, and the maximum fine for each count is $100,000.

## The Sentencing Guidelines

The next step in determining the appropriate sentence is to calculate the applicable advisory sentencing range under the United States Sentencing Guidelines (U.S.S.G. or "Guidelines"). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The Government agrees with the Probation Office that the applicable offense guideline is Section 2X5.2 and that the applicable sentencing range is 1 to 6 months, with a fine range of $1,000 to $100,000. *See* PSR ¶¶ 32-45.

To determine the applicable offense guideline, the Guidelines direct the Court to begin with the Statutory Index found in Appendix A. U.S.S.G. § 1B1.2(a). For violations of 2 U.S.C. § 192, the Statutory Index references Guidelines Sections 2J1.1 and 2J1.5. Because the Statutory Index specifies more than one offense guideline, "the court will determine which of the referenced guideline sections is most appropriate for the offense conduct charged." U.S.S.G. § 1B1.2, App. Note 1. Although neither offense guideline specifically addresses contempt of Congress, Section 2J1.1, which is captioned "Contempt," is akin to the Defendant's offense and most appropriate to address his conduct. Section 2J1.1 in turn directs that Section 2X5.1 be applied. *See* U.S.S.G. § 2J1.1, App. Note 1 ("Because misconduct constituting contempt varies significantly and the nature of the contemptuous conduct, the circumstances under which the contempt was committed, the effect the misconduct had on the administration of justice, and the need to vindicate the authority of the court are highly context-dependent, the Commission has not provided a specific guideline for this offense."). Because Section 2X5.1 applies only to felony offenses, however, and a

violation of Section 192 is a Class A misdemeanor, the application notes for Section 2X5.1 in turn indicate that Section 2X5.2 should be applied.  *See* U.S.S.G. § 2X5.1, App. Note 3.  Applying Section 2X5.2, as did the Probation Office, an offense level of 6 applies to both counts of conviction in this case before any adjustment for Zero-Point Offender status.  Applying the § 4C1.1 Adjustment, the total offense level is 4, and the advisory sentencing range is 1 to 6 months.  PSR ¶¶ 32-45; *see also* U.S.S.G. §§ 5G1.1(b), (c)(2) (explaining that a statutory mandatory-minimum sentence—here, one month—shall establish the bottom-end of the applicable range).

The Court should also reject the Defendant's assertion that he is entitled to credit for acceptance of responsibility.  *See* PSR at 25-26.  To be entitled to a reduction for acceptance of responsibility, the Guidelines require that the Defendant "clearly demonstrates" his acceptance.  U.S.S.G. § 3E1.1(a); *see also United States v. Dozier*, 162 F.3d 120, 128 (D.C. Cir. 1998) ("To qualify for an adjustment, a defendant must 'clearly' accept responsibility for his crime; it is not enough that he arguably do so.").

And it is a "rare situation" in which a two-level reduction is appropriate, where, as here, the defendant goes to trial.  U.S.S.G. § 3E1.1, App. Note 2; *see United States v. Thomas*, 97 F.3d 1499, 1500 (D.C. Cir. 1996) ("Defendants who . . . force the government to trial are not ordinarily entitled to the benefit of U.S.S.G. § 3E1.1.").  "The key, according to the application note 2, is whether the defendant 'puts the government to its burden of proof at trial by denying the essential factual elements of guilt,' in which case the adjustment does not apply, or whether the defendant goes to trial to 'preserve issues that do not relate to factual guilt,' in which case the defendant remains eligible for the adjustment."  FED. SENT. L. & PRAC. § 3E1.1 (2023 ed.).

Here, the Defendant denied an essential element of his guilt – namely that he willfully failed to comply with the lawfully issued subpoena.[9]  And a defendant, who challenges whether he had the intent required to commit the offense, contests a factual element of the offense and thus is acting in a manner inconsistent with acceptance of responsibility.  *United States v. Mikutowicz* is instructive.  365 F.3d 65 (1st Cir. 2004).    In *Mikutowicz*, the First Circuit held that the district court had clearly erred when it found that the defendant had accepted responsibility, where the defendant had "admitted the actus reus of his crimes prior to trial.  He admitted establishing offshore bank accounts, taking deductions from AGM for 'services' provided by Ellis, diverting the deducted monies to the offshore accounts, and not paying taxes on the diverted funds. *However, Mikutowicz remained steadfast that his conduct was not 'willful*' . . . .".   *Id.* at 76 (emphasis added); *see also United States v. Baucom*, 486 F.3d 822, 830 (4th Cir.2007) (holding that the district court clearly erred in granting a § 3E1.1 adjustment because the defendants did not proceed to trial solely to preserve their constitutional challenge to the validity of the tax code, but also contested the element of willfulness to challenge their factual guilt); *United States v. Gilbertson*, 435 F.3d 790, 799 (7th Cir.2006) (upholding denial of § 3E1.1 adjustment where defendant went to trial to contend he lacked requisite intent); *United States v. Roy*, 375 F.3d 21,

_____

[9] *See, e.g.*, Def's Closing Argument, 9/7/23 Transcript at 646 ("Because if the government has failed to prove beyond a reasonable doubt that Dr. Navarro's failure to comply with this subpoena was the result of inadvertence, accident, or mistake, then they haven't met their burden."); at 649 ("Where was Dr. Navarro on March 2nd, 2022?  We don't know.  The government provided no evidence about that. Do we know that his failure to comply beyond a reasonable doubt was the result of accidents, inadvertence, or mistake?"); at 650 ("So why didn't the government – why didn't the government present evidence to you about where Dr. Navarro was or what he was doing?"); at 650-51 ("Why hasn't the government told you where he was?  And as a result, ladies and gentlemen, the government has failed to prove beyond a reasonable doubt that Dr. Navarro's failure to comply was not the result of accident, inadvertence, or mistake."); *see also* CNN post Sep. 7, 2023 (Defendant stated: "the reality here is the government has not proved his [sic] case") https://www.cnn.com/2023/09/07/politics/peter-navarro-contempt-of-congress-january-6-committee-subpoena/index.html (last accessed January 17, 2024).

25 (1st Cir.2004) (upholding denial of § 3E1.1 adjustment based on defendant's "continued insistence that he acted without the requisite criminal intent").

Furthermore, the Defendant's claim for acceptance of responsibility is contradicted by his conduct during and after the offense.  Not once since he was served by the Committee with a subpoena for documents and testimony did the Defendant, up to and including through his guilty verdict (or prior to the Committee being disbanded), undertake any effort to comply with his obligations under the law.  The Defendant never offered to produce a single document or endeavored to appear for the deposition as required.   The Defendant has expressed no remorse for his conduct and attacked others at every turn.  There can be no doubt that were the Defendant again placed under subpoena by a future Congress, he would likewise again refuse to comply if it served the political interests of his allies and patrons.  The Defendant's conduct establishes that his fealty is not to his legal obligations nor our constitutional order.  The Court should reject the Defendant's request to be credited with acceptance of responsibility that he has never shown.

In sum, the Court should accept the Government's and Probation Office's recommendation that Section 2X5.2 applies and the base offense level is 6.  Accounting for the new Zero-Point Offender adjustment, the offense level is reduced by two levels to 4, and the applicable advisory sentencing range is 1 to 6 months' imprisonment and a fine of $1,000 to $100,000.

## The Statutory Sentencing Factors

The final step in determining the appropriate sentence is to consider the various factors set forth in 18 U.S.C. § 3553(a), *see Gall*, 552 U.S. at 49-50, including the nature, circumstances, and seriousness of the offense; the history and characteristics of the Defendant; the need to promote the rule of law and provide just punishment; the need to afford adequate deterrence; and the need

to avoid unwarranted sentencing disparities.  Those factors, which are addressed *in seriatim*, all support a Guidelines-compliant sentence at the top of the advisory sentencing range.

### *The Nature, Circumstances, and Seriousness of the Offense*

The nature and circumstances of the offense support a top-end Guidelines sentence.  Even before he was served with the subpoena, the Defendant had decided he would not comply with it.  After receiving the subpoena, and learning it sought the same information he had published in a book (and in his own words, information he had not discussed with the former President), he refused to comply with it.  From the time he was initially subpoenaed, the Defendant has shown that his true reasons for total noncompliance have nothing to do with his purported respect for the Constitution, the rule of law, or executive privilege, and everything to do with his personal disdain for the Committee and their effort to investigate the attack on our country's peaceful transfer of power.  The Defendant attempted to hide his disregard for the Committee's lawful authority behind the baseless assertion of executive privilege in which he persisted despite the Committee's straightforward and clear admonishments that he was required to comply.  There is nothing in the Defendant's background or history that excuses or justifies his behavior.

The seriousness of the offense also merits a top-end Guidelines sentence.  The Defendant's contempt was directed at a congressional committee convened to investigate a violent attack on the United States Capitol—the worst such assault since a foreign military descended upon the Capitol in 1814—and an unprecedented effort to reverse a presidential election and stop the peaceful transfer of power.  The Defendant's abject refusal to heed the Committee's subpoena, under the circumstances with which this country is confronted, could not be more serious.

### *The History and Characteristics of the Defendant and the Need for Specific Deterrence*

The need for specific deterrence requires the Court to sentencing the Defendant at the top of the applicable Guidelines.  The Defendant has continued to show his disdain for the lawful processes of our government system, refusing to provide financial information to the Probation Office so that it can properly evaluate his ability to pay a fine.  Rather than disclose his financial records, a requirement with which every other defendant found guilty of a crime is expected to comply, the Defendant informed Probation that he would prefer instead to pay a fine.  So be it. This Court should require the Defendant to comply with the bargain he proposed when he refused to answer standard questions about his financial condition.  The Court should impose a $100,000 fine on both counts.

There also can be no doubt that faced with a Congressional subpoena seeking information on a topic with which he meets with disdain, the Defendant would reoffend, given his refusal to even acknowledge the criminality of contempt.  This Court's sentence must provide a clear message to the Defendant that his contemptuous conduct stops here.  Given this and all the other factors discussed herein, only a sentence at the top end of the Guidelines will be sufficient but not greater than necessary to accomplish this.

### *The Need to Provide for Adequate General Deterrence and to Promote the Rule of Law*

A top-end Guidelines sentence is necessary to provide adequate general deterrence and promote the rule of law.  The Defendant thumbed his nose at the Committee from the moment he was served with a subpoena; he never intended to, or even tried, to comply with his obligations under the law.  Such behavior cannot be tolerated, lest it become commonplace and accepted, and the important work of congressional committees like the Select Committee rendered impossible. And, while the Committee's work has ended, there will be more congressional investigations in

the future. A sentence of incarceration is mandatory, and imposing a sentence above the minimum, at the top of the Guidelines, will reinforce to future subpoena recipients their legal obligations. Moreover, sentencing the Defendant to a term of imprisonment at the top end of the Guidelines will promote public confidence by demonstrating that individuals who commit crimes will be held accountable, regardless of their own influence and prominence and that of their allies.

### The Need to Avoid Unwarranted Sentencing Disparities

A sentence of imprisonment is mandatory, and a term at the top end of the Guidelines will avoid unwarranted disparities between the Defendant and other congressional contemnors. There are only a few cases in which defendants have been charged with willfully defaulting on a subpoena and convicted after trial, like the Defendant was here. But in those few cases, each has been sentenced to a period of incarceration. First, in perhaps the most analogous case – *United States v. Bannon*, a sentence of four months was imposed. *See* Bannon Judgment and Commitment Order, at 3 (attached as Exhibit 3).     And Bannon, unlike the Defendant, engaged with the Committee, and intermittently at least suggested that under certain circumstances he might comply with the obligations of the subpoena he received. The sentences in other congressional contempt cases are also consistent with a top of the Guidelines sentence. Peter Licavoli, for example, was sentenced to six months' imprisonment for his refusal to testify in response to a congressional subpoena. *See* "Racket Figure Gets Contempt Sentence," N.Y. Times, Apr. 15, 1960, *available at* https://www.nytimes.com/1960/04/15/archives/racket-figure-gets-contempt-sentence.html     (last accessed Jan. 18, 2024). In *United States v. Tobin*, the defendant was sentenced to thirty days for not providing certain documents in response to a subpoena. 195 F. Supp. 588, 617 (D.D.C. 1961). Notably, however, the defendant in that case, unlike the Defendant here, had previously voluntarily provided some records and was acting on clear directions not to comply from the sitting governors

of two states which controlled the subpoenaed entity for which the defendant worked.  *Id*. at 596.
The defendant also offered at sentencing to provide the records he previously had withheld.  *Id*. at
617.   The Defendant here, by contrast, has never taken a single step to comply with the
Committee's subpoena and has acted in bad faith throughout by claiming he was merely acting on
former President Trump's instructions—even though former President Trump's attorney made
clear he was not.  A sentence equal to what the court ordered in *Tobin*—the minimum allowed
under Section 192—would not reflect, therefore, the more contemptuous conduct at issue in this
case.  And any sentence below the six-month sentence imposed in *Licavoli* would similarly fail to
account for the full extent of the Defendant's deliberate conduct.

Moreover, several defendants who did appear in response to subpoenas and were convicted
with contempt for refusing to answer some—but not all—questions posed have been sentenced to
terms of imprisonment ranging from six months to a year.  *See, e.g.*, *Hutcheson v. United States*,
369 U.S. 599, 599 (1962) (defendant sentenced to six months' imprisonment on eighteen counts
of contempt of Congress for refusing to answer eighteen questions); *Yellin v. United States*, 287
F.2d 292, 294 (7th Cir. 1961) (defendant sentenced to one-year terms of imprisonment, concurrent,
on four counts of contempt of Congress for refusing to answer four questions); *United States v.
Seeger*, 303 F.2d 478, 480 (2d Cir. 1962) (defendant sentenced to one-year terms of imprisonment,
concurrent on ten counts of contempt of Congress for refusing to answer ten questions).  The
Defendant's outright refusal to produce a single document or even appear at all is far more
contemptuous than the conduct of defendants who appeared and refused to answer a few of several
questions posed.  Under these circumstances, the Defendant's total noncompliance warrants a
sentence of incarceration at the top end of the Guidelines.

## CONCLUSION

The rioters who overran the Capitol on January 6, 2021, did not just attack a building—they assaulted the rule of law upon which this country was built and through which it endures.  By flouting the Committee's subpoena and its authority to investigate that assault, the Defendant exacerbated that assault, following the attack on Congress with his rejection of its authority.  He unlawfully withheld documents and testimony that could have advanced the Committee's authorized investigation to get to the bottom of what led to January 6 and ascertain what steps must be taken to ensure that it never happens again.  That cannot be tolerated.  Respect for the rule of law is essential to the functioning of the United States government and to preserving the freedom and good order this country has enjoyed for more than two centuries.  The Defendant's bad-faith strategy of defiance and contempt deserves severe punishment.  This Court should impose a sentence of six months' imprisonment, reflecting the most severe Guidelines-compliant punishment available, and fine the Defendant $200,000.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/Elizabeth Aloi
        Elizabeth Aloi, D.C. Bar No. 1015864
        John Crabb Jr.
        Assistant United States Attorneys
        Fraud, Public Corruption, and Civil Rights Section
        United States Attorney's Office

        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-7212 (Aloi)
        elizabeth.aloi@usdoj.gov