UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL NO. 22-cr-200 (APM) |
| v. : | |
| : | |
| PETER K. NAVARRO, : | |
| : | |
| **Defendant.** : | |

**UNITED STATES' REPLY TO
DEFENDANT NAVARRO'S SENTENCING MEMORANDUM**

Defendant Navarro's sentencing memorandum is replete with false and misleading characterizations of the law and the facts of this case. The Government responds herein.

**I.    Section 192 requires that the Defendant be incarcerated for at least one month.**

The Defendant was convicted of violating 2 U.S.C. § 192, which provides that he be "imprison[ed] in a common jail for not less than one month." The Defendant argues that the Court is not required to impose the mandatory minimum sentence, as provided for by Section 192, for two reasons: (1) "a common jail" either no longer exists or, if it exists, it did not exist when the statute was enacted; and (2) the government has somehow waived application of the mandatory minimum sentence. Neither of the Defendant's arguments is valid. First, the term "common jail" is neither as mysterious nor archaic as the Defendant imagines; it is a term of art for a place of incarceration, often used for petty or misdemeanor offenses, such as Section 192. Second, the Defendant's concept of "desuetude" is not supported by the applicable law.

    **a.    The phrase "common jail" is a term of art; not the designation of a specific place of incarceration.**

Section 192 was enacted on January 24, 1857. Thirty-Fourth Congress, Session III, Chap. XIX, at 155-56 (attached as Ex. A). As originally enacted, Section 192 provided for imprisonment

in "*the* common jail." *Id.* at 156 (emphasis added).  Subsequently, on June 22, 1938, Section 192 was amended.[1]  Public Laws, Ch. 593 & 594, at 942-43 (attached as Ex. B ).  The amended Sec. 192 provided for "imprisonment in *a* common jail for not less than one month."  *Id.* at 942 (emphasis added).

The term "a common jail" does not designate a specific place of incarceration; instead, it connotes a type of facility used for incarceration.[2]  Requiring imprisonment in a "common jail" has also been used to denote a petty offense.  *See, e.g., Duke v. United States*, 301 U.S. 492 (1937).  In *Duke*, the Supreme Court was called upon to determine if a certain misdemeanor constituted a petty offense, such that it could be charged by information.  *Id.* at 493.  To make this determination, the Supreme Court relied on "Section 335 of the Criminal Code" which defined felonies and misdemeanors.  *Id.* at 494.  The Supreme Court noted that Section 335 had been amended in 1930 (8 years before Sec. 192 was amended),

> by adding the following proviso: 'Provided, That all offenses the penalty for which does not exceed *confinement in a common jail*, without hard labor for a period of

---

[1]  Accordingly, the Defendant's prolix review of locations of incarceration used prior to 1938 is of no moment. *See, e.g.*, Def. Sent. Mem. at 16 (Arsenal Penitentiary, *circa* 1831), (Old Capitol Prison, 1861-67), *id.* at 17 (Albany Penitentiary, used in "ancient time[s]").

[2]  This is illustrated by the fact that, when Congress amended Section 192 in 1938, it changed the article introducing "common jail" from the definite "the" to the indefinite "a." The 1938-Amendment of Section 192 also changed the prosecuting authority to whom a contempt referral should be made from "the district attorney for the District of Columbia" (Ex. A) to "the appropriate United States Attorney"  Ex. B, further demonstrating that the term "common jail" does not refer to a specific carceral facility in the District of Columbia.  In sum, "common jail" refers to a type of facility – not a specific facility.  *See, e.g., Rattley v. Irelan*, 197 F.2d 585, 587 (D.C. Cir. 1952) (noting the "baneful effect of keeping young, first-offenders in a *common jail* in company with case-hardened criminals") (emphasis added); *Barkman v. Sanford*, 162 F.2d 592, 594 (5th Cir. 1947) ("An impecunious accused, unable to furnish bail, should not be required to languish in the common jail"); *United States v. Perez*, No. 95-0818, 1996 WL 790810 (C.A.A.F. Sept. 30, 1996) ("the evil of police confining citizens in a common jail without the benefit of a judicial officer considering the facts and evidence to determine if probable cause exists"); *United States ex rel Yaris v. Shaughnessy*, 112 F. Supp. 143, 143 (S.D.N.Y. 1953) (emphasis added) (the Federal Detention Headquarters in New York City which *serves as the common jail* for federal offenders").

>six months, or a fine of not more than $500, or both, shall be deemed to be petty offenses; and all such petty offenses may be prosecuted upon information or complaint.

*Id.* (emphasis added). The Supreme Court explained that the statute was amended "to bring about a subdivision of misdemeanors by creating a class of misdemeanors of minor gravity to be known as petty offenses . . . ." *Id.*; *see also Brown v. United States*, 748 F.3d 1045, 1052 n.18 (11th Cir. 2014) ("A petty offense was defined as any offense 'the penalty for which does not exceed *confinement in a common jail*, without hard labor for a period of six months, or a fine of not more than $500, or both.' Act of Dec. 16, 1930, ch. 15, 46 Stat. 1029, 1029–30.") (emphasis added); 3C Fed. Prac. & Proc. Crim. App. C (2023 ed.), Appendix C. Federal Rules of Criminal Procedure for The United States District Courts, With Advisory Committee Notes ("A petty offense is an offense the penalty for which does not exceed confinement in *a common jail* without hard labor for a period of six months or a fine of $500, or both, 18 U.S.C. former § 541 [now § 1].") (emphasis added); 24 A.L.R. 1002 (Originally published in 1923) ("Both those offenses are punishable by only six months' confinement *in the common jail*, and we have held that they are properly noninfamous offenses.") (emphasis added).

In 1948, Congress redefined "petty offense," by codifying a simplified definition in 18 U.S.C. § 1(3). Act of June 25, 1948, ch. 645, 62 Stat. 684. Congress again redefined "petty offense" in 1984. Criminal Fine Enforcement Act of 1934, Pub. L. No. 98-596, § 8, 98 Stat. 3134, 3138, amended section repealed by Sentencing Reform Act of 1984, Pub. L. No. 98-473, § 218(a)(1), 98 Stat. 1987, 2027 (effective Nov. 1, 1987). Finally, for offenses committed after November 1987, there is no longer a "petty offense" category in the federal criminal code. Although 18 U.S.C. § 19 is entitled "Petty offense defined," that section references 18 U.S.C. §

3


3571. *See* Alan L. Adlestein, A CORPORATION'S RIGHT TO A JURY TRIAL UNDER THE SIXTH AMENDMENT, 27 U.C. Davis L. Rev. 375, 458 (1994).

Additionally, the term "common jail" has largely, but not entirely, been replaced by the term "imprisonment" since detainees' places of confinement are designated by the Attorney General:

> Confinement in common jail.-Word "imprisonment" in paragraph (3) was substituted for "confinement in a common jail", since it is unnecessary to describe the place of confinement in view of section 4082 of his title, which provides that all persons convicted of an offense against the United States shall be committed for such terms of imprisonment as the court may direct, to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinement where the sentences of all such persons shall be served.

1970 Edition V.4 Titles 16-18 4150 (1970) Sections 1 – 2, Revisor's Notes at 4151 (attached as Ex. C).

Jails and penitentiaries are different types of carceral facilities. *See, e.g.*, *Weil v. Gov't of Canal Zone*, 42 F.2d 448, 449 (5th Cir. 1930) ("Canal Zone has a penitentiary and also common jails."). Accordingly, Section 192's reference to "a common jail" simply means that the Defendant is to be incarcerated for at least one month in a facility akin to a jail as opposed to a penitentiary.

Principles of statutory construction also require this result. "The point of the old-soil principle is that 'when Congress employs a term of art,' that usage itself suffices to '"adop[t] the cluster of ideas that were attached to each borrowed word"' in the absence of indication to the contrary." *George v. McDonough*, 596 U.S. 740, 753 (2022); *see also Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken."). Suggesting otherwise clearly flies in the face of Congressional intent.

4

### b. Defendant's concept of "desuetude" is baseless.

The Defendant claims that the statutorily prescribed mandatory minimum sentence should not be imposed based on what he describes as the "concept of desuetude." Def. Sent. Mem. at 20-21. The Defendant's position has no basis in law. Even assuming arguendo that the statutorily prescribed mandatory minimum sentence has not previously been sought by the government, that would be of no moment. "The failure of the executive branch to enforce a law does not result in its modification or repeal. *The repeal of laws is as much a legislative function as their enactment*." *D.C. v. John R. Thompson Co.*, 346 U.S. 100, 113–14 (1953) (emphasis added and citations omitted)[3]; *see also In re Mosaic Mgmt. Grp., Inc.*, 22 F.4th 1291, 1321 (11th Cir.), abrogated on other grounds by *Siegel v. Fitzgerald*, 596 U.S. 464 (2022) ("inaction by an arm of another branch of government, tasked with administering or enforcing a law, does not modify legislation enacted by Congress"); *United States v. Morrison*, 686 F.3d 94, 106 (2d Cir. 2012) (same).[4]

---

[3] *But see Poe v. Ullman*, 367 U.S. 497, 511–12 (1961) ("These, then, are the circumstances in which the Court feels that it can, *contrary to every principle of American or English common law*, go outside the record to conclude that there exists a 'tacit agreement' that these statutes will not be enforced.") (emphasis added). *Poe*, which addressed enjoining the enforcement of Connecticut's prohibition on the use of contraceptives, *id*. at 498, should not, however, be construed as having overturned *Thompson, Co.,* 346 U.S. 100, sub silentio. *See, e.g., Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority sub silentio.").

[4] The cases relied upon by the Defendant do not support his position: (1) *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2610 (2022), addressed the scope of regulatory authority – it did not endorse modification of legislation by the executive inaction; (2) *United States v. Elliott*, 266 F. Supp. 318, 326 (S.D.N.Y. 1967), held that "non-use alone does not abrogate a statute"; (3) *United States v. Agriprocessors, Inc.*, No. 08-CR-1324 (LRR), 2009 U.S. Dist. LEXIS 64592, *53-53, 57 (N.D. Iowa July 27, 2009), declined to apply the concept of desuetude, which had not even been raised by the parties; and (4) *Wright v. Crane*, 13 Serg. & Rawle 220, 228 (Pa. 1825), a 199 year-old-case apparently dealt with the state offense of being a "common scold." In fact, the authority cited by the Defendant betrays the weakness of his position.

**II.     The Defendant did not accept responsibility for his conduct but for his legal challenges.**

The Defendant incorrectly argues, at 9, that he is entitled to two points off the applicable Guidelines range for acceptance of responsibility and suggests that his purported willingness to waive a jury trial for what he describes as a "stipulated bench trial" demonstrates as much. That alone is insufficient. *See United States v. Thomas B. Adams Jr.,* No. 21-CR-354 (APM), 2024 WL 111802, at *2 n.1 ("The court denied Defendant acceptance-of-responsibility points due to public statements made after his stipulated trial, which the court deemed inconsistent with his factual admissions.").

As was clear by the defense presented at trial, the Defendant was never willing to stipulate that his default was willful and not by accident. Faced with this reality, the Defendant disregards his own advocacy, and claims disingenuously that the sole reason his default was not willful was because he understood that the former President had invoked privilege. He does this, despite well settled law on what it means to be willful for the purpose of the contempt statute that requires his guilt even were this true.[5] The D.C. Circuit has rightly rejected application of U.S.S.G. § 3E1.1,

---

[5] The law on willfulness is settled in this Circuit. *See Licavoli v. United States*, 294 F.2d 207, 208 (D.C. Cir. 1961) ("[H]e who deliberately and intentionally fails to respond to a subpoena 'willfully makes default.'") (citations omitted), 209 (holding that a defendant's good-faith reliance on counsel's advice that the law excuses compliance does not "immunize a deliberate, intentional failure to appear pursuant to a lawful subpoena lawfully served"); *see also* ECF No. 68 at 30 (Opinion denying Defendant's Motion to Compel) ("The Government is correct that *Licavoli* forecloses a defense premised solely on Defendant's claimed belief that President Trump's invocation of executive privilege excused his nonappearance…"). Moreover, the Circuit's decision in *Licavoli* is rooted in Supreme Court authority, *see United States v. Bryan*, 339 U.S. 323, 330 (1950) (finding defendant's intentional refusal to produce records in response to a congressional subpoena was willful default even where the defendant claimed to the congressional committee at the time of refusal that she was following the advice of her counsel); *United States v. Fleischman*, 339 U.S. 349, 356-57 (1950) (finding defendant "willfully made default" by failing to produce records in her joint—even if not exclusive—control); *Sinclair v. United States*, 279 U.S. 263, 299 (1929) ("There is no merit in appellant's contention that he is entitled to a new trial because the court excluded evidence that in refusing to answer he acted in good faith on the advice of

6

when a defendant admits to conduct, but not the requisite mens rea. *See United States v. Kirkland*, 104 F.3d 1403, 1406 (D.C. Cir. 1997) ("It may be that a situation could be presented in which an entrapment defense is not logically inconsistent with a finding of a defendant's acceptance of responsibility, even though we doubt it… but certainly defense counsel's argument before the district court did not raise it.  All that he claimed, which caused the district judge to label the argument absurd, was that a finding of acceptance of responsibility could and should rest *only* on defendant's admission that he performed the acts in question; that defendant contested an element of the crime-intent-did not undermine his claim. We think the district court was clearly correct (not just lacking clear error) in rejecting such an argument.").

Taken together, Defendant's trial arguments and public statements make clear he has not accepted responsibility for his conduct.  Certainly, the Defendant has not demonstrated any remorse, a key factor for this Court's consideration under U.S.S.G. § 3E1.1. *See In re Sealed Case*, 350 F.3d 113, 117 (D.C. Cir. 2003) (evaluating defendant's acceptance of responsibility); *United States v. Jones*, 997 F.2d 1475, 1478 (D.C. Cir. 1993) ("Reflecting the same principles as the case law, the sentencing Guidelines identify 'voluntary and truthful admission to authorities' and the 'timeliness of the defendant's [remorseful or helpful] conduct' as indicia of acceptance of responsibility and as therefore pertinent to whether the court should allow the defendant the two-point reduction.").  Not only has the Defendant expressed no remorse, but he has not engaged in "helpful," conduct, instead obfuscating the issues before this Court by suggesting the former President had invoked privilege, when he so clearly had not.

---

competent counsel. . . . His mistaken view of the law is no defense."), *overruled on other grounds*, *United States v. Gaudin*, 515 U.S. 506 (1995), and is not the subject of contrary authority in any other circuit.

7

As the D.C. Circuit as found, "[t]he acceptance of responsibility provisions of the Guidelines are very explicit, that simply an admission of guilt is not sufficient… [O]ne of the requirements is that there be a voluntary *and truthful* admission of the related conduct." *United States v. Taylor*, 937 F.2d 676, 679 (D.C. Cir. 1991) (internal citations omitted) (emphasis added). The Defendant, by repeatedly refusing to acknowledge that he was not actually directed to invoke executive privilege, has not advanced a truthful account of his conduct. He should not be rewarded with the two-points off for acceptance. *Id.* at 680–81 (D.C. Cir. 1991) ("It was not error for the district court to require an acceptance of responsibility that extended beyond the narrow elements of the offense.").

### III. There is no legal basis to release the Defendant during the pendency of his meritless appeal.

Federal law requires that a criminal defendant "who has been found guilty of an offense and sentenced to a term of imprisonment" be detained during the pendency of his appeal, unless the defendant can establish (A) by clear and convincing evidence that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released, and (B) "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal." 18 U.S.C. § 3143(b)(1). It is the latter factor—whether the Defendant's appeal raises a substantial question of law or fact likely to result in reversal—on which the Defendant's motion clearly fails.

In assessing the likelihood of success on appeal, the Defendant's conviction is presumed valid; the Defendant bears the burden of establishing otherwise. *See United States v. Perholtz*, 836 F.2d 554, 555-56 (D.C. Cir. 1988) ("The law has shifted from a presumption of release to a presumption of valid conviction."); *see also United States v. Shoffner*, 791 F.2d 586, 589 (7th Cir. 1986) (finding that a defendant must "demonstrate that he has a substantial question to present [on

8

appeal] before he may be admitted to bail"); *accord United States v. Libby*, 498 F. Supp. 2d 1, 4 (D.D.C. 2007). To overcome that presumption, a defendant must show that his or her appeal presents "a close question or one that very well could be decided the other way." *Perholtz*, 836 F.2d at 556. This "close question" standard is "more demanding" than one that requires the inquiry to be "fairly debatable," "fairly doubtful," or simply "not frivolous." *Id*. at 555. The Defendant plainly has not met his burden with regard to either his executive privilege or purported political bias claims.

> **a. The Defendant's executive privilege claims do not raise a substantial question of law or fact likely to result in a reversal.**

The Defendant's forthcoming appeal rests on his baseless assertion that the former President asserted privilege over the information sought by the Committee's subpoena, and that this is a legal defense to his complete default. Not so. Even had the former President invoked executive privilege – and he did not – that would not excuse the Defendant's wholesale default on either count of conviction.

Within mere moments of receiving it, the Defendant told the Committee that he would not comply with its subpoena because of executive privilege, and acted as though he possessed both blanket testimonial immunity from appearing at all and some unstated shield from producing a single document. But as it relates to the subpoena received by the Defendant, a former aide to a former president, the only type of potentially applicable executive privilege at issue, had it actually been asserted, would be the presidential communications privilege.[6] That privilege is limited to

---

[6] The deliberative process privilege is not relevant here as the Supreme Court has only recognized the authority of a former President to invoke the presidential communications privilege under certain circumstances. *See GSA*, 433 U.S. 425 (1977). Moreover, the deliberative process privilege only covers information that is pre-decisional – *i.e.*, that was prepared to assist government decisionmakers in arriving at decisions – and deliberative in the sense of reflecting the give-and-take of the consultative process antecedent to such decisions. The Committee gave

9

communications "made in the process of arriving at *presidential* decisions." *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997) (emphasis added); *see also Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1 (1999) (Att'y Gen. Reno) (concluding that the President could assert executive privilege to protect information concerning deliberations regarding his decision whether to offer clemency); *In re Sealed Case,* 121 F.3d at 752 (noting that the presidential communications privilege covers not only communications directly with the President about his own governmental decision-making but also "communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate"). It may be asserted by both current and former Presidents; neither did in connection with the Defendant's subpoena.

Here, the Defendant never spoke with the former President about the Committee's subpoena, and the January 23, 2023, letter from former President Trump's attorney merely states that the Defendant should have asserted privilege with respect to his communications with former President Trump himself. There was no suggestion of an invocation at all with respect to the Defendant's communications with third parties. Indeed, the Committee informed the Defendant that most of the information it was seeking did not concern communications he took in his capacity as presidential adviser at all, but instead related to matters undertaken in his personal capacity with persons outside the government. And as noted in the Government's Sentencing Memo, the Defendant himself has claimed never to have spoken with the former President about the topics the Committee wanted to discuss, nor about the documents he was called to produce. Thus, there

---

no indication that it was asking the Defendant for information that would satisfy that description with respect to any executive branch decision-making.

is no world in which executive privilege could justify a complete default with respect to either Count of conviction, nor a world in which any reasonable person could have thought so.

With respect to Court Two, the Department of Justice has made clear that testimonial immunity should apply *only* with respect to questions seeking information from a close presidential adviser concerning "matters that occur[red] during the course of discharging [the adviser's] official duties." *See* Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena, 38 Op. O.L.C. 5 at 7 (July 15, 2014) ("Simas Opinion"); *Testimony Before Congress of the Former Counselor to the President*, 43 Op. O.L.C. _ (2019) ("McGahn Opinion") at 19; Conway Opinion at 1. Arguably, no president, current or former, would have the authority to make a categorical invocation of testimonial immunity over all the information sought by the Committee from the Defendant because most of the information the Committee sought did not concern matters that occurred in the course of the Defendant's discharge of his governmental duties.

For example, the subpoena sought, among other things, "all documents and communications relating in any way to protests, marches, public assemblies, rallies, or speeches in Washington, D.C. on November 14, 2020," and "all communications, documents and information that are evidence of the claims of purported fraud in the three-volume report you wrote, *The Navarro Report*." *See* Ex 1 at 19-20.

Defendant was a trade adviser, and responsible in part for the Trump administration's response to the Coronavirus crisis. In contrast, the Select Committee subpoena sought information wholly related to the attack on the Capitol on January 6, 2021, and the threat to the peaceful

transition of power between administrations.[7] As with the alleged assertion of executive privilege, any such assertion of testimonial immunity therefore would have been germane only (at most) to the Defendant's testimony about a fraction of the subjects about which the Committee informed him it wished to inquire at the deposition.

Accordingly, a reasonable assertion of executive privilege or testimonial immunity, had one actually occurred, could not have been grounds for the Defendant to refuse to testify altogether; instead, the most it would have justified would have been an assertion of privilege at the former President's request regarding particular documents or testimony seeking information about communications between the Defendant and the former President himself (or, in the case of a proper immunity assertion, about testimony concerning matters related to the Defendant's official duties). Therefore, even if the Defendant could establish that former President Trump instructed him to assert privilege as to *all* questions that might be asked of him at the deposition, such an assertion would not have been proper. It follows that such an assertion could not preclude the Defendant's conviction on Count Two of the Indictment.[8] But of course, the record is devoid of

---

[7] Given his own assertions to the contrary, mostly notably in the press releases accompanying the release of his "reports," it is not credible to believe that the Defendant thought the subpoena related exclusively to his official responsibilities. *See, e.g.*, ECF No. 79-4 (Press Release).

[8] Moreover, as previously briefed, because the Defendant failed to raise an immunity claim with the Committee, he is not allowed to invoke testimonial immunity before this Court or the Court of Appeals after the fact to foreclose prosecution for a violation of Section 192. Such argument has been waived. *See United States v. Bryan*, 339 U.S. 323, 330-34 (1950) ("[I]f respondent had legitimate reasons for failing to produce the records of the association, a decent respect for the House of Representatives, by whose authority the subpoenas issued, would have required that she state her reasons for noncompliance upon the return of the writ. . . . To deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of authority and an obstruction of its processes." (citation omitted)); *Hutcheson v. United States*, 369 U.S. 599, 608-611 (1962) (stating that a constitutional objection "must be adequately raised before the inquiring committee if [it] is to be fully preserved for review in this Court. To hold otherwise would enable a witness to toy with a congressional committee in a manner obnoxious to the rule that such committees are entitled to be clearly apprised of the grounds on which a witness asserts a right of

any assertion at all. As the Defendant's own testimony at a pretrial hearing made clear, even the Defendant's conversation with the former President included nothing – not even a wisp – that could constitute an actual invocation of executive privilege.

Finally, with respect to Court One, no authority exists that suggests a witness could have absolute immunity from producing documents. The OLC opinions on testimonial immunity address only immunity from compelled testimony, and OLC has specifically explained that the doctrine does not apply to subpoenas for documents. Simas Opinion at 9. *See also* ECF No. 96 at 4 ("The claimed assertion of testimonial immunity is relevant only to Count Two"). The rationales for such immunity do not justify any categorical rule with respect to a subpoena for documents and, in any event, such a rule is foreclosed by the Court of Appeals' decision in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc) (rejecting absolute immunity over compulsory process demanding physical items). The differing treatment of testimony and documents is consistent with the logic and holdings of these Office of Legal Counsel opinions, as many of the arguments advanced in support of testimonial immunity – such as the difficulty of trying to parse in real time which questions would elicit privileged information – do not apply when considering a request for documents.

All OLC opinions available at the time of the Defendant's default concluded that, under certain circumstances, upon a proper invocation of executive privilege, a presidential adviser may withhold specifically identified privileged documents from his or her subpoena response. No OLC opinion concluded that a presidential adviser may ignore a subpoena's demand for documents

---

refusal to answer." (internal citations omitted)); *McPhaul v. United States*, 364 U.S. 372, 378-79 (1960) (finding that the defendant could not raise a defense that he did not possess subpoenaed records because he had never made the claim before the issuing committee).

altogether.[9] Testimonial immunity and executive privilege do not provide a defense for the Defendant's complete failure to produce a single document in response to the Committee's document demand. Because the Defendant's executive privilege challenge could not disturb the conviction on Count One, for this reason alone, the Defendant's request for release pending appeal should be denied.

### b. The Defendant's unsubstantiated allegations of bias do not disturb his conviction.

The second meritless argument the Defendant attempts to advance his claim that his appeal is likely to succeed is a personal attack on the prosecution team. These allegations, wholly untethered to fact or law, reveal only desperation. As this Court as already ruled, the Defendant has offered no evidence of selective prosecution or political bias. *See* ECF No. 68 at 25 - 30 (denying selective prosecution claims for the second time). Nor is it political bias to decry false claims; even former Attorney General Barr agrees there was no widespread election fraud.[10] Plain and simple, the Defendant was prosecuted because of his contemptuous conduct, and must now face the consequence of thumbing his nose at the rule of law.[11]

---

[9] *See* Olson Memo; Assertion of Executive Privilege With Respect to Clemency Decision, 23 Op. O.L.C. 1 (1999); Immunity of the Former Counsel to the President From Compelled Congressional Testimony, 31 Op. O.L.C. 191, 192 (2007); Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena, 38 Op. O.L.C. 5 (July 15, 2014); McGahn Opinion.

[10] *See, e.g.,* Bustillo, Ximena, "Barr calls Trump's fraud claims 'detached from reality' in Jan. 6 panel testimony." (National Public Radio, June 13, 2022) available at https://www.npr.org/2022/06/13/1104634760/barr-trump-detached-from-reality-jan-6 (last accessed January 21, 2024).

[11] The Defendant's claim that the government "betrayed its motive at trial when it improperly associated Dr. Navarro's prosecution with the events of January 6, 2021, is unfounded. Def. Sent. Mem. at 27-28 (citing government's opening statement). The Court has already ruled that the government's reference to the January 6, 2021 attack on the Capitol was proper: "[T]his clearly relates to pertinency and the issue of whether his testimony was pertinent to what Congress was investigating. . . . And if it was framed in that way, I think it's appropriate; it's not prejudicial;

### III.     Conclusion

As this Court has repeated noted, "[e]xecutive privilege is an extraordinary assertion of power and 'not to be lightly invoked.'" *See, e.g.,* Hrg. Tr. 8/30/23 at 6. The Defendant makes a mockery of the institution of the presidency when he insists that executive privilege principles shield his misconduct.  The Defendant's contempt deprived the public and Congress of a full accounting of what led to the riot at the Capitol on January 6, 2021, as part of efforts to prevent disruptions of the peaceful transfer of power.  Such conduct is, at its core, an assault on our democracy.  For the Defendant's contempt of Congress's execution of one of its most solemn duties, he deserves the maximum sentence under the applicable Sentencing Guidelines.  For the foregoing reasons, and those set forth the Government's Sentencing Memorandum, the Court should sentence the Defendant to 6 months' incarceration on each count of conviction, the maximum fine, and order him to report to the Bureau of Prisons.

---

and, *frankly, ultimately accurate insofar as what the Committee was trying to obtain and determine and what his role and the information that he had would play in that process . . . ."*  9/6/23 a.m. transcript at 379-80 (emphasis added).

                    Respectfully submitted,

                    MATTHEW M. GRAVES
                    United States Attorney
                    D.C. Bar No. 481052

By:    */s/*
        Elizabeth Aloi, D.C. Bar No. 1015864
        John Crabb Jr.
        Assistant United States Attorneys
        Fraud, Public Corruption, and Civil Rights Section
        United States Attorney's Office

        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-7212 (Aloi)
        elizabeth.aloi@usdoj.gov